PETER S. LUBIN (*pro hac vice*)
 psl@ditommasolaw.com
**DITOMMASO LUBIN**
17W200 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Telephone:  (630) 333-0000

KATRINA CARROLL (*pro hac vice*)
kcarroll@litedepalma.com
**LITE DEPALMA GREENBERG, LLC**
211 W. Wacker Drive, Suite 500, Chicago, IL 60606
Telephone: (312) 750-1265

STEPHEN J. SIMONI (Bar No. 284558)
 StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS**
       **CLASS ACTION LAW OFFICES**
12131 Turnberry Drive, Suite 100
Rancho Mirage, CA 92270-1500
Telephone:  (917) 621-5795

CHAD C. AUSTIN (Bar No. 235457)
 ChadCAustin@gmail.com
**LAW OFFICE OF CHAD C. AUSTIN**
4632 Berwick Drive
San Diego, CA  92117
Telephone:  (619) 992-7100

*Counsel for Plaintiff Matthew Donaca
and the Proposed Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW DONACA, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LIFEWATCH, INC. | No.  EDCV-13-02064 (JGB) (SPx) <br><br> **DECLARATION PURSUANT TO L.R. 79-5.2.2(b)** <br><br> **Hearing:  Aug. 22, 2016** <br> **Time:     9:00 a.m.** <br> **Before:  Hon. J.G. Bernal** |

1

Defendant.

STEPHEN J. SIMONI, being over eighteen years of age, hereby declares under the penalties of perjury:

1.      I am admitted to the California Bar and represent Plaintiff Matthew Donaca and the Proposed Class in the above-captioned case.

2.      I submit this Declaration pursuant to L.R. 79-5.2.2(b).

3.      Defendant Lifewatch, Inc. ("Lifewatch") has designated the February 19, 2014 deposition of Sarai Baker ("Baker Tr."), taken in the matter *Life Alert Emergency Response, Inc. v. Connect America.com, LLC*, No. CV 13/03455 JAK (SSX) (C.D. Cal.), as "Attorney's Eyes Only" pursuant to the Stipulated Protective Order (Dkt. 43) entered in this litigation on January 7, 2015.

4.      Plaintiff Matthew Donaca ("Plaintiff") relies on various excerpts of Ms. Baker's deposition transcript in support of his Renewed Motion for Class Certification.  Specifically, Plaintiff references the below excerpts from Ms. Baker's deposition in his (i) memorandum of support of his renewed motion for class certification and (ii) Exhibit PX 29 to the Simoni Declaration filed in support of the class certification memorandum, as well as (iii) attaches the below excerpts of Ms. Baker's deposition as Exhibit PX 2 to the Simoni Declaration filed in support of the class certification memorandum:

2

| | | |
|---|---|---|
| 26:22-27:5 | 79:19-80:3 | 121:3-12 |
| 27:23-28:3 | 80:7-17 | 122:5-13 |
| 58:18-59:8 | 85:8-14 | 122:16-25 |
| 63:8-10 | 94:3-13 | 124:19-25 |
| 65:15-18 | 101:23-102:41 | 127:6-22 |
| 73:15-74:19 | 104:5-109:1 | 128:6-18 |
| 77:3-6 | 109:13-15 | 176:9-12 |

5.    Plaintiff also relies on additional excerpts from Ms. Baker's deposition, but these "additional" excerpts are publicly available as part of the record on appeal in *Life Alert Emergency Response, Inc. v. Lifewatch, Inc.*, No. 14-55930 (9th Cir.) and, accordingly, do not implicate L.R. 79-5.2.2.(b).  These publicly-available excerpts are as follows:

| | |
|---|---|
| 41:2-42:2 | 48:8-14 |
| 42:7-11 | 150:17-158:22 |
| 44:10-15 | |

6.    Plaintiff's counsel contacted  Lifewatch's counsel via e-mail seeking permission to publicly file and utilize the "Attorney's Eyes Only" materials. Counsel spoke promptly thereafter, and Lifewatch's counsel agreed to review the deposition excerpts at issue.

7.    Lifewatch's counsel was not amenable to waiving the "Attorney's Eyes Only" designation.

3

8.      A true and correct copy of the REDACTED VERSIONS OF

DOCUMENTS PROPOSED TO BE FILED UNDER SEAL are attached hereto as

Exhibit A.

9.      A true and correct copy of the UNREDACTED VERSIONS OF

DOCUMENTS PROPOSED TO BE FILED UNDER SEAL are attached hereto as

Exhibit B.

Date:  June 7, 2016                        Respectfully submitted,


By: ____/s/[1] Stephen J. Simoni__
STEPHEN J. SIMONI (Bar No. 284558)
StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS**
**CLASS ACTION LAW OFFICES**
12131 Turnberry Drive, Suite 100
Rancho Mirage, CA 92270-1500
Telephone:  (917) 621-5795


By: ____/s/ Chad C. Austin_____

CHAD C. AUSTIN (Bar No. 235457)
ChadCAustin@gmail.com
**LAW OFFICE OF CHAD C. AUSTIN**
4632 Berwick Drive
San Diego, CA  92117
Telephone:  (619) 992-7100
Facsimile:  (858) 712-0316


By: ____/s/ Katrina Carroll__

---

[1] In accordance with Local Rule 5-4.3.4(a)(2)(i), the ECF/CM filer, Stephen J. Simoni, attests that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

4

1

2       KATRINA CARROLL (*pro hac vice*)
        kcarroll@litedepalma.com
3       **LITE DePALMA GREENBERG, LLC**
        211 West Wacker Drive
4       Suite 500
        Chicago, IL 60606
5       Telephone:  (312) 750-1265
6
7       By: ____/s/ Peter S. Lubin__
        psl@ditommasolaw.com
8       **DITOMMASO LUBIN**
        17W200 22nd Street, Suite 410
9       Oakbrook Terrace, IL 60181
        Telephone:  (630) 333-0000
10
11
12      *Counsel for Plaintiff Matthew
        Donaca and the Proposed Class*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

1   STEPHEN J. SIMONI (Bar No. 284558)
2    StephenSimoniLAW@gmail.com
    **SIMONI CONSUMERS**
3   **CLASS ACTION LAW OFFICES**
4   12131 Turnberry Drive, Suite 100
    Rancho Mirage, CA 92270-1500
5   Telephone:  (917) 621-5795

6
    *Attorney for Plaintiff Matthew Donaca*
7   *and the Proposed Class*

8   *(Additional Counsel on Signature Page)*

9             UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
10

11  MATTHEW DONACA, individually      No. EDCV-13-02064 (JGB) (SPx)
    and on behalf of all others similarly
12  situated,                         **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF**
13            Plaintiff,              **RENEWED MOTION FOR CLASS**
                                       **CERTIFICATION**
14       v.

15  LIFEWATCH, INC.

16            Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

598257.2

# **TABLE OF CONTENTS**

**Pages(s)**

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD .............................................................................................. 5

ARGUMENT ............................................................................................................ 6

I.   LW Is Vicariously Liable for the Acts of Its Telemarketers .......................... 6

    1.   LW's Telemarketers Sell Medical Devices on Behalf of and for the Benefit of LW and LW Controls its Telemarketers ............................. 8

        a.   "On Behalf of and for the Benefit of" ....................................... 8

        b.   LW Controls Its Telemarketers ................................................ 10

    2.   LW's Feigned Ignorance is Unpersuasive ........................................... 12

II.  The Proposed Class is Readily Ascertainable ............................................. 15

III. The Class Satisfies Rule 23(a) ................................................................... 18

    A.   Numerosity ......................................................................................... 18

        1.   The Only Plausible Explanation is that the Vast Majority of LW's Customers Became Customers Because of Robo-Calling ............................................................................. 19

        2.   The Class is Geographically Diverse ....................................... 23

        B.   Commonality ............................................................................ 24

        C.   Typicality ................................................................................. 25

        D.   Adequacy .................................................................................. 27

IV.  The Class Satisfies Rule 23(b)(3) ............................................................. 29

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    A.    Predominance ....................................................................... 29

    B.    Superiority ............................................................................ 32

CONCLUSION ................................................................................... 34

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>                                                                                   <u>Pages(s)</u>

3

4

*Bee, Denning, Inc. v. Capital All. Group*,
    No. 13-cv-2654-BAS-WVG, 2015 U.S. Dist. LEXIS 129495

5

    (S.D. Cal. Sept. 24, 2015) ........................................................................ 7, 33, 34

6

*Bishop v. Saab Auto. A.B.*,
    No. CV 95-0721 JGD (JRx), 1996 U.S. Dist. LEXIS 22890 (C.D. Cal. Feb. 16,

7

    1996) ...................................................................................................................... 6

8

*Booth v. Appstack, Inc.*,
    No. C13-1533JLR, 2015 U.S. Dist. LEXIS 40779

9

    (W.D. Wash. Mar. 29, 2015) ............................................................................... 7

10

*Ellis v. Costco Wholesale Corp.*,

11

    657 F.3d 970 (9th Cir. 2011) ........................................................................... 6, 7

12

*FTC v. Lifewatch Inc.*,

13

    No. 15 C 5781, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016)....*passim*

14

*Gen. Tel. Co. of the Sw. v. Falcon*,

15

    457 U.S. 147 (1982) ...........................................................................................24

16

*Grant v. Capital Mgmt. Servs., L.P.*,

17

    449 F. App'x 598 (9th Cir. 2011) ...................................................................... 31

18

*Haley v. Medtronic, Inc.*,
    169 F.R.D. 643 (C.D. Cal. 1996) ......................................................................19

19

*Hanlon v. Chrysler Corp.*,

20

    150 F.3d 1011 (9th Cir. 1998) ............................................................... 27, 29, 30

21

*Hanon v. Dataproducts Corp.*,

22

    976 F.2d 497 (9th Cir. 1992) ............................................................................ 26

23

*In re: Cathode Ray Tube Antitrust Litig.*,
    No. ALL DIRECT ACTION CASES MDL NO. 1917, JAMS REF. No.

24

    1100054618, 2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013)..........19

25

26

*In re Conagra Foods, Inc.*,

27

    90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................................. 6

28

*In re DISH Network, L.L.C.*,
    28 FCC Rcd. 6574 (2013) ................................................................ 7

*International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson*,
    102 F.R.D. 457 (N.D. Cal. 1983) ................................................... 16

*Kamar v. Radio Shack Corp.*,
    254 F.R.D. 387 (C.D. Cal. 2008) .................................................. 30

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ......................................................... 32

*Keegan v. Am. Honda Motor Co.*,
    284 F.R.D. 504 (C.D. Cal. 2012) .................................................. 16

*Knutson v. Schwan's Home Serv., Inc.*,
    2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) ....................... 17

*Lamumba Corp. v. City of Oakland*,
    No. C. 05-2712 MHP, 2007 U.S. Dist. LEXIS 81688
    (N.D. Cal. Nov. 2, 2007) ............................................................... 16

*Life Alert Emergency Response, Inc.  v. Connect America.com LLC*,
    601 Fed. Appx. 469 (9th Cir. Feb. 4, 2015) ................................... 8

*Lushe v. Verengo Inc.*,
    No. CV 13-07632 AB (RZ), 2015 U.S. Dist. LEXIS 16961
    (C.D. Cal. Feb. 2, 2015) ................................................................. 7

*Maddock v. KB Homes, Inc.*,
    248 F.R.D. 229 (C.D. Cal. 2007) .................................................. 29

*Makaron v. GE Sec. Mfg.*,
    No. CV-14-1274-GW(AGRx), 2015 U.S. Dist. LEXIS 75240
    (C.D. Cal. May 18, 2015) ............................................................... 7

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ......................................................... 24

*McCrary v. Elations Co.*,
    No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443
    (C.D. Cal. Jan. 13, 2014) ......................................................... 16, 18

iv

*McFarland v. Memorex*,
   96 F.R.D. 357 (N.D. Cal. 1982) ................................................................ 30

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007) ............................................................... 26

*Meyer v. Portfolio Recovery Assocs.*,
   707 F.3d 1036 (9th Cir. 2012) ................................................................... 31

*Pecover v. Elec. Arts Inc.*,
   No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632
   (N.D. Cal. Dec. 21, 2010) ......................................................................... 24

*Perez-Olano v. Gonzalez*,
   248 F.R.D. 248 (C.D. Cal. 2008) ................................................................. 6

*Rannis v. Recchia*,
   380 Fed. Appx. 646 (9th Cir. 2010) ........................................................... 19

*Rodriquez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2009) ................................................................... 27

*Singer v. Becton Dickinson & Co.*,
   No. 08-CV-821 - IEG (BLM), 2009 U.S. Dist. LEXIS 114547
   (S.D. Cal. Dec. 9, 2009) ........................................................................... 30

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..................................................................... 28

*United States v. Bonds*,
   608 F.3d 495 (9th Cir. 2010) ....................................................................... 7

*Vandervort v. Balboa Capital Corp.*,
   287 F.R.D. 554 (C.D. Cal. 2012) ............................................................... 33

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .............................................................................. 24

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ................................................................... 27

*Wolin v. Jaguar Land Rover N. Am., L.L.C.*,
   617 F.3d 1168 (9th Cir. 2010) ................................................................... 33

v

1

**Statutes**

2

47 U.S.C. § 227 ....................................................................... 1, 6, 30, 31, 34

3

105 Stat. 2394 § 2(10) ............................................................................ 6

4

**Other**

5

Fed. R. Civ. P. 23(a) .................................................................... 5, 18, 27

6

Fed. R. Civ. P. 23(b) ....................................................................... *passim*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

This case arises from a massive, unsolicited robo-call campaign designed to sell Defendant Lifewatch, Inc.'s ("LW") medical alert systems. The campaign involves millions of automated telephone calls all made without prior express consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

Indeed, LW is no stranger to litigation relating to its robo-calling activities. In addition to other private lawsuits and government enforcement actions brought against LW, in 2014 the Federal Trade Commission and the Attorney General of Florida filed suit against LW and its CEO, Evan Sirlin, in the Northern District of Illinois (the "FTC matter"), alleging that LW was liable for telemarketing improprieties including robo-calling, Do Not Call violations and caller ID "spoofing." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *3-4 (N.D. Ill. Mar. 31, 2016) ("FTC Opinion" or "FTC Op."). Because these violations are ongoing, the plaintiffs sought a preliminary injunction in late 2015.

***That injunction was granted on March 31, 2016***, after a full hearing and based on an extensive record. An injunction was necessary ***this year***, the Hon. Gary Feinerman held, despite LW's assertion that the evidence against it was too old to demonstrate continuing misconduct. FTC Op. at *8-9.

Just like LW argued in connection with Plaintiff's first class certification motion in this case, LW asserted two defenses to liability in the FTC matter, both

1

ultimately rejected: (1) LW argued that it is not legally responsible for its telemarketers' misconduct because they are independent of LW, they sell medical alert devices to companies other than LW, and LW purchases accounts on a "non-exclusive basis"; (2) LW argued that its past misconduct has been remedied and that its new quality control program ensures that current telemarketers are legally compliant. *Id*. at *4-6.

Judge Feinerman found both of these arguments wholly unpersuasive. Based on his review of the voluminous record, the court made the following factual findings:

- Judge Feinerman reviewed evidence in connection with the *Worldwide* litigation, filed on January 6, 2014, where LW's telemarketers were accused of robo-calling and Do Not Call violations. The court determined that LW was the defendants' "sole medical alert client" (*id*. at *9); that LW "paid $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013" (*id*.); that "the weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products" (*id*. at *13), and; "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct" (*id*. at *14).

- Judge Feinerman rejected Mr. Sirlin's attempt to plead ignorance of the Worldwide defendants' robo-calling on LW's behalf, stating "the court does not

2

find that testimony credible." *Id*. at *16.

• Judge Feinerman rejected LW's contention that it was not responsible for the telemarketer's scripts, citing the FTC's evidence of call scripts filed in connection with LW's Florida telemarketing licensing (*id*. at *16-17) and the 2012-2014 Florida filings of LW's telemarketers (*id*. at *20).  The court concluded that Mr. Sirlin "essentially ***conceded*** that Lifewatch was responsible for misrepresentations in the script." *Id*. at *17-18 (emphasis added).

• The court conducted an exhaustive analysis of the evidence adduced by the FTC to demonstrate the ongoing nature of LW's misconduct, including: evidence in 2014 relating to the FTC's "honeypot," a system set up to catch illegal telemarketing; evidence derived from the FTC's Consumer Sentinel database of consumer complaints of robo-calls and Do Not Call violations ***as recent as June 16, 2015*** (655 specific complaints named LW); and complaints to the Better Business Bureau ***as recent as February 17, 2015***.  *Id*. at *22-27.

• The court considered "declarations, telephone transcripts, and live testimony" illustrating over fifty consumer experiences with LW's telemarketers. *Id*. at *27-35.

• The court found LW's evidence of its compliance program and the testimony of LW Director of Operations, Sarai Baker, as "lacking in credibility." *Id*. at *36.

• Judge Feinerman found it "telling" that, despite LW's alleged enforcement

3

measures, "Lifewatch does not currently provide sales scripts to its telemarketers and does not review or approve the scripts they use." *Id*. at *37-38.  The court found Mr. Sirlin's testimony on this point "unpersuasive" and "Lifewatch's ostrich-like approach … extremely troubling." *Id*. at *39.

- Further evidence adduced by FTC investigator Menjivar reveals ***16,937 DNC and robo-call complaints involving numbers associated with LW's current telemarketers***. *Id*. Judge Feinerman thus found that LW's current telemarketers were no more likely to follow the law than the ones previously shut down.  *Id*. at *39-40.

- Judge Feinerman determined that "the evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers." *Id*. at *48. Citing declarations of LW former employees and emails from LW's ***current*** Call Center Liaison, Lauren Vandewater, the court found that, the telemarketers "are principally acting on Lifewatch's behalf… as Lifewatch's agents." *Id*. at *51.

Judge Feinerman's factual findings were carefully made on largely the same record Plaintiff puts before this Court.[1]  Based on that record, Plaintiff Matthew

---

[1] Rather than detailing the overwhelming volume of evidence against LW in numbered paragraph form in the accompanying Simoni Declaration, Plaintiff has attached to that Declaration as Exhibit PX29 a Fact Chart (cited herein as "PFC") summarizing relevant evidence with reference to each exhibit. Plaintiff believes the PFC will be helpful to the Court in analyzing the entire universe of documents and their applicability to each class certification factor.

4

Donaca ("Plaintiff") now asks this Court to certify a class as follows:

> **Proposed Class:** All individuals in the United States whose identity can be ascertained through Lifewatch's records and who received one or more phone calls directed to a telephone number assigned to a residential landline service using an artificial or prerecorded message made by, on behalf of, or for the benefit of Lifewatch from October 16, 2013 through the present.

On February 1, 2016, the Court denied Plaintiff's initial bid for class certification. ECF Doc. 77. In its Order, the Court focused primarily on Plaintiff's failure to: (1) set forth an ascertainable and appropriately numerous class and method for identifying its members; and (2) submit sufficient evidence that telemarketers were placing the calls on behalf of and for the benefit of LW. As explained below, Plaintiff's new Proposed Class is limited to a discrete and identifiable class of people, all of whom can be linked to LW and contacted directly. In doing so, Plaintiff has addressed the Court's concerns and class certification should be granted.

## LEGAL STANDARD

Under Rule 23(a), the party seeking class certification must demonstrate four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Additionally, Rule 23(b)(3)—the prong under which Plaintiff seeks to certify the Class here—requires Plaintiff to show that "questions of law or fact common to the members of the class predominate over

5

any questions affecting individual members, and [that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed. R. Civ. P. 23(b)(3). "The named plaintiffs must also demonstrate that the class is ascertainable." *Bishop v. Saab Auto. A.B.*, 1996 U.S. Dist. LEXIS 22890 *9-10 (C.D. Cal. Feb. 16, 1996).

In determining class certification, the court does not make findings of fact, and does not draw any ultimate conclusions on the plaintiff's claims. *In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 965 (C.D. Cal. 2015). And, while the certification analysis must be "'rigorous,'" and "may 'entail some overlap with the merits of the plaintiff's underlying claim' … Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980-81 (9th Cir. 2011) (citations omitted). Indeed, "the evidence only needs to enable the court to make a 'reasonable judgment' that Rule 23 requirements have been met." *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 255 (C.D. Cal. 2008). As fully explained below, the Proposed Class should be certified.

## ARGUMENT

### I.  LW Is Vicariously Liable for the Acts of Its Telemarketers

Congress enacted the TCPA after finding that robo-calls are a serious problem that, pose a nuisance and invade the privacy of telephone subscribers nationwide. *See* TCPA, 47 U.S.C. § 227 note; *see also* 105 Stat. 2394 § 2(10).

6

Congress granted a private right of action for victims, 47 U.S.C. § 227(b), and courts have routinely certified classes to remedy TCPA violations.[2]

In order to prevent the exact conduct at issue in this case – where businesses hire others to obscure the ultimate source of robo-call marketing– the FCC ruled that companies are vicariously liable for calls made on their behalf. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 6588 (2013).[3]  As this Court has recently recognized, "the standard for classical agency under the TCPA is no different from the federal common law standard applied in any other context…."  *Lushe v. Verengo Inc.*, 2015 U.S. Dist. LEXIS 16961, at *3 (C.D. Cal. Feb. 2, 2015).  *See also Makaron v. GE Sec. Mfg.*, 2015 U.S. Dist. LEXIS 75240, *15 (C.D. Cal. May 18, 2015) (sellers can be vicariously liable for TCPA violations under agency principles).  A key requirement of classic common law agency is that the principal is "in control" of the agent's actions. *See United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010).

---

[2] *See, e.g., Booth v. Appstack, Inc.*, 2015 U.S. Dist. LEXIS 40779, *34-35 (W.D. Wa. Mar. 29, 2015) (certifying a class of plaintiffs who alleged that defendants made or benefitted from robo-calls); *see also Bee, Denning, Inc. v. Capital Alliance Group*, 2015 U.S. Dist. LEXIS 129495, *38 (S.D. Cal. Sept. 24, 2015) (granting class certification in a TCPA case and ruling that "[w]ithout the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.").

[3] *See also id*. at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.").

7

Notably, both the Ninth Circuit and the Northern District of Illinois, in issuing its March 31, 2016 injunction, have specifically rejected LW's contention that it cannot be liable for its "rogue" telemarketers. *Cf. Life Alert Emergency Response, Inc. v. Connect America.com LLC*, 601 Fed. Appx. 469, 474 (9th Cir. 2015) ("The district court did not buy this story of telemarketers-gone-rogue, and neither do we."); FTC Op. at *51 (citing *Life Alert*, and stating that "[t]he same holds true here").

### 1. LW's Telemarketers Sell Medical Devices on Behalf of and for the Benefit of LW and LW Controls its Telemarketers

Here, there is no question that robo-calls made by LW's telemarketers were on behalf of, and for the benefit of, LW and that LW controlled them. The record is replete with evidence showing that this misconduct was continuing throughout the Class Period, and was so pervasive and egregious that a ***2016 injunction*** was necessary. *See generally* FTC Op.; PFC #1-13. As illustrated in the PFC, the robo-calling was done on behalf of and for the benefit of LW, and LW was intimately involved in the entire process:

### a. "On Behalf of and for the Benefit of"

- Telemarketers sold LW's medical alert devices on behalf of and for the benefit of LW during the Class Period. PFC #1-8. By way of example, in October 27, 2014, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that

8

"Lifewatch is over all of us." PFC #1. In a January 15, 2015 call, a "Senior Life Support" telemarketer represented that "all of the products are from Lifewatch," and "we sell for them." PFC #3; *see also* PFC #2, 4-7 (telemarketers linking sales companies and products to LW or confirmatory sales calls from LW).

- The products described by the telemarketers during the Class Period are linked to LW by price, charged-by designation, and description.   PFC #22-24. Telemarketers advised the consumers of the precise payment, that the charge would appear under the name "Lifewatch," and that the products say "Lifewatch, USA."  PFC #22-23.

- The telemarketing calls during the Class Period involve ***live transfers*** directly to LW's verification department or company.   PFC #25-31   (examples of live transfers).    Given the live transfer of sales calls, LW's assertion that telemarketers were not selling exclusively to LW is baseless and not credible.[4]

- LW admits that it ***currently has 7 telemarketers*** and that, during the live transfer process, ***it does nothing to confirm that robo-calling, misrepresentations or DNC violations are not occurring*** because, per LW,  "that would probably be confusing." PFC #34, 79, 119.

---

[4] Mr. Sirlin testified at the December 2015 FTC hearing that, in his opinion,  a telemarketer could simply real-time transfer calls to another medical alert company by pushing a different button.  PFC #32.  But, when asked about the basis for this opinion, Mr. Sirlin confirmed that it was pure speculation on his part because he has "seen phones, not from telemarketers, that .. can transfer and switch calls."  *Id.*

9

- LW- not the telemarketer- takes all customer payments and, in turn, LW pays telemarketers commissions for each customer generated. *See, e.g.,* PFC #65-68 (LW pays telemarketers); PFC #69-70 (every card goes through LW account).

- LW profits and generates substantial revenues derived from robo-calling. PFC #85. By way of example, During the Class Period, from ***January through August of 2014***, LW earned almost ***six million dollars*** from monthly fees paid by consumers. *Id.* For the same time period, LW earned ***over thirteen million dollars*** from the sale of customer accounts, as reflected on a Profit and Loss statement produced to the FTC by Lifewatch. *Id.*

### b.    LW Controls Its Telemarketers

- There is ample evidence of knowledge and control by LW based on its communications and interactions with former employees and competitors, and emails by current employees and its telemarketers that show that LW has controlled and continues to control its telemarketers during the Class Period. PFC #9-21.

- LW has at least one dedicated employee—a "Call Center Liaison"—who is ***currently*** responsible for reviewing sales calls and communicating with telemarketers. PFC #35-38.

- LW communicates with telemarketers regarding the contents of their calls, including reviewing their calls, advising them on what they can and cannot say,

10

and editing telemarketing scripts.  PFC #35 (telemarketer sending sales script to LW liaison for review); PFC #36 (LW liaison attaches edited sales script); PFC #37  (LW liaison instructing telemarketers as to what they should or should not say).  *See also* PFC #39  (Baker testimony indicating LW is in direct contact with its telemarketers regarding the content of sales calls); PFC #41  (Baker communicated with telemarketer TMI regarding "pricing, product info, CRM data entry, commissions, order fulfillment, customer-related issues.").

- LW has an "outside seller compliance" program through which it communicates with and controls its telemarketers.  PFC #43.  LW submitted "**copies of all sales scripts given to those soliciting for LW**" **"copies of all sales information or literature we provide our salespeople or of which we inform our salespeople (including, but not limited to, scripts, outlines, instructions and information regarding how to conduct telephonic sales, sample introduction, sample closings, product information and contest or premium award information"** (emphasis added) in connection with its Florida telemarketing license **in 2012, 2013 and 2015**, each signed by Evan Sirlin.  PFC #16.

- LW also provided its telemarketers a "Call Center Welcome Package" during the Class Period, which was also attached to LW's license applications. Among other things, the package includes an "Up-sell Script," rebuttal scripts, and a product explanation of "how things work." In the "Quality Control" section of

11

the package, it states that "**Scripts and Rebuttals must be approved by Lifewatch-USA.**" PFC #17.

- Some of LW's telemarketers who sought licenses in Florida also included copies of LW's Call Center Welcome Package and proposed scripts as part of their applications in the Class Period. *See, e.g.,* PFC #19.  Others attached scripts and other LW documents linking them directly to LW during the Class Period. *Id.*

- LW had its own internal Do Not Call list, which confirms LW's awareness of and complacency in the robo-calling done on its behalf.  PFC #73-74.

Indeed, there is no question that the rampant robo-calling was conducted on LW's behalf and that LW directed and controlled the campaign.

## 2.    LW's Feigned Ignorance is Unpersuasive

Any attempt by LW to feign ignorance of its robo-calling scheme is simply not credible (as the Northern District of Illinois just found in March). *See, e.g.*, FTC Op., at *16 (rejecting Mr. Sirlin's attempt to plead ignorance of the Worldwide robo-calling on LW's behalf stating "the court does not find that testimony credible."); *id*. at *39 (finding Mr. Sirlin's testimony "unpersuasive" concerning LW's contention that it does not review or approve scripts and finding "Lifewatch's ostrich-like approach … extremely troubling.").

The record is also riddled with inconsistencies, conflicting testimony, and completely unbelievable explanations by Sarai Baker, LW's Director of Operations. For example:

12



13



14

Indeed, the evidence of LW's culpability in this case is overwhelming and LW's protestations of ignorance are not believable.

## II.     The Proposed Class is Readily Ascertainable

This Court was previously concerned that Plaintiff's prior-defined class of "all individuals in the United States who received one or more phone calls … made by, on behalf of, or for the benefit of LW" was not ascertainable for two reasons: (1) this Court found that Plaintiff did not submit evidence demonstrating any other individuals received unlawful phone calls; and (2) this Court found that Plaintiff had not proposed any feasible method by which to identify such individuals. *See* ECF Doc. 77 at 10. As explained below, Plaintiff's revised Class Definition addresses these concerns.

Plaintiff adopts this Court's prior recitation of the applicable law governing ascertainability. *Id*. at 9. To summarize, a class is ascertainable if it is

15

"administratively feasible for the court to determine whether a particular individual is a member" using objective criteria. *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012). An ascertainable class may be defined "by the activities of the defendants." *Lamumba Corp. v. City of Oakland*, 2007 U.S. Dist. LEXIS 81688, at *11 (N.D. Cal. Nov. 2, 2007) (citing *International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson*, 102 F.R.D. 457, 464 (N.D. Cal. 1983)).

This Court took such an approach in *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014), which involved the sale of over-the-counter supplements. There, despite the defendant's contention that the class was not ascertainable because it did not have records identifying consumer purchasers, this Court determined that the defendant did have some records of sales to retailers, that class members could self-identify through affidavits and that "proper notice regarding the form of the product and its characteristics may help reduce consumer confusion regarding class membership." *Id*. at *22-28. Here, the Class is even more easily ascertainable than in *McCrary*. It is not just defined by the activities of LW; it is defined by LW's ***own records***.

Practically speaking, this Class consists of the following 2 groups: (1) LW's customers; and (2) non-customers of LW, including Mr. Donaca, whose information is contained in LW's records and demonstrates the receipt of a robo-call. LW knows exactly who is in the Class.

16

As demonstrated in the PFC, LW's 66,000 customers are all identified in the Company's CRM system.  PFC #54-83.  LW's CRM tracks the identity of each telemarketer who signed up each customer (*id.* #62-63), the commissions paid by LW to the telemarketer for each customer (*id.* #65-66), and the CRM system contains enough detail to confirm that such customers were originated through outbound telemarketing (*id.* #64).  Based on all this, customers who received robo-calls can be easily identified and directly contacted.

Indeed, the fact that LW can use its CRM system to contact its own customers is illustrated by the company's 2014 "refund program," which involved contacting 3,000 customers in response to the FTC's shutdown of the Worldwide entities. PFC #71-72.  LW's customers are thus ascertainable. *See Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively.").

Concerning non-customers, LW's Director of Operations testified that LW circulates an internal Do Not Call list containing information on each individual and the relevant telemarketer.  PFC #73-76.  If these people had not received a telemarketing call on LW's behalf, why would LW maintain records of a Do Not Call violation and why would LW be aware of their identities? Apart from its own Do Not Call list, LW also certainly has records of individuals who, like Mr. Donaca, complained of robo-calls.  PFC #74, 78.  LW also has in its possession the

17

records produced by the FTC concerning complaints of ascertainable non-customer individuals of robo-calling on LW's behalf. *See e.g.,* PFC #79 (16,937 Do Not Call and robo-call complaints for LW's current telemarketers); PFC #82 (describing 180 BBB complaints); id. (between January 1, 2012 and June 16, 2015, 433 Do Not Call complaints filed against LW). These non-customer individuals are also ascertainable and can be contacted specifically, just as LW's customers can.

Although Plaintiff believes ***direct notice*** can be given to the discrete and identifiable class and does not need to rely on self-identification, if there is any doubt that any person receiving direct notice received a robo-call, class members can submit affidavits swearing, *e.g.*, (i) that they became customers of LW because of a robo-call or, alternatively; (ii) they can describe the robo-call and swear that the call was made on LW's behalf.  This Court endorsed self-identification by affidavit in *McCrary*, and in that case there were no records to assess the identity of any of the class members. 2014 U.S. Dist. LEXIS 8443, at *22.  Here the case is stronger because Plaintiff knows exactly who is in the class and does not need to rely on affidavits alone.  For these reasons, Plaintiff's class is ascertainable and the Court's previous concerns should no longer pose any issues.

## III.    The Class Satisfies Rule 23(a)

### A.    Numerosity

Plaintiff adopts the Court's recitation of the law concerning numerosity at page 11 of its prior opinion, ECF Doc. 77.  To supplement that discussion, a class

18

of forty or more is usually sufficiently numerous and "raises a presumption of impracticability of joinder based on numbers alone." 1 William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011); *see also Rannis v. Recchia*, 380 Fed. Appx 646, 651 (9th Cir. 2010). The court may make common sense assumptions to support numerosity. *See, e.g., In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137945, at *91-92 (N.D. Cal. June 20, 2013). In considering numerosity, the Court may also consider geographical diversity of potential class members. *See, e.g., Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996).

This Court, considering Plaintiff's prior Class definition, found that numerosity had not been met because Plaintiff had not established that calls were being made for the benefit of LW during the Class Period. Plaintiff's new Proposed Class addresses this concern because Class members are all tied to LW, as explained in the ascertainability section, *supra*.

**1. The Only Plausible Explanation is that the Vast Majority of LW's Customers Became Customers Because of Robo-Calling**

The Class here consists of many thousands of people. With respect to LW's 66,000 customers, when evaluating the evidence, the only logical conclusion is that the vast majority of these customers came from robo-calling (and indeed, given the level of detail in its CRM system, LW can tie each customer to each telemarketer and thus link each person to robo-calling).

19

Not coincidentally, from 2012 when it began robo-calling through the end of 2015, LW *tripled* its customer base and *tripled* in size.  PFC #83-84. During just eight months within the Class Period (*January through August of 2014)*, LW earned almost *six million dollars* from monthly fees paid by consumers and *over thirteen million dollars* from the sale of customer accounts.  *Id.* #85.   These numbers are unsurprising given Mr. Sirlin's statement in 2013 that attributed a meteoric rise in its customer base – 8,000 customers a month – to telemarketing. *Id.*

There is no evidence in the record whatsoever that establishes a plausible explanation for these numbers than rampant outbound robo-calling.  In fact, any argument to the contrary would be inconsistent with the testimony of LW's own Director of Operations who, when asked about LW's television, radio, print or web advertising, responded that she had no knowledge of any such advertising by LW. PFC #67.

The record also confirms that the robo-calling campaign occurred *continually throughout the Class Period*.  FTC Op., at *8. During this time, LW used over 50 telemarketers, many of whom filed licensing materials in Florida and can be linked to LW.   FTC Op., at *22, 27; PFC #87.   The FTC uncovered declarations, call transcripts and testimony from fifty consumers all showing that robo-calls were being made throughout the relevant time period, including in 2015. PFC #91.

20

Most tellingly however, the FTC investigated phone numbers associated with LW's *current* telemarketers, revealing *16,937 DNC and related robo-call complaints*. PFC #79; FTC Op., at \*39; *see also* PFC #7, 8, 94, 96 (recounting FTC "honeypot" investigation in 2014-2015); PFC #82 (describing 180 BBB complaints, one from *February 17, 2015*); *id.* (between **January 1, 2012 and June 16, 2015**, there were **433 Do Not Call complaints** filed against LW).

Examples of just some of the robo-calls made by telemarketers on behalf of and for the benefit of LW during the Class Period include:

- On **November 25, 2014**, William James, who has been on the National DNC Registry since 2003, received a robo-call.  After pressing "1", he spoke with representatives from both "Medical Alert" and "Senior Life Support, " and ordered the product with a fake name and credit card information. The following day, he received a call back from "Laverne calling from LW," informing him that his credit card information did not process. Mr. James received another call **on January 30, 2015**, set forth below.  PFC #95.

- David Eden, who is on the National DNC registry, **was contacted multiple times in December 2014** by a robo-caller selling medical alert devices.  For example, **on December 22, 2014**, Mr. Eden received a medical alert device robo-call.  Mr. Eden pressed "1" and telemarketer stated that he worked for LW. On **January 12, 2015**, Mr. Eden received a voicemail from "Senior Life Support."  When he called back, the representative stated that LW USA was the

21

company's "'corporate office.'"   Mr. Eden was advised that the credit card transaction would say "LW USA."  PFC #97.

- Mr. James received another robo-call from a company called "Medical Alarms" on **January 30, 2015**.  Mr. James again placed an order for a medical alert device.  While on the call, he was given the company's customer service number which is the customer service number listed on LW's website.  www.lifewatch-usa.com (as of June 1, 2016).  He was then transferred to "Laverne," who again gave him the same LW customer service number.  PFC #99.

*See also* PFC #92 (**October 19, 2013 call**); PFC #93 (**January 14, 2014** call).  These calls are consistent with the calls received by Mr. Donaca during (and preceding) the Class Period.  *See* Typicality analysis, *infra.*

There is also evidence in the record that, beginning in 2012 but continuing into the Class Period and through at least the first week of January 2014 (when the *Worldwide* litigation was commenced), LW's telemarketers were blasting millions of calls on its behalf.  PFC #103.  For example, Unique Information Systems, which provided its services ***exclusively*** to LW beginning in 2011, "sent out nearly 2 million calls per day, six days per week, to consumers."  *Id.* #104.  The company was not permanently enjoined from telemarketing operations until **November 13, 2014**, ***over a year after the beginning of the Class Period***, until it was shut down as a result of the *Worldwide* litigation.  *FTC v. Worldwide Info Services, Inc. et al.*, No. 6:14-cv-8-Orl-41DAB, Dkt. 102.  *See also* PFC #103 (call between Diana Mey

22

and "Senior Life Savers" on **October 27, 2014, where manager stated that it cycles through 10,000 calls per day** and the company "used to be" called LW); *id.* (during **October 3, 2014** call, consumer told "it's all the same – that[] what's going to show up on your bank statement is Lifewatch."); *id.* ("Lifewatch is over all of us. We're just a small branch from [sic] them."); *id.* (employee of Senior Life Support from **10/31/2014-11/7/2014** declared that "it was clear that these incoming calls had been generated by a consumer's response to an outgoing recorded message or 'robo-call' from the company").

Finally, LW has been the subject of several government investigations and has been sued in at least a dozen other lawsuits alleging that LW's telemarketers engaged in robo-calling in violation of the TCPA since November 2012. *See* PX30 (Litigation Chart identifying cases. At least five of these cases allege unauthorized robo-calls made by and on behalf of LW during the Class Period, some *as recently as September 2015*. *Id.; see also Bank v. LW, Inc.*, No. 15-5708 (E.D.N.Y.) at Dkt. 1 (identifying unauthorized robo-calls in July, August and September 2015). Because many of these cases appear to have been settled, these individuals would not be Proposed Class members. However, the complaints buttress numerosity and demonstrate that robo-calling was the norm, not the exception, for LW.

## 2. The Class is Geographically Diverse

Another relevant numerosity factor is the location of class members. Here, the potential class members are spread out and not geographically confined:  for

23

example, Mr. Donaca resides in California, Mr. James resides in Mississippi, Mr. Eden resides in Illinois, and Mr. Lifshitz resides in Ohio.  PFC #107-110.

Based on all of the foregoing, common sense dictates that the Class here, which consists of the majority of LW's 66,000 customers, non-customers on LW's Do Not Call List and others who have complained of robo-calls and are identifiable in LW's records (including those produced in the FTC litigation), numbers far in excess of the 40 people necessary for numerosity.

**B.**   **Commonality**

To satisfy commonality, Plaintiff must identify "a common contention" that is "capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  Commonality only requires a ***single*** significant question of law or fact. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). Commonality is "a low hurdle easily surmounted." *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632, at *37 (N.D. Cal. Dec. 21, 2010).

Here, there are multiple common questions.  To start, Plaintiff's and the class's claims rely on a single contention arising out of a common nucleus of operative facts: LW violated the TCPA by causing to be placed and benefitting from robo-calls made to residential landline numbers without the recipient's prior express consent. If LW is found liable, each class member has suffered the same injury and is entitled to statutory damages under the TCPA.

24

This common nucleus of operative facts gives rise to several common and controlling factual and legal questions that will resolve each class member's TCPA claims in one stroke, including:

- Whether LW, or someone acting on its behalf, placed calls using an artificial or prerecorded message as contemplated by the TCPA;

- Whether LW's conduct constitutes a violation of the TCPA;

- Whether LW can establish an affirmative defense of prior express consent;

- Whether Plaintiff and the Class are entitled to actual, statutory, or other forms of damages, and other monetary relief; and;

- Whether Plaintiff and the Class are entitled to treble damages based on the willfulness of LW's conduct.

Notably, Plaintiff has presented voluminous evidence that both he and the members of the putative class received robo-calls on behalf and for the benefit of LW in violation of the TCPA. *See* above discussion regarding vicarious liability. Thus, in addition to the other common questions listed above, the questions of whether LW is ultimately responsible for these TCPA-violative calls under common law agency principles (LW is), and whether the calls themselves violated the TCPA (they did), are common questions, capable of resolution class-wide.

## C. Typicality

A named plaintiff's claim is typical if plaintiff alleges injuries similar to those of the proposed class members, if that claim is made based upon facts which are not unique, and if those injuries spring from the same course of alleged conduct

25

of the defendants. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). Commonality and typicality inquiries frequently overlap. *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 611 n.16 (S.D. Cal. 2007).

Here, Plaintiff's claims are emblematic of the Proposed Class he seeks to represent:

- Mr. Donaca received robo-calls on his landline telephone during the Class Period.  Upon answering the call, a pre-recorded message and/or artificial voice stated that the call was regarding medical alert devices.  PFC #122.

- The robo-calls directed Mr. Donaca to press "1" to speak to a representative.  *Id.* #123.  It was during the course of these several phone calls that Mr. Donaca learned that LW was the seller of these devices.  *Id.* #124.  In addition, Mr. Donaca was informed by LW that an automatic telephone dialing system was used.  *Id.* #126.

- Mr. Donaca did not give LW prior express consent for the calls.  *Id.* #125.

Other consumers, in addition to Mr. Donaca, received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of LW during the Class Period.  These consumers were directed to press "1" to speak to a representative, and it was during the course of these calls, and related confirmatory calls, that the consumers learned that LW was the seller of the devices.  PFC #91-100 and related discussion *supra*.  The FTC Investigators who

26

were being forwarded calls from the honeypot had the identical experience.  *Id.*

Plaintiff's and other Class members' claims all result from the exact same conduct, and all of these calls had the same purpose (to generate sales of medical device monitoring systems and services from which LW would profit).  As a result, Plaintiff's rights under the TCPA were violated by the same common course of conduct to which LW subjected every other putative Class member, and Plaintiff suffered the exact same injury as all other class members.

**D.    Adequacy**

Finally, Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Further, whether the class representatives satisfy the adequacy requirement depends on "'the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Rodriquez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009) (quoting *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998)).

27

Plaintiff and his Counsel are undoubtedly adequate. Plaintiff has demonstrated that he has the same interests as the other members of the proposed Class: he received unsolicited telemarketing calls from Defendant in violation of the TCPA. PFC #130. He shares the same interest in ensuring that LW is found liable for its conduct and has vigorously prosecuted this case in discovery and he will continue to prosecute this matter to the best of his ability. PFC #131-132. Plaintiff is familiar with the class action vehicle, his responsibilities as a class representative, and the service he will provide as a named plaintiff, and he has affirmatively committed himself to acting in the Class's best interests at all times. *Id.* None of Mr. Donaca's other cases or interests is antagonistic to those of the class.

LW previously attempted to paint Plaintiff as an "extortionist," and will likely do so again, because he sent LW a demand letter after receiving numerous unsolicited calls during which telemarketers pushed LW's medical alert devices. However, as the Court is aware, demand letters are a common precursor to a lawsuit, and can help parties avoid protracted and costly litigation. Such a letter cannot constitute extortion under California Penal Code § 518 unless there is a showing of the "wrongful" use of fear by threat of a lawsuit that is "objectively baseless." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939-940 (9th Cir. Cal. 2006). Given that the FTC has sued LW for this very same conduct (among other illegal activities) at issue here, and Judge Feinerman issued an injunction against LW, the

28

suggestion that Plaintiff's demand letter was anything other than an appropriate response to continued telemarketer harassment is baseless. The Court should decline LW's transparent invitation to shift the Court's focus away from its own misconduct.[5]

Plaintiff has also retained experienced and skilled counsel who will continue to adequately represent the interests of the Class. Counsel Katrina Carroll of Lite DePalma Greenberg, LLC and Peter S. Lubin of DiTommaso Lubin P.C. have repeatedly demonstrated their commitment to and experience with plaintiffs' class litigation, have the financial resources to represent the class and will commit more than sufficient resources and effort to litigate this action to its conclusion.[6]

## IV.   The Class Satisfies Rule 23(b)(3)

### A.   Predominance

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 236 (C.D. Cal. 2007) (quoting *Hanlon*, 150 F.3d at 1022. "The mere presence of potential individual issues does not defeat the

---

[5] To the extent LW argues that Plaintiff's declination to produce the retention agreement he entered into with counsel makes him inadequate, he is under no obligation to produce that agreement and LW cannot demonstrate how such disclosure would be relevant or necessary. Regardless, should the Court desire, Plaintiff will produce the agreement for inspection *in camera*.

[6] A copy of Lite DePalma Greenberg's firm resume, including Ms. Carroll's background and experience, is attached to the Simoni Declaration as PX 27. Copies of DiTommaso Lubin, P.C.'s resume and Mr. Lubin's detailed biography are attached to the Simoni Declaration as PX 28.

29

predominance of common questions." *McFarland v. Memorex*, 96 F.R.D. 357, 363-64 (N.D. Cal. 1982). As such, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

Here, the foregoing discussion regarding commonality and typicality demonstrates that the claims of Plaintiff and the Proposed Class arise out of a common course of conduct. Where, as here, a class challenges a uniform policy or practice, "[c]lass certification is usually appropriate . . . since in that situation predominance is easily established." *Singer v. Becton Dickinson & Co.*, 2009 U.S. Dist. LEXIS 114547 (S.D. Cal. Dec. 9, 2009) (citing *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008)). As such, Plaintiff's and the Class's claims will be subject to common proof, and this litigation is well-suited to the class action process. Furthermore, the relief sought is identical in each Class member's case because the TCPA provides a statutory damages award of $500 for each violation of the Act. 47 U.S.C.§ 227(b)(3)(C). Each member of the Class is seeking the same statutory damages, which allows damages to be easily calculated.

Plaintiff anticipates an argument from LW that the (sole) question of prior express consent will predominate over the (myriad) other common questions identified above. First, express consent "is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears

30

the burden of proof." *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (upholding class certification, noting that defendant "did not show a single instance where express consent was given before the call was placed").   But even putting that aside, there is no consent issue here.

LW has asserted that consent is established because it receives affidavits from telemarketers stating that they will comply with state and federal telemarketing laws.   Noticeably absent from these affidavits, however, is any specific reference to prior express written consent.[7]  *See, e.g.,* PX 25 at 35-37.  And even if the agreements did mention consent, there is not one piece of evidence showing that any telemarketer ever obtained any class member's consent (*i.e. the consent of the "called party" under the TCPA*, 47 USCS § 227(b)(1)(B)). Actually, to the contrary, when asked whether LW made any attempt at the time each sales call was transferred to LW to verify that there had been no robo-calling or Do Not Call violations, LW's CEO answered that LW chose not to do so.  PFC #34.  Further with respect to LW's alleged compliance program, Judge Feinerman found the testimony Ms. Baker and Mr. Sirlin as "lacking in credibility" (FTC Op. at *36) and its "ostrich-like approach …*extremely troubling*" (*id*. at *39).

---

[7] Even according to LW, the affidavits were only adopted in October 2014.  PX 1 at 102:11-17.  Thus, even if the affidavits *were* sufficient to demonstrate consent, which they are not, LW has not offered a single shred of evidence that its telemarketers were obtaining prior express, written consent from class members between October 2013 and October 2014.

On the other hand, Plaintiff's evidence reveals that both he and scores of other class members received these calls without ever once providing express written consent or while listed on the Do Not Call registry (where consent obviously was not given), and that LW was intimately aware of this. *See generally supra*. Indeed, a ***lack of consent*** is the common sense conclusion: how would telemarketers obtain prior express ***written*** consent from consumers they were ***cold robo-calling*** to generate ***new*** customers for LW? The ***lack of consent*** is a ***common*** issue rather than an individual one.

Accordingly, *all* relevant factual and legal inquiries in this matter are capable of class-wide proof, and predominate over any other minor, individualized question(s) LW may manufacture.

## B.    Superiority

Finally, to proceed as a class action under Rule 23(b)(3), the district court must find that a class action is superior to other available methods for fair and efficient adjudication. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975). The rule identifies a non-exclusive list of pertinent superiority factors:

- the interest of members of the class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and

- the difficulties likely to be encountered in the management of a class action.

32

Fed. R. Civ. P. 23(b)(3).[8]   Courts also look to whether alternative methods of dispute resolution are reasonably available and compare them to the class action device.  *See, e.g., Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 562 (C.D. Cal. 2012).  Here, a class action is the superior method for this controversy.

First, the interest of class members in individually controlling the prosecution of this litigation is small.  "'Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.'"  *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, (C.D. Cal. 2012) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).  The TCPA provides for statutory damages in the amount of $500 per violation; it costs a plaintiff $400 (including a $50 administrative fee) to merely file a claim in federal court, much less litigate it.  Thus, the TCPA's damages provision "is generally insufficient to incentivize individual litigation."  *See Bee, Denning, Inc. v. Capital Alliance Group*, No. 13-cv-2654, 2015 U.S. Dist. LEXIS 129495, at *34-35 (Sept. 24, 2015 S.D. Cal.) (agreeing with plaintiffs' argument).

Second, although some potential class members have commenced litigation against LW, for the most part these claims appear to have been settled or voluntarily dismissed (based on a recent review of the dockets).  The only remaining federal cases brought by consumers against LW for violations of the

---

[8] The other pertinent factor, "the desirability or undesirability of commencing the litigation of the claims in the particular forum," is neutral in this litigation.

TCPA are ***class actions***, not individual cases, and show that the class action device

is necessary for plaintiffs to come forward to purse their claims.[9]

Third, manageability of this case as a class action does not pose any

difficulties.  The experience of Plaintiff's counsel in suits of this kind speaks to

their ability to manage a class of the expected size here.

A class action "is superior to other methods of litigation 'if no realistic

alternative exists.'"   *Bee, Denning*, 2015 U.S. Dist. LEXIS 129495, at *34.

Admittedly, an individual can bring an individual TCPA claim in small claims

court (potentially avoiding significant filing fees and the need for an attorney).  But

where, as here, a company has engaged in a pattern and practice of using other

telemarketers to do its "dirty work," making proof of liability very complex, the

lawsuit is "ill-suited" for small claims court.  *See Bee, Denning*, 2015 U.S. Dist.

LEXIS 129495, at *36 (TCPA case not suited for small claims court where

defendant concealed its conduct through aliases and difficult to trace toll-free

numbers).  Indeed, the only real alternative to a class action is no action at all.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court

enter an order (i) certifying the Proposed Class, (ii) appointing Plaintiff as the Class

---

[9]   The cases are *Salam v. LW, Inc.*, Case No. 13-cv-9305 (N.D. Ill.), and *Bank v. LW, Inc.*, Case No. 15-cv-2278 (E.D.N.Y.).  Note that these matters involve different claims and classes and coordination of the actions was rejected by the Judicial Panel on Multidistrict Litigation.

Representative, (iii) appointing Katrina Carroll of Lite DePalma Greenberg, LLC and Peter Lubin as Co-Lead Class Counsel, and (iv) granting any such further relief as this Court deems reasonable and just.

Date: June 7, 2016                    Respectfully submitted,

By: ___/s/[10] Stephen J. Simoni__
STEPHEN J. SIMONI (Bar No. 284558)
StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS**
**CLASS ACTION LAW OFFICES**
12131 Turnberry Drive, Suite 100
Rancho Mirage, CA 92270-1500
Telephone: (917) 621-5795


By: ___/s/ Chad C. Austin_____

CHAD C. AUSTIN (Bar No. 235457)
ChadCAustin@gmail.com
**LAW OFFICE OF CHAD C. AUSTIN**
4632 Berwick Drive
San Diego, CA 92117
Telephone: (619) 992-7100
Facsimile: (858) 712-0316


By: ___/s/ Katrina Carroll__

KATRINA CARROLL (*pro hac vice*)
kcarroll@litedepalma.com
**LITE DePALMA GREENBERG, LLC**
211 West Wacker Drive
Suite 500
Chicago, IL 60606

---

[10] In accordance with Local Rule 5-4.3.4(a)(2)(i), the ECF/CM filer, Stephen J. Simoni, attests that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

35

Telephone:  (312) 750-1265

By: ___/s/ Peter S. Lubin__
psl@ditommasolaw.com
**DITOMMASO LUBIN**
17W200 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Telephone:  (630) 333-0000

*Counsel for Plaintiff Matthew
Donaca and the Proposed Class*

36

# PX 2 - REDACTED

THE FOLLOWING PAGES HAVE BEEN REDACTED FROM THIS EXHIBIT PENDING RESOLUTION OF PLAINTIFF'S APPLICATION PURSUANT TO L.R. 79-5.2.2(b)

| | | |
|---|---|---|
| 26:22-27:5 | 79:19-80:3 | 121:3-12 |
| 27:23-28:3 | 80:7-17 | 122:5-13 |
| 58:18-59:8 | 85:8-14 | 122:16-25 |
| 63:8-10 | 94:3-13 | 124:19-25 |
| 65:15-18 | 101:23-102:41 | 127:6-22 |
| 73:15-74:19 | 104:5-109:1 | 128:6-18 |
| 77:3-6 | 109:13-15 | 176:9-12 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------X

LIFE ALERT EMERGENCY RESPONSE, INC., a California corporation,

Plaintiff,

v.

Docket No. CV 13/03455 JAK (SSX)

CONNECT AMERICA.COM, LLC, a Delaware limited liability company, KENNETH GROSS, an individual, LIFEWATCH, INC., a New York corporation, EVAN SIRLIN, an individual, LIVE AGENT RESPONSE 1, LLC, a Florida limited liability company, GREG SMALL, an individual, TRILOGY INVESTMENT, LLC, a Florida limited liability company, MICHAEL HILGAR, an individual, WORLDWIDE INFO SERVICES, INC., a Florida corporation and DOES 1 to 10, inclusive,

Defendants.

-------------------------------------------X

1225 Franklin Avenue
Garden City, New York
February 19, 2014
10:45 a.m.

VIDEOTAPED DEPOSITION of LIFEWATCH, INC., Defendant, by SARAI BAKER, taken by Plaintiff, pursuant to Federal Rules of Civil Procedure, and Order, held at the above-noted time and place, before Donna C. Gilmore, a Stenotype Reporter and Notary Public within and for the State of New York.

COPY

(92 of 568)

Case 5:13-cv-02064-JGB-SP Document 90-10 Filed 06/07/16 Page 53 of 227 Page ID
#:2495
Case 2:13 cv 03455 JAK SS Document 182 4 F ed 04/14/14 Page 15 of 40 Page D
#:2202

```
                                                           41
 1                       Sarai Baker
 2        Q     And approximately how long has
 3   Ms. Vanderwater worked for LifeWatch, to your
 4   knowledge?
 5        A     Two years.
 6        Q     And she's been call center liaison the
 7   whole time?
 8        A     No.
 9        Q     What did she start as?
10        A     Order processing supervisor.
11        Q     As call center liaison, does she work in
12   the order processing department of LifeWatch?
13        A     No.
14        Q     Which department does she work in?
15        A     She's, she directly reports to me.
16   There's not a specific department.
17        Q     Describe for me what Ms. Vanderwatter's
18   responsibilities are as call center liaison.
19        A     Communication with the sellers.
20        Q     Anything else?
21        A     Reviewing recording.
22        Q     When you say that Ms. Vanderwater
23   communicates with sellers, do you mean that she is
24   communicating with representatives of third-party
25   call centers that LifeWatch works with?
```

ER0042

(93 of 568)

Case 5:13-cv-02064-JGB-SP Document 90-10 Filed 06/07/16 Page 54 of 227 Page ID
#:2496
Case 2:13-cv-03455 JAK-SS Document 182-4 Filed 04/14/14 Page 16 of 40 Page D
#:2203

```
                                                          42
 1                        Sarai Baker
 2          A    Yes.
 3          Q    Can you tell me in general what the nature
 4   of those communications are?
 5          A    Regarding product information, pricing
 6   information, CRM, some customer-related questions.
 7          Q    Does she also, to your knowledge,
 8   communicate with the third-party call center
 9   representatives about sales scripts that they're
10   using?
11          A    No.
12          Q    Who at LifeWatch does that?
13               MR. LIPARI:  Objection.  Object to
14               form, assumes facts not in evidence.
15          A    I wouldn't know.  I don't know.
16          Q    Who at LifeWatch do you believe would know
17   about that?
18               MR. LIPARI:  Objection, form.
19          A    I don't know.
20          Q    And to your knowledge, does LifeWatch
21   communicate with third-party call center
22   representatives about sales scripts that the call
23   centers are using?
24          A    I don't know.
25          Q    Have you ever communicated with
```

(94 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-1 Filed 06/07/16 Page 55 of 227 Page ID #:2497
Case 2:13 cv 03455 JAK SS  Document 182 4  F ed 04/14/14  Page 17 of 40  Page D #:2204

```
                                                           43
  1                        Sarai Baker
  2    third-party call center representatives about sales
  3    scripts that they're using?
  4         A    We, any communication would be regarding
  5    product and pricing.
  6         Q    Have you ever, have you ever communicated
  7    with a third-party call center representative about
  8    sales scripts that the call center was using?
  9                   MR. LIPARI:  Asked and answered.  You
 10              can answer again.
 11         A    Any information that was communicated was
 12    about product and pricing.
 13         Q    As opposed to what?
 14                   MR. LIPARI:  Objection, vague.  Don't
 15              answer.  As opposed to jelly.
 16         Q    Well, did you ever have a conversation
 17    with any third-party call center representative
 18    about the content of a sales script that they were
 19    using?
 20         A    Product, product information, pricing
 21    information.
 22         Q    You never discussed rebuttals that were in
 23    the scripts --
 24                   MR. LIPARI:  Objection.
 25         Q    -- that were being used by the call
```

(95 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-1 Filed 06/07/16 Page 56 of 227 Page ID
#:2498
Case 2:13-cv-03455-JAK-SS Document 182-4 Filed 04/14/14 Page 18 of 40 Page D
#:2205

```
                                                              44
   1                      Sarai Baker
   2   center?
   3              MR. LIPARI:  Object to form, vague,
   4         terminology hasn't been defined, and asked
   5         and answered.
   6              You can answer again, if you
   7         understand the question and the
   8         terminology that's been used.
   9       A   Yeah, I'm not sure specifically.
  10       Q   Have you ever seen sales scripts that are
  11   being used by third-party call centers for
  12   LifeWatch?
  13       A   I have seen pieces, again for, to verify
  14   the product and pricing information is correct
  15   that's being provided to the customer.
  16       Q   Who provided you the pieces of those sales
  17   scripts?
  18              MR. LIPARI:  If you know.
  19       A   I was going to say, I don't recall.
  20              MR. LIPARI:  We're just looking for
  21         your best recollection here.
  22       Q   Let me go back to what you mentioned was a
  23   responsibility of Lauren Vanderwater, and you
  24   mentioned that she reviews recordings.  What
  25   recordings are you referring to?
```

48

1                           Sarai Baker

2    recordings that she was reviewing recordings that

3    Lifewatch's bank had requested?

4         A    That is part of it.

5         Q    What else, what other recordings does she

6    review?

7         A    We also randomly request recordings.

8         Q    And by "we," you mean LifeWatch randomly

9    requests sales recordings from outside call centers,

10   correct?

11        A    From outside sellers.

12        Q    Okay.  But the recordings are of sales

13   phone calls, correct?

14        A    Yes.

15        Q    Any other recordings that you request?

16        A    No.

17        Q    And who is the one at LifeWatch that

18   requests the sales recordings from the outside call

19   centers?

20        A    Either Lauren or myself.

21        Q    And how frequently does LifeWatch, say in

22   2013, request recordings from the outside call

23   centers?

24        A    For our, for the random or for the --

25        Q    For Lifewatch's purposes, not for the

(108 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-1 Filed 06/07/16 Page 58 of 227 Page ID #:2500
Case 2:13-cv-03455 JAK-SS Document 182-4 Filed 04/14/14 Page 31 of 40 Page ID #:2218

150

```
 1                        Sarah Baker
 2        Q    Did you have any deals with US Digest,
 3   LLC?
 4        A    I don't recall it.
 5             MR. LOEB:  This is a good place to
 6        break.
 7             THE VIDEOGRAPHER:  This completes Tape
 8        Number Three.  The time is 4:44 p.m. and
 9        we're going off the record.
10             (A brief recess was taken from
11        4:44 p.m. to 5:00 p.m.)
12             THE VIDEOGRAPHER:  This begins Tape
13        Number Four.  The time is 5 p.m. and we're
14        back on the record.
15             MR. LOEB:  I have another document I'd
16        like to mark as Exhibit 20.
17             (E-mail was marked as Plaintiff's
18        Exhibit 20, for identification, as of this
19        date.)
20        Q    I show the witness Exhibit 20, which is an
21   e-mail string, and my question is have you seen all
22   or part of this e-mail string before?
23        A    Yes.
24        Q    What part have you seen?
25        A    I've definitely seen the part from Lauren,
```

151

```
 1                         Sarai Baker

 2     the part at the bottom from Lauren and "Good

 3     afternoon, Katie."

 4          Q    Okay.   That's the e-mail that is from

 5     Lauren Vanderwater to Katie, Worldwide Info Service

 6     -- and Worldwide Info Services?

 7          A    Yes.

 8          Q    Are you copied on that e-mail?

 9          A    No.

10          Q    Were you forwarded a copy of this e-mail,

11     do you believe?

12          A    I'm -- yes, whenever Lauren sends out an

13     e-mail to the centers I am sent a copy of it.

14          Q    And which call center do you believe this

15     e-mail was sent to by Lauren Vanderwater?

16          A    Worldwide.

17          Q    And in particular to Katie, Katie at

18     Worldwide?

19          A    That's what it looks like, yes.

20          Q    Do you know who Katie is?

21          A    I mean, I'm not sure.   She was with their

22     customer service.

23          Q    Did you have dealings with her?

24          A    Yes, I believe I did.

25          Q    All right.   The e-mail from Lauren
```

ER0059

152

    1                          Sarai Baker

    2      Vanderwater says, "Good afternoon, Katie.  See below

    3      from Sarai regarding all Canadian orders," and then

    4      there's three items of instructions?  Is it correct

    5      that those three items are instructions that you

    6      gave?

    7           A    Yes.

    8           Q    And why did you give those instructions?

    9           A    Evan and Mitch directed me to.

ER0060

153

1                          Sarai Baker

8          Q      But your intent was to have the actual

9     sales agents in the outside call centers change

10    their sales pitches to reflect these changes, right?

11         A      Regarding pricing?

12         Q      Yes.

13         A      Yes, yes, regarding pricing.

14         Q      Right.  To your knowledge, did all the

15    sales agents for the outside call centers modify

16    their sales pitches as you instructed them?

17                       MR. LIPARI:  Objection to form and

18                object to the characterization.

19         A      Orders, accounts were then entered in to

20    the CRM at this adjusted price.

21         Q      My question is going to you understood at

22    the time you had Lauren Vanderwater send out this

23    e-mail that the sales agents at the Worldwide call

24    center as part of their sales pitch were quoting

25    certain prices for Canadian orders to Canadian

ER0061

(112 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-10 Filed 06/07/16 Page 62 of 227 Page ID #:2504
Case 2:13 cv 03455 JAK SS Document 182 4 F ed 04/14/14 Page 35 of 40 Page D #:2222

154

1                    Sarai Baker

2    customers, correct?

3        A    They would have, for Canadian orders if

4    they knew the person lived in Canada they would have

5    to change the pricing.

6        Q    Right, in their sales pitches to those

7    Canadian customers, right?

8        A    Sure.

9        Q    And to your knowledge, did the sales

10   agents change their sales pitches based on this

11   instruction?

12                  MR. LIPARI:  Object to form, asked and

13            answered.

14                  You can answer if you understand the

15            question.

16       A    The CRM showed that orders were being

17   entered under this new pricing.

18       Q    As far as you knew the sales agents

19   changed their sales pitches to the customers on

20   their phone calls, right?

21                  MR. LIPARI:  Asked and answered.  You

22            can answer any way you'd like.  You don't

23            have to change your answer.

24       A    The CRM reflected that.

25       Q    And how did the CRM reflect that?

(113 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-10 Filed 05/07/16 Page 63 of 227 Page ID #:2505
Case 2:13-cv-03455-JAK-SS Document 182-4 Filed 04/14/14 Page 36 of 40 Page D #:2223

155

1                    Sarai Baker

2        A    The product that was assigned, the product

3   and price -- the price that was assigned to that

4   client was then 49.95.

5        Q    So the pricing after this instruction in

6   the e-mail from Lauren Vanderwater, Lifewatch's CRM,

7   indicated that the Worldwide sales agents had

8   modified the pricing for the Canadian orders, right?

9                    MR. LIPARI:  Object to form, calls for

10             speculation, asked and answered.

11       A    I mean, yes, the CRM reflected it.

12       Q    You didn't have to follow up, to your

13   recollection, you didn't have to follow up and make

14   another request to Worldwide?

15       A    I cannot recall specifically to Worldwide.

16   Could we have followed up with them or other centers

17   to do that?  Sure.  I can't tell you if it was

18   specifically for Worldwide.

19       Q    Do you recall following up to any of

20   LifeWatch's call centers on these instructions to,

21   for the sales of LifeWatch medical alert systems to

22   Canadians?

23       A    I don't recall.

24       Q    Let's refer to the other portion of the

25   e-mail, the top portion that's in the e-mail string

ER0063

156

```
 1                      Sarai Baker
 2    that's from a John at johninfo@gmail dated May 22,
 3    2013.  Do you believe you've ever seen that portion
 4    of the e-mail string?
 5        A    Just from what I was shown by the lawyers.
 6        Q    So you reviewed this e-mail before your
 7    deposition, this e-mail string?
 8        A    I did, I have seen this.
 9        Q    Prior to being shown by your attorneys,
10    had you seen the entire e-mail string?
11        A    No.
12        Q    And in the middle of the e-mail string
13    there's an e-mail from Katie dated May 21, 2013 to
14    Michael Medalert.  Do you see that?
15        A    Yes.
16        Q    Do you know who Michael Medalert is?
17        A    I do not.
18        Q    Do you know who johnwwinfo@gmail.com, who
19    that is?
20        A    I do not, no.
21        Q    In the top e-mail, the one that's from
22    John dated May 22, 2013, do you recognize any of the
23    e-mail addresses that that e-mail was sent to?
24        A    No, I do not.
25        Q    Now, have you searched for any e-mails
```

ER0064

(115 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-10 Filed 06/07/16 Page 65 of 227 Page ID
#:2507
Case 2:13 cv 03455 JAK SS Document 182 4 F ed 04/14/14 Page 38 of 40 Page D
#:2225

157

1                           Sarai Baker

2    that you have between yourself and any of

3    Lifewatch's outside call centers?

4         A    We are working on, we're in the process of

5    obtaining those.

6         Q    I'm asking have you searched for them

7    personally.

8         A    Not as of yet.

9         Q    You have your own personal computer at

10   LifeWatch, right?

11        A    Yes.

12        Q    Did you look on your own personal computer

13   if you have copies of any e-mails between yourself

14   and Lifewatch's outside call centers?

15        A    Not as of yet.  We're working on it.

16        Q    Why haven't you looked for them on the

17   computer?

18        A    Just, I just hadn't had time to look

19   through it yet.

20        Q    Do you know if anyone else at LifeWatch

21   has looked for e-mails between LifeWatch and outside

22   call centers?

23        A    I don't know specifically, no.

24        Q    Generally.

25        A    Meaning I don't -- no, I don't know if

(116 of 568)

Case 5:13-cv-02065-JGB-SP Document 90-10 Filed 06/07/16 Page 66 of 227 Page ID
#:2508
Case 2:13 cv 03455 JAK SS Document 182 4 F ed 04/14/14 Page 39 of 40 Page D
#:2226

                                                                    158
1                              Sarai Baker
2     other people have or not.
3                     MR. SULTZER:  And Ralph, just for the
4               record, we put a litigation hold to
5               LifeWatch and I made a representation to
6               you already that you already asked for all
7               that information and I'm in the process of
8               assembling whatever is there, so Sarai is
9               not involved in that.  As we said in
10              processing, she has no idea in terms of,
11              you know, I'm not working with her on
12              that.  But I want you to know that and
13              we've already given you some documents
14              today, we're going to give you more
15              documents next week, and we should be
16              finalizing our production at that time.
17    Q     Do you know if Lauren Vanderwater has
18    searched her computer to see if she has any e-mails
19    between her and Lifewatch's outside call centers?
20    A     I do not know.
21    Q     Did you ask her to search for them?
22    A     No.
23                    MR. LOEB:  I have a document I'd like
24              to mark as Exhibit 21.
25                    (Discover statement was marked as

# PX 29

## PLAINTIFF'S FACT CHART ("PFC")

*Class Period: October 16, 2013 through the present*

**Facts Supporting Vicarious Liability**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 1. | Telemarketers sold, and continued to sell during the Class Period, medical alert devices on behalf of LW. | On an **October 27, 2014** call, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that "Lifewatch is over all of us." PX 7 FTC Doc. 19-1 at 74 (sales call transcript). |
| 2. | | On a **January 12, 2015** call, a "Senior Alert" telemarketer advised the declarant that "Lifewatch USA is the company's 'corporate office.'" PX 17 FTC Doc. 24-28 at ¶ 14 (declaration). |
| 3. | | On a **January 19, 2015** call, a "Senior Life Support" telemarketer represented to a consumer that "all of the products are from Lifewatch," and "we sell for them." PX 7 FTC Doc. 19-1 at 30-31 (sales call transcript). |
| 4. | | On a **January 23, 2015** call, a "Senior Life Support" telemarketer identified Senior Life Support as a branch of LW, but that the "main company is Lifewatch." PX 9 FTC Doc. 20-1 at 70 (sales call transcript). |
| 5. | | On a **September 11, 2015** call, an "Agent Med Alert" telemarketer, when asked whether she sends her calls and sales to anyone else other than Lifewatch stated, "Nope. They're the only company we use." PX 23 FTC Doc. 77-1 at 80 (sales call transcript); *see also id.* at 74 (Consumer – "Your company is really Lifewatch." Telemarketer – "Correct."). |
| 6. | | On a **September 15, 2015** call, a telemarketer for "Medical Alarms" advised that the company was Lifewatch. PX 23 FTC Doc. No. 77-1 at 67 (sales call transcript). |
| 7. | | *See also* PFC 94, 96, 98 (referencing FTC's "honeypot") |
| 8. | | The *FTC v. Lifewatch* court conducted an exhaustive analysis of the evidence adduced by the FTC demonstrating the ongoing nature of LW's misconduct, including: evidence in 2014 relating to the FTC's "honeypot"; evidence derived from the FTC's Consumer Sentinel database of consumer complaints of robo-calls and Do Not Call violations, as recent as June 16, 2015 (655 specific complaints named LW); |

1

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | complaints to the Better Business Bureau as recent as February 17, 2015. 2016 U.S. Dist. LEXIS 45057, at *22-27. |
| 9. | Lifewatch has controlled and continues to control its telemarketers throughout the Class Period. | Judge Feinerman determined that "the evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers." 2016 U.S. Dist. LEXIS 45057, at *48. On this point, the court found persuasive declarations of LW former employees and also emails from LW's current Call Center Liaison, Lauren Vandewater, showing LW's review and approval of telemarketing scripts. "In light of the evidence," the court found, the telemarketers "are principally acting on Lifewatch's behalf… as Lifewatch's agents." 2016 U.S. Dist. LEXIS 45057, at *51. |
| 10. | | Joseph Settecase, who owned a telemarketing company that made robo-calls on behalf of LW beginning in 2011 (the telemarketer entered into a final settlement with the FTC on November 13, 2014), declared that "Lifewatch was aware of all the telemarketing [his company] engaged in on Lifewatch's behalf." PX 15 FTC Doc. 24-11 at ¶ 8. |
| 11. | | Leslie Steinmetz, who helped Lifewatch develop new business from 9/09-12/12, including through the use of telemarketing, confirmed that Lifewatch "did control and monitor telemarketers that it worked with" and "employees were in regular contact with representatives of its telemarketers." PX 22 FTC Doc. 26-12 at ¶ 4. He further declared that "Lifewatch was aware of all the telemarketing activities [his company] engaged in on Lifewatch's behalf." *Id.* at ¶ 6. *See also FTC v. Lifewatch, Inc.* Mem. Op. and Order at 29 (finding Steinmetz's averment that LW monitored and controlled its telemarketers credible). |
| 12. | | Kenneth Gross, a competitor of LW who also purchased customers from LW from 9/01-3/13, declared that LW monitored and controlled its telemarketers (also providing examples). PX 14 FTC Doc. 24-9 at ¶¶ 9-11. *See also FTC v. Lifewatch, Inc.* Mem. Op. and Order at 29 (finding Gross's averment that LW monitored and controlled its telemarketers credible). |
| 13. | | Judge Feinerman reviewed evidence in connection with the *Worldwide* litigation, filed on January 6, 2014, where LW's telemarketers were accused of robo-calling and Do Not Call violations. The court determined that LW was the Worldwide defendants' "sole medical alert client" (2016 U.S. Dist. LEXIS 45057, at *9); that "Lifewatch paid |

2

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013" (*id.*); that "the weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products" (*id.* at *13), and; "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct" (*id.* at *14). |
| 14. | There is ample evidence of knowledge and control by Lifewatch based on its communications and interactions with its "Sellers," particularly in connection with LW's, and LW's telemarketers, applications for telemarketing licenses. | Lifewatch has the authority to terminate any telemarketer that breaches its agreement and, in fact, has exercised that authority. PX 2 Baker Tr. 80:7-17. |
| 15. | | In September 2012, the Florida Department of Agriculture and Consumer Services ("FDACS") discovered that Florida telemarketers were selling LW products. Because of this, the FDACS determined that *Lifewatch* needed to be registered as a telemarketer. In response, on November 9, 2012, Lifewatch, Inc. ("Lifewatch") filed for a telemarketing license. PX 12 FTC Doc. 22-1 at ¶ 9. |
| 16. | | LW's 2012 application attached **"copies of all sales scripts given to those soliciting for us," attached "copies of all sales information or literature we provide our salespeople or of which we inform our salespeople (including, but not limited to, scripts, outlines, instructions and information regarding how to conduct telephonic sales, sample introduction, sample closings, product information and contest or premium award information."** PX 12 FTC Doc. 22-2 at 6. These same materials were attached to the applications LW filed in 2013 and 2015, all of which were signed by Evan Sirlin. PX 12 FTC Doc. 22-1 at ¶¶ 12-13. |
| 17. | | LW also attached a "Call Center Welcome Package" to its applications which it provided to its telemarketers during the Class Period. *See, e.g.*, PX 12 FTC Doc. 22-1 at ¶¶ 10, 13. Among other things, LW's Call Center Welcome Package includes an "Up-sell Script," rebuttals on how to address certain questions raised by potential customers, and an explanation of "how things work" to be used with the |

3

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 18. | | **customer.** PX 12 FTC Doc. 22-1 and 22-2 at 10-20. Under the "Quality Control" portion of the Package, it states that "**Scripts and Rebuttals must be approved by Lifewatch-USA.**" *Id.* at 20. |
| | | The FDACS investigation (1) identified over a dozen telemarketers that applied for telemarketing licenses in Florida and (2) tied the telemarketers directly to LW. The telemarketers included: |
| | | • **US Digest, LLC** (operated from 2012 until it closed after an FDACS compliance inspection on May 28, 2014); |
| | | • **Multi Level Marketing LLC** (appears to have operated from April 29, 2013 to 2014 and used the name "**LifeWatch**" and "**Preferred Reader**"); |
| | | • **Direct Agent Response, Inc.** (operated from October 23, 2013 until it was dissolved on June 2, 2014); |
| | | • **Senior Medical Alert Systems, LLC** (operated from May 22, 2014 until apparently 2015; FDACS conducted an on-site interview and an employee confirmed that calls were being live transferred to Lifewatch; FDACS found violations for 41 telemarketers on site and the company paid a fine and continued to operate; on November 3, 2014, Senior Medical Alert filed a form with FDACS listing Evan Sirlin and Mitchell May **of Lifewatch** as officers); |
| | | • **TMI Marketing** (operated from March 11, 2013 and renewed its license on March 28, 2014; application listed **Lifewatch** as the only company for which it was telemarketing); |
| | | • **Oasis Money Group LLC** (FDACS conducted an inspection on March 28, 2014 and determined that the company was operating illegally under another company's, **Payless Solutions Inc.'s** telemarketing license; Oasis employees were using a "**Senior Life Response**" script and FDACS determined that the company was telemarketing on behalf of **Lifewatch**); |
| | | • **Payless Solutions Inc.** (operated from 2010 until it changed its name on October 30, 2014 to **Global Marketing Enterprises, Inc.**); |
| | | • **Payless Solutions Enterprises LLC** (began operating on August 25, 2014; attached a "**Medical Alert System**" script); |
| | | • **Miranda Money Group LLC** (began operating on September 17, 2004; a/k/a **Oasis Money Group** and the license application listed **Lifewatch Inc** as an |

4

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | affiliate; the application stated that **Lifewatch** used the fictitious name **Senior Life Support**; Senior Life Support scripts were attached);<br>• **Personal Security Shopper Inc.** (telemarketing license since December 2008; on December 21, 2012 license application listed **"Life Watch"** as a fictitious name and included **Lifewatch's** Call Center Welcome Package);<br>• **Total Security Vision Inc.** (began operating on August 4, 2014 and on September 12, 2014 filed a script for the sale of medical alert devices);<br>• **Alertlink** (began operating September 11, 2013 until the company cancelled its bond on approximately September 13, 2014; affiliated with **I Slingshot Inc. and Peacewatch Enterprises Inc**; included medical alert device sales scripts; FDACS linked **Peacewatch** to **Lifewatch**; FDACS conducted an on-site inspection on February 3, 2014 and found **"Senior Care Line"** scripts at Alertlink's location; during the inspection an employee confirmed that the company was using an autodialer to make robo-calls; FDACS determined that "a majority of Alertlink's telemarketers were unlicensed, and the company was issued a fine");<br>• **Live Response Agent Inc.** (operated from June 14, 2013 until FDACS determined that operations ceased in July 2014; its license application listed **Life Watch USA** as its parent company and the company attached medical alert system scripts); and<br>• **Javomi Inc.** (operated from May 7, 2013 until its bond was cancelled on July 25, 2014).<br><br>PX 12 FTC Doc. 22-1 at ¶¶ 14- 62. |
| 19. | | Some of these telemarketer's applications included copies of LW's Call Center Welcome Package – along with its requirement that "Scripts and Rebuttals must be approved by Lifewatch-USA" – and proposed scripts. *See, e.g.*, PX12 FTC Doc. 22-1 at ¶¶ 17 and PX 12 FTC Doc. 22-2 at 88-105 (4/18/14 – U S Digest LLC, aka "Senior Care Alert). Others attached scripts and other LW documents, or identified LW as an affiliate, linking them directly to LW during the Class Period. *See, e.g.*, PX 12 FTC Doc. 22-1 at ¶ 22 and PX 12 FTC Doc. 22-3 at 26-33 (10/23/13 – Direct Agent Response, Inc. aka "Senior Life Alarm", attaching LW forms, subscriber welcome |

5

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|  |  | package, and contract); PX 12 FTC Doc. 22-1 at ¶ 33 and FTC PX 22-3 at 106-123 (3/29/14 – TMI Marketing Group, LLC aka "American Alert Services, LLC", attaching LW script and other LW documents); PX 12 FTC Doc. 22-1 at ¶ 42 and PX 12 FTC Doc. 22-3 at 158-169 (9/17/14 – Miranda Money Group LLC application identifying LW as affiliate using "Senior Life Support" and addendum stating that LW does all fulfillment). |
| 20. |  | The FDACS investigation also provides detail on 6 telemarketing companies shut down by January 6, 2014 as a result of *FTC v. Worldwide Info Services, Inc.* matter in the United States District Court in the Middle District of Florida, all determined by FDACS to have telemarketed for Lifewatch. They are: **Elite Information Solutions, Inc.; Absolute Solutions Group, Inc.; The Credit Voice, Inc.; Live Agent Response 1 LLC; Arcagen Inc.; and American Innovative Concepts, Inc.** *See* PX 12 FTC Doc. 22-1 at ¶¶ 63-83. |
| 21. |  | Based on the evidence cited above concerning Lifewatch's Florida licensing submission and the submissions of Lifewatch's Florida- affiliated telemarketers, Judge Feinerman determined that "the scripts in question originated with Lifewatch" and that during the FTC injunction hearing, Mr. Sirlin "essentially conceded that Lifewatch was responsible for misrepresentations in the script." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *16-18 (N.D. Ill. Mar. 31, 2016). |
| 22. | The products described by the telemarketers during the Class Period are linked to Lifewatch by price, charged by designation, and description. | Telemarketers advised consumers of the precise payment they could expect for the medical alert service. *See, e.g.*, PX 19 FTC Doc. 25-14 at ¶ 3 ($34.95/month);  PX 6 FTC Doc. 17-2 at 6, 14 (James (Gilman) told that monitoring fee was $34/month, confirmed at $34.95/month); PX 17 FTC Doc. 24-28 at ¶ 14 ($39.95/month); PX __ FTC Doc. 77-1 at 15 ($29.95/month);  PX 23 FTC Doc. 77-1 at 26-27 ($39.90 for first month and shipping, $29.95/month thereafter). *See also* PX 20 FTC Doc. 25-27 at ¶ 4 (Thill's mother billed at $34.95). |
| 23. |  | Telemarketers advised consumers that the charge would appear under the name "Lifewatch." *See, e.g.*, PX 7 FTC Doc. 19-1 at 74 ("what's going to show up on your bank statement is Lifewatch"). |
| 24. |  | "Our products say Lifewatch, USA."  PX 23 FTC Doc. 77-1 at 69. |
| 25. | The telemarketing calls during the Class Period involve live | As explained by Ms. Baker, after a telemarketer enters a customer's information into LW's CRM database, the telemarketer "switches" the customer over to LW's |

6

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | transfers to Lifewatch's verification department or company. | verification company, MedGuard, who verifies the information, including the customer's name, address, phone number and payment information.  PX 1 FTC Trans. at 82:14-19.  *See also* PX 26 FTC Doc. 96 and FTC Doc. 96-1 at 19 (telemarketer acknowledging it is no longer verifying on their end, but inserting information into CRM and doing a live transfer). |
| 26. | | In a September 11, 2015 call, an "Agent Med Alert" telemarketer advised that, if the consumer wants the medical alert system, "we transfer you, live transfer you to [LW's] shipping department to make sure we got – [LW] got all the information correct before they send out the medical alert system.  Been doing this for 30 years plus."  PX 23 FTC Doc. 77-1 at 80-81. |
| 27. | | FTC Investigator Tyndall was live transferred during a **September 2014** call.  PX 11 FTC Doc. 21-2 at 51-52. |
| 28. | | FTC Investigator France was live transferred during a **January 2015** call.  PX 10 FTC Doc. 21-1 at 37. |
| 29. | | Mr. James was live transferred during a **November 2014** call.  PX 6 FTC Doc. 17-2 at 11-12. |
| 30. | | Mr. Eden was live transferred during a **December 2014** call.  PX 17 FTC Doc. 24-28 at ¶¶ 6-7. |
| 31. | | *See also, e.g.,* PX 23 FTC Doc. 77-1 at 63-64 (live transfer of customer in **September 2015**); PX 7 FTC Doc. 19-1 at 73-74 (live transfer of customer in **February 2015**). |
| 32. | | Mr. Sirlin testified at the December 2015 FTC hearing that, "from a technological point of view, there's no reason they couldn't just determine where to send that transfer to."  PX 1 FTC Tr. 145:24-146:14.  He further stated his opinion that a telemarketer could simply real-time transfer calls to another medical alert company by pushing a different button.  *Id.* 172:1-182:7.  But, when asked about the basis for this opinion, Mr. Sirlin *confirmed that it was based on pure speculation* on his part because he has "seen phones, not from telemarketers, that .. can transfer and switch calls."  *Id.* 173:2-173:5. |
| 33. | During the live transfer and verification process, LW can confirm that there has been no robo-calling, misrepresentations | From 2012 through present, every customer call is live transferred from the telemarketer to MedGuard, LW's affiliate. PX 1 FTC Tr. 147:1-147:8 |

7

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | or DNC violations, but chooses not to do so. | During the verification process, Mr. Sirlin testified that MedGuard, LW's affiliate, does nothing to verify robo-calling, or DNC violations or misrepresentations. PX 1 FTC Tr. 173:6-175:15. When asked whether MedGuard asks each customer, "'Did this sale come through a robo-call?'", Mr. Sirlin replied that MedGuard does not because "'[T]hat would probably be confusing.'" 174:23-174:25. There is no indication that LW ever attempts to get consent for the call from any customer. |
| 35. | Lifewatch has at least one employee—a "Call Center Liaison"—who is *currently* responsible for reviewing sales calls and communicating with telemarketers. | On **December 23, 2014**, a telemarketer notified Lauren Vanderwater, the Call Center Liaison for LW, that they were revising its sales script, and "will send it to you for your approval." PX 26 FTC Doc. 96-1 at 19. |
| 36. | | On **June 5, 2014**, LW's Vanderwater attaches a telemarketing script that LW edited ("I took out one line about the billing but I added a few things where they are saying its free (its free to use) or that avoids confusion with the customers and avoid[s] compliance issues."). PX 26 FTC Doc. 96-1 at 46-50. |
| 37. | | In other e-mails, LW's Vanderwater instructed telemarketers what they should say. *See, e.g.*, PX 26 FTC Doc. 96-1 at 4 (**June 2015** – "sales reps are NEVER allowed to say Lifewatch or that they work for Lifewatch"); at 6 (**May 2015** – instructing telemarketers not to call certain numbers or to state that a friend, family member or anyone referred them); at 8-10 (advising telemarketers on how to handle a myriad of issues, including cancellations and referrals); at 21 (**December 2014** – "You should not have ANYTHING saying you are Lifewatch."); at 27 (do not tell customers that billing doesn't start until after they plug in and activate the unit). |
| 38. | | LW threatened its telemarketers for non-compliance with its directives. *See, e.g.*, PX 26 FTC Doc. 96-1 at 27 (telemarketer "will lose commission on that deal") at 51 (deducting commissions if recordings non-compliant). |
| 39. | Testimony by Ms. Baker supports a finding of vicarious liability. | Lifewatch is in direct contact with its telemarketers regarding the content of the telephone calls during which Lifewatch products and services are sold. Ms. Baker, admits to seeing "pieces" of sales scripts used by third-party call centers. PX 2 Baker |

8

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | Tr. 44:10-44:15. |
| 40. | | Ms. Baker testified at the December 2015 FTC hearing that, since 2014, LW provides information regarding "what not to say" during calls with customers and also information on LW's products including "product descriptions, pricing... fact sheets, as well as information on phone service compatibility with medical alert devices." PX 2 Baker Tr.: 79:19-80:3. |
| 41. | | Ms. Baker testified at her February 2014 deposition that she communicated with then-current telemarketer TMI regarding "pricing, product info, CRM data entry, commissions, order fulfillment, customer-related issues." PX 2 Baker Tr. 63:8-10. |
| 42. | | At her February 2014 deposition, Ms. Baker testified that LW's Call Center Liaison, Ms. Vandewater does not communicate with the third-party call centers about sales scripts. PX 2 Baker Tr. 42:7-11. Ms. Baker further did not know whether Lifewatch communicates with the call centers concerning the scripts. *Id.* 42:20-24. She also testified that there is no one at LW whose responsibility it is to review sales scripts. *Id.* 65:15-65:18. |
| 43. | LW currently has an "outside seller compliance" program. | The Northern District of Illinois found LW's evidence of its compliance program and the testimony of LW Director of Operations, Sarai Baker, as "lacking in credibility." 2016 U.S. Dist. LEXIS 45057, at *36. The court similarly found Mr. Sirlin's testimony "unpersuasive" and Lifewatch's ostrich-like approach extremely troubling." *Id.* at *39. |
| 44. | Lifewatch purposefully hid the fact that the telemarketers were calling on its behalf. | *See, e.g.*, PX 21 FTC Doc 26-1 at ¶ 19 ("In approximately mid-December 2013, Katie Boling told us to stop saying that we were calling directly from Lifewatch."); PX 26 FTC Doc. 96-1 at 4 (June 2015 – "sales reps are NEVER allowed to say Lifewatch or that they work for Lifewatch"); and at 21 (December 2014 – "You should not have ANYTHING saying you are Lifewatch."). |
| 45. | LW's feigned ignorance of rampant robo-calling on its behalf is simply not credible. | Judge Feinerman rejected Mr. Sirlin's attempt to plead ignorance of the Worldwide defendants' robo-calling on LW's behalf stating "the court does not find that testimony credible." *Id.* at *16. |

9

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 46. | | When asked during her February 2014 deposition, as to whether she has an understanding of what robo-calling is or whether she heard about the rampant robo-calling problem in the medical alert system industry, Ms. Baker testified "not really." PX 2 Baker Tr. 121:3-8. This testimony occurred *after* Lifewatch had received Donaca's 2013 demand letter, *after* the Worldwide litigation had been initiated in 2014, *after* Lifewatch had been served with the complaint in *Salam v. Lifewatch, inc.*, 1:13-cv-9305 (N.D. Ill 2013), also alleging rampant TCPA violations, and *after* the Indiana Attorney General had initiated an investigation into Lifewatch's telemarketing practices. PX 1 FTC Tr. 12:10, 94:19-95:2. |
| 47. | | At her deposition, when counsel asked whether Ms. Baker was familiar with the term robo-calling, defined as "an automated calling system that calls your home number and allows you to press one to be put in contact with a live sales representative," she said no. She further said that she has never received such a call, that no one she knows has ever received such a call *and that to her knowledge, robo-calls have never been discussed at LW.* PX 2 Baker Tr. 128:6-18.<br><br>Ms. Baker didn't "have an answer" to counsel's question of whether LW "has done anything to prevent its outside call centers from using robo-calling." Remarkably, she further testified that the subject of robo-calling *never came up* at any discussions at LW. *Id.* 127:6-22. Such testimony is remarkable, given that Ms. Baker identified herself at the December 2015 FTC hearing as LW's Director of Operations and the supervisor of LW's "outside seller compliance program." PX 1 FTC Tr. 77:3-6. |
| 48. | | During a line of questioning concerning particular complaints of robo-calls, there are inexplicable redactions in the Baker transcript, for which Lifewatch has failed to provide a redaction log or an unredacted version of the transcript.[1] PX 2 Baker Tr. 104:5- 109:1. |

[1] Lifewatch indicated last week that it was prepared to provide Plaintiff with an unredacted copy of Ms. Baker's transcript on June 8, the day *after* Plaintiff's renewed motion for class certification is due. Clearly, if Lifewatch has a copy of a redacted transcript, it has a copy of an unredacted transcript.

10

| # | STATEMENT | EVIDENCE |
|---|---|---|
| 49. | | During the deposition, Ms. Baker was questioned about an email string between LW and Worldwide, which Ms. Baker was copied on. Although the transcript contains inexplicable redactions, Ms. Baker testified that she was regularly copied on communications with call centers and that she was in the process of searching for emails between herself and Lifewatch's outside call centers in connection with discovery in that matter. No such emails were ever produced in this case or in the related *Salam* matter. PX 2 Baker Tr. 150:17-158:22 |
| 50. | | Ms. Baker testified at a deposition on February 19, 2014 that she was unaware that the State of Indiana sued Lifewatch for robo-call and Do Not Call violations in 2012. PX 2 Baker Tr. LifeAlert 122:5-13.   Ms. Baker was then shown a copy of the complaint and testified that she had never seen it before. *Id.* 122:16-25. ***Remarkably, when asked the same question at the FTC preliminary injunction hearing in December 2015,*** despite having been shown a copy of the complaint almost a year earlier, ***Ms. Baker still had no knowledge*** that the State of Indiana sued LW. PX 1 FTC Tr. 94:19-95:2. |
| 51. | | When asked about the FTC lawsuit filed on January 6, 2014, Ms. Baker testified at her February 2014 deposition that she was not aware of the matter. PX 2 Baker Tr. 124:19-25. |
| 52. | | At her deposition in February 2014, Ms. Baker claimed that she did not know whether Worldwide was a telemarketer; Further, when asked whether at some point she learned or even heard that Worldwide "was using robo-calling in connection with the telemarketing it was doing," Ms. Baker professed her ignorance and said no.  PX 2 Baker Tr. 94:3-94:13; 101:23-102:4 |
| 53. | | When asked whether to her knowledge any of LW's telemarketers had called people on the national do not call list, Ms. Baker testified at her deposition, "I don't know." Baker Tr. 121:9-12. Further, when asked whether LW does anything to ensure that call centers do not violate the national Do Not Call registry, Ms. Baker stated "I do not know." PX 2 Baker Tr. 85:8-85:14. |

11

**Facts Supporting Ascertainability**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 54. | Lifewatch knows who its customers are. | Evan Sirlin testified that LW has 66,000 *current* clients (as of December 2015), all of whom are ascertainable. PX 1 FTC Tr. 143-25:144:3. |
| 55. | LW obtains the identity of every customer at the time of the sales call. | LW relies on its "outside sellers for customer origination." PX 1 FTC Tr. 77:23-25. These outside sellers operate call centers. In the course of a call with a telemarketer, customers who agree to purchase Lifewatch's system are directed, by live transfer, to a verification department to confirm the details of their order. *From 2012 and continuing to present*, every customer call goes through MedGuard, LW's affiliate, and leads directly to Lifewatch. *Id.* 147:1-147:8. |
| 56. | | At the time the call is transferred, Medguard confirms for LW the customer's information, including the customer's name, address, phone number, and payment information. PX 1 FTC Tr. 82:14-19. |
| 57. | After a customer signs up, LW does all of the order fulfillment and tracks shipments of LW equipment. | LW tracks shipments of monitoring equipment to all customers, including those originated through telemarketing. LW's "new member services division" directly contacts customers to confirm receipt. PX 1 FTC Tr. 83:12-83:20. |
| 58. | LW keeps customer contact information in "CRM" database. | LW uses a third party database, called the CRM, to identify its customers. PX 25 FTC Doc. 92 at ¶ 29 (11/10/2015 Amended Baker Decl.); PX 1 FTC Tr. 81:19-20 |
| 59. | | The CRM permits LW "to keep a database of all clients that we have in the system. It facilitates multiple tools, identif[ies] how many people we have in specific states or any other type of information that we need." PX 4 Duran Tr.[2] 21:18-25. |
| 60. | | "The CRM includes identifying information for each of Lifewatch's active customers. Further, the identifying information of the outside seller that sold the customer account to Lifewatch is contained within the CRM." PX 25 FTC Doc. 92 at ¶ 35. |

[2] Notwithstanding its obvious relevance, Mr. Duran's February 21, 2014 transcript was not provided to Plaintiff's counsel by Lifewatch. Lifewatch's counsel was able to pull excerpts of Mr. Duran's transcript from an appeal taken in *Life Alert Emergency Response, Inc.v. ConnectAmerica, Inc., et al.*, a C.D. Cal. case (No. CV 13-3455) that also named Lifewatch as a defendant.

12

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 61. | | The function of the CRM department is "to maintain data integrity, to catch general mistakes of data entry issues." PX 2 Baker Tr. 26:22-27:5. |
| 62. | For each customer, LW tracks the identity of each telemarketer who sold the account to LW in the CRM. | The specific telemarketers used by Lifewatch are identified in its CRM, by customer. PX 2 Baker Tr. 109:13-15. |
| 63. | | LW's telemarketers have log-in credentials, including passwords, and **direct access** to input customer information into the CRM database. PX 1 FTC Tr. 80:21-81:2; 81:19-24. |
| 64. | The CRM system tracks inbound vs. outbound calls. | Included in LW's Call Center Welcome Package, filed in Florida, in connection with its telemarketing license is a Quality Control Section, pursuant to which LW represents:<br>**For call centers utilizing advertisements and mailers:**<br>1) All mailers need to be approved<br>2) All mailers need to be dated as to their creation and mail out times<br>3) All inbound calls need to be tied to a specific mailer and noted in the CRM<br><br>PX 12 FTC Doc. 22-2 at 11 (emphasis in original).  The CRM, therefore, contains highly specific information concerning the exact method of call origination. Since LW's CRM system tracks inbound calls received as a result of advertisements and mailers, LW can identify customers originating from outbound telemarketing by excluding CRM information designating inbound calls. |
| 65. | The CRM system has specific details on payments made to telemarketers, tied to each customer. | LW pays its telemarketers for providing them with customer accounts.  PX 4 Duran Tr. 69:13-20. |
| 66. | | The CRM tracks commissions that are paid to LW's sellers. PX 2 Baker Tr. 27:23-28:3. |
| 67. | | Mr. Sirlin testified concerning different categories of commissions based on how the customer is originated:<br>"Q. And you pay $350 to the outside sellers for each sale?<br>A. Outside companies that we buy sales from, on average, 350. |

13

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | And if we do TV and radio direct, on average, 350. Marketing, average 350." PX 1 FTC Tr. 176:9-176:12. |
| 68. | | However, despite LW's position that it advertises in various media. Ms. Baker testified at her February 2014 deposition that she had no knowledge of any television, radio, print or web advertising by Lifewatch. PX 2 Baker Tr. 58:18-59:8. |
| | | LW tracked the relationships of outside sellers to specific customers and would "charge[] back" telemarketers for "misleading the customers." PX 1 FTC Tr. 114:8-114:13. |
| 69. | LW directly bills and collects payments from its customers monthly for monitoring services. | Mr. Sirlin testified that the majority of LW's 66,000 current clients use recurring billing through credit card processors. PX 1 FTC Tr. 143-25:144:3. |
| 70. | | "[T]he CRM is designed such that *every* credit card goes through a *LifeWatch* bank account." PX 4 Duran Tr. 68:14-23 (emphasis added). |
| 71. | LW directly contacted thousands of its customers in connection with a 2014 "refund program." | In 2014, LW implemented a "refund program" in response to the FTC's shut down of the Worldwide entities responsible for telemarketing on LW's behalf. PX 1 FTC Tr. 78:14-21. |
| 72. | | In connection with the refund program, LW ascertained from its own records that it had 3,000 customers who had not activated their device. PX 1 FTC Tr.  99:23-100:2. Further, LW determined from its customer records whether it contacted customers or customers contacted LW regarding the refund program. PX 1 FTC Tr. 101:5-101:20. |
| 73. | LW maintains an internal Do Not Call List of consumers. | Sarai Baker testified at the December 2015 FTC hearing, that LW "circulates an internal Do Not Call List." PX 1 FTC Tr. 79:11-12. |
| 74. | | LW provides the latest iteration of Lifewatch's internal DNC list to telemarketers when they contract with LW. PX 24 FTC Doc. 87-3 at ¶ 8. |
| 75. | LW can identify telemarketers who have contacted LW customers on the National Do Not Call Registry or its internal Do Not Call list. | LW checks its CRM to see if the customer who called the customer service department is an existing or prospective LW customer.  If the person is in the CRM, and has advised that they were called despite being on the National Do Not Call Registry, LW claims that it will warn or terminate the seller.  PX 25 FTC Doc. 92 at ¶ 42. |
| 76. | | Lifewatch claims that "If Lifewatch finds that a sale was made to a consumer on Lifewatch's internal Do Not Call list, Lifewatch will raise the issue with the outside seller." PX 25 FTC Doc. 92 at ¶ 43.  Therefore, Lifewatch can determine Do Not Call |

14

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|   |           | violations specific to each seller based on the CRM system. |
| 77. | LW is well aware of widespread misrepresentations and Do Not Call violations currently occurring and can tie them to its telemarketers. | LW's knowledge of Do Not Call violations is ongoing through the present. Ms. Baker claims that LW has terminated 20-24 outside sellers *in the past two years* (which overlaps substantially with the Class Period) for issues including specific Do Not Call violations. PX 1 FTC Tr. 86:22-87:4. |
| 78. | Mr. Donaca is an ascertainable class member. | Mr. Donaca served a pre-litigation demand letter on LW on or about June 17, 2013, thus making LW specifically aware of his identity and his complaint that LW was robo-calling at that time. *See also* PFC 122-126. |

15

## Facts Supporting Numerosity

*Class Period: October 16, 2013 through the present*

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 79. | The FTC and Better Business Bureau databases indicate that there is a significant volume of robo-calling continuing to occur during the Class Period by LW's telemarketers. | In connection with the FTC matter, Lifewatch identified its **7 current** telemarketers. PX 1 FTC Tr. 80:6 (Baker testimony that "We're currently purchasing from seven outside sellers"). The FTC then conducted a search using their business names or known fictitious names, revealing numerous DNC complaints against 3 of the 7. The FTC then searched for phone numbers associated with these telemarketers, **revealing 16,937 DNC and robo-call complaints**. *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *39 (N.D. Ill. Mar. 31, 2016). |
| 80. | | Judge Feinerman found "that evidence shows that Lifewatch's **current** telemarketers are no more likely to follow the law than the ones shut down in past government actions." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *39-40 (N.D. Ill. Mar. 31, 2016) (citing FTC exhibit) (emphasis added). |
| 81. | | In addition, between **January 1, 2012 and June 16, 2015**, there were **433 Do Not Call complaints** filed against Lifewatch according to the FTC's Consumer Sentinel database. PX 5 FTC Doc. 14-1 at ¶ 55 (Menjivar Decl.). |
| 82. | | The FTC also found that the Better Business Bureau received 180 complaints specifically against Lifewatch since 2012, and one complaint from **February 17, 2015** alleges that the consumer had received calls from Lifewatch's telemarketers at least once a week for years despite being on the DNC registry. *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *25–*26 (N.D. Ill. Mar. 31, 2016). |
| 83. | The size of Lifewatch's current customer base supports a finding of numerosity. | Lifewatch **tripled** its customer base from 2012 to the end of 2015 due to aggressive marketing efforts, and currently has over 66,000 customers, many of whom were originated through outbound telemarketing, as ascertainable through Lifewatch's own CRM database. PX 1 FTC Tr. 171:19-171:25. *See also* Ascertainability, *supra*. |
| 84. | | LW tripled in size during this same time period, employing 90 people to keep up with ballooning customer base. PX 1 FTC Tr. 171:19-171:25. |
| 85. | Revenues generated by LW supports a finding of numerosity. | In 2013, Mr. Sirlin attributed the meteoric rise in its customer base to telemarketing call centers. He stated to a competitor that, LW was adding **8,000 customers a** |

16

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | *month* from telemarketing call centers and that it would continue to do so. PX 14 FTC Doc. 24-9 at ¶¶ 3, 13. |
| | | During the Class Period, from *January through August of 2014*, LW earned almost *six million dollars* from monthly fees paid by consumers. PX 1 FTC Tr. 186:17-187:4. For the same time period, LW earned *over thirteen million dollars* from the sale of customer accounts, as reflected on a Profit and Loss statement produced to the FTC by Lifewatch. PX 1 FTC Tr. 187:11-187:15. |
| 86. | Throughout the Class Period, through the present, LW contracted with scores of telemarketers to obtain its customers. | In 2013, LW had telemarketing agreements with at least 22 different entities. Copies of the telemarketing agreements, Bates numbered SAL-LW-00001-00389, are not attached because of their volume. |
| 87. | | During the relevant time period, Lifewatch used "over fifty telemarketers... at least one of which has been sanctioned or shut down by Florida regulators." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *22 (N.D. Ill. Mar. 31, 2016). |
| 88. | | LW currently (as of the date of the FTC injunction hearing in December 2015) uses 7 companies who still conduct outbound telemarketing. PX 1 FTC Tr. 225:11-225:15. As demonstrated below, the evidence shows that these companies are robo-calling. |
| 89. | LW itself cannot even keep track of its "revolving door" of telemarketers. | At her deposition, Ms. Baker went over a list of telemarketers but was "not sure" about many who were selling for LW. PX 2 Baker Tr. 73:15-74:19. |
| 90. | | When asked about why LW stopped using Worldwide Info Services, Ms. Baker testified that she did not know. PX 2 Baker Tr. 79:23-79:25. |
| 91. | The FTC's investigation revealed that robo-calling on LW's behalf and for its benefit happened throughout the Class Period, including in the year 2015. | The FTC uncovered voluminous evidence, set forth in declarations, call transcripts and testimony from *fifty consumers*, that all trace back to Lifewatch and show that robo-calls were made by and on behalf of LW by its telemarketers and are continuing to be made. *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *27 (N.D. Ill. Mar. 31, 2016). Some of the FTC's evidence is summarized below. |
| 92. | | Gail Thill, a declarant in the FTC case, recounted a call made **on October 19, 2013,** |

17

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | during which her mother purchased a medical alert system. PX 20 FTC Doc. 25-27 at ¶ 3 (Thill Decl.). The bank statements identified several attempts by Lifewatch to obtain monthly payments from the mother's bank account. *Id.* at ¶¶ 4-5. |
| 93. | | Isaac Lifshitz, another FTC declarant, recounted a **January 2014 telemarketing call** during which he purchased a medical alert device and received a package from Lifewatch. PX 19 FTC Doc. 25-14 at ¶¶ 3, 5 (Lifshitz Decl.). |
| 94. | | In connection with its investigation **in 2014**, the FTC set up a "honeypot" – a group of phone lines set up to receive inbound calls to catch illegal telemarketing. PX 11 FTC Doc. 21-2 at ¶ 2 (Tyndall Decl.). In **September 2014**, Investigator Tyndall received a number of robo-calls from "Rapid Response Alert" and "Senior Life Support." *See generally id.* These conversations were recorded (*see* attachments to Tyndall Decl., PX 11 FTC Doc 21-2 at 7-72). Using an undercover credit card, Investigator Tyndall ordered the medical alert system. The system was branded "Lifewatch" and the credit card charge description included, inter alia, "LIFEWATCH USA." *Id.* at ¶¶ 6, 8. |
| 95. | | On **November 25, 2014**, William James, who has been on the National DNC Registry since 2003, received a robo-call selling a "Life Alert System." PX 18 FTC Doc. 25-9 at ¶¶ 3-4 (James Decl.). After pressing "1", Mr. James (using the pseudonym Gary Gilmore), *see id.* ¶ 4, spoke with representatives from both "Medical Alert" and "Senior Life Support." *Id.* at ¶ 4. Mr. James (Gilmore) ordered the product with a fake name and credit card information. PX 6 FTC Doc. 17-2 (11/25/2014 Trans.) at 5-17. The following day, "Laverne calling from Lifewatch, the medical alarm company" contacted Mr. James (Gilmore) to confirm the credit card information because it did not process. *Id.* at 23-24 (11/26/2014 Trans.). Mr. James received an additional call **on January 30, 2015**, set forth below. |
| 96. | | On **December 16, 2014**, FTC Investigator France received a robo-call (forwarded from the honeypot) from "Senior Life Support." PX 10 FTC Doc. 21-1 at ¶7 (France Decl.). After purchasing a medical alert system, she received a call back from "Jacqueline" to confirm the order. A confirming call was made by "Cathy" from corporate, who took Investigator France's name, address and credit card information. *Id.* at 8. Later that same day, Investigator France received a voice |

18

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | message from "Carmelo" with "Lifewatch Medical Alarm Company" regarding the order placed with Jacqueline. *Id.* at ¶ 10 and selected attachments, PX 10 FTC Doc. 21-1 at 10-47. She never received the product. |
| 97. | | David Eden, who is on the National DNC registry and is a declarant in the FTC litigation against Lifewatch, was contacted multiple times in **December 2014** by a robo-caller selling medical alert devices. For example, on **December 22, 2014**, Mr. Eden received a medical alert device robo-call. Mr. Eden pressed "1" to speak to a representative. The telemarketer stated that he worked for Lifewatch. PX 17 FTC Doc. 24-28 at ¶¶ 5-7 (Eden Decl.). Mr. Eden is on the National Do Not Call Registry, and has not given any company prior permission to make prerecorded telemarketing calls. *Id.* at ¶ 3. On **January 12, 2015**, Mr. Eden received a voicemail from "Senior Life Support." When he called back, the representative identified the company aS "Senior Alert," but also stated that Lifewatch USA was the company's "'corporate office.'" Mr. Eden was advised that the credit card transaction would say "Lifewatch USA." *Id.* at ¶¶ 12-15. |
| 98. | | On **January 8, 2015**, Investigator France received a second call from Senior Life Support. Once it was discovered that she had already placed an order but did not receive the product, she was transferred to "Carmelo." Carmelo provided Investigator France with tracking information. The package, once located, had a yellow label that identified it as being from "LIFEWatchUSA," and the device itself had a "LIFEWatchUSA" label. Other Lifewatch-branded documents were also contained in the package. PX 10 FTC Doc. 21-1 at ¶¶ 13-17 and selected attachments, PX 10 FTC Doc. 21-1 at 10-47. |
| 99. | | Mr. James received another robo-call from a company called "Medical Alarms" on **January 30, 2015**. PX 6 FTC Doc. 17-2 at 54-76. Using the pseudonym William Bormann, Mr. James again placed an order for a medical alert device. While on the call, he was given the company's customer service number (*id.* at 71) – 1-800-716-1433 – which is the customer service number listed on Lifewatch's website. www.lifewatch-usa.com (as of June 1, 2016). He was transferred to "Laverne" for confirmation and billing. *Id.* at 72-73. Laverne also gave Mr. James (Bormann) the same Lifewatch customer service number. *Id.* at 74-75. |
| 100. | Mr. Donaca's experience | *See* PFC 122-126. |

19

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | demonstrates that LW was robo-calling in 2013. | |
| 101. | LW employment of a designated Call Center Liaison to handle communications with its call centers supports a finding of numerosity. | Ms. Vandewater is LW's Call Center Liaison. She reports directly to Ms. Baker, and her sole responsibilities are to communicate with LW's telemarketers and review call recordings. PX 2 Baker Tr. 41:2-42:2. |
| 102. | | Ms. Baker and Ms. Vandewater both review recordings of sales phone calls they request from the call centers. PX 2 Baker Tr. 48:8-48:14. |
| 103. | Beginning in 2012 and continuing through the Class Period, robo-calls were made anywhere from 10,000 to two million consumers per day, days a week. | For example, one telemarketer, identifying itself as "Senior Life Savers" in a *October 27, 2014* call to a consumer (Diana Mey) *stated that it cycles through 10,000 calls per day.* PX 8 FTC Doc. 19-2 at 75. During that call, the manager represented that the company "used to be" called Lifewatch. *Id.* at 67. This is consistent with the consumer was told in a prior call, on October 3, 2014, *i.e.*, that "it's all the same – that[] what's going to show up on your bank statement is Lifewatch." PX 7 FTC Doc. 19-1 at 74. Further, "Lifewatch is over all of us. We're just a small branch from [sic] them." *Id.* at 74-75. *See also* PX 21 at ¶ 6 (employee of Senior Life Support from **10/31/2014-11/7/2014** declared that "[I]t was clear that these incoming calls had been generated by a consumer's response to an outgoing recorded message or 'robo-call' from the company.") |
| 104. | | Another telemarketer, Unique Information Systems, which provided its services exclusively to Lifewatch beginning in 2011, "sent out nearly 2 million calls per day, six days per week, to consumers." PX 15 FTC Doc. 24-11 at ¶¶ 4, 7 (Settecase Decl.). That telemarketer was responsible for the "dialer" that "sent out" the outbound calls to consumers for Lifewatch using pre-recorded messages. *Id.* at ¶¶ 6-7. Of those connections, 10,000-20,000 were then connected to a live telemarketer when the consumer pushed a button on his or her phone. *Id.* at ¶¶ 6, 11. The company continued to telemarket into the Class Period, during which time a permanent injunction was entered against it in the *Worldwide* litigation. |
| 105. | Lifewatch continued to pay its telemarketers large amounts of money for customer accounts – | For example, early in the Class Period, *in May through December 2013*, American Innovative Concepts ("AIC"), an exclusive Lifewatch telemarketer, received over $3.7 million in payments from Lifewatch before stipulating to a permanent |

20

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | including telemarketers that were later prohibited from robo-calling and telemarketing completely – during the Class Period, suggesting that the number of Class members exceeds 40. | injunction preventing AIC from engaging in robo-calling, telemarketing, and marketing medical alert products or services. *See, e.g.*, PX 16 FTC Doc. 24-12 at ¶ 4 and Ex. A (Kane Decl.). |
| 106. | LW has been sued on an individual basis in a number of lawsuits alleging that LW's telemarketers engaged in robo-calling in violation of the TCPA during the Class Period. | PX 30, Litigation Chronology. *See, e.g., Aronson v. Lifewatch, Inc.*, No. GD 13-20109, Court of Common Pleas, Allegheny County, PA (SAL-LW-00458-464) (removed to W.D.Pa. 13-cv-1624); *Stapleton v. Lifewatch, Inc.*, No. V13017127, Prince William District Court, Virginia (SAL-LW-00674-677); *Guiley v. Lifewatch-USA*, No. 2014-CVI-0426, Canton Municipal Court, Small Claims Division, Canton, OH (SAL-LW-00399-419); *Todd v. Lifewatch, Inc.*, No. 14-cv-00509, N.D. Ill. (SAL-LW-00479-494); *Bank v. Lifewatch, Inc.*, No. 15-cv-2278, N.Y.E.D.,  *Bank v. Lifewatch, Inc.*, No. 15cv5078, N.Y.E.D.; *Hossfeld v. Lifewatch, Inc.*, No. 16-cv-1614, N.Y.S.D. |
| 107. | Potential class members are spread out and not confined in one geographical area. | Mr. Donaca resides in California. |
| 108. | | Mr. James resides in Mississippi. PX 18 FTC Doc. 25-9 at ¶ 1. |
| 109. | | Mr. Eden resides in Illinois.  PX 17 FTC Doc. 24-28 at ¶ 1. |
| 110. | | Mr. Lifshitz resides in Ohio.  PX 19 FTC Doc. 25-14 at ¶ 1. |

21

**Facts Supporting Commonality**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 111. | LW's telemarketers placed solicitation calls to putative class members attempting to sell medical alert devices on behalf of and for the benefit of LW. | *See, e.g.,* PFC 86-88, 91-99, 122-126. |
| 112. | | On an **October 27, 2014** call, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that "Lifewatch is over all of us."  PX 7 FTC Doc. 19-1 at 74 (sales call transcript). |
| 113. | | On a **January 12, 2015** call, a "Senior Alert" telemarketer advised the declarant that "Lifewatch USA is the company's 'corporate office.'"  PX 17 FTC Doc. 24-28 at ¶ 14 (declaration). |
| 114. | | On a **January 19, 2015** call, a "Senior Life Support" telemarketer represented to a consumer that "all of the products are from Lifewatch," and "we sell for them." FTC PX 7 Doc. 19-1 at 30-31 (sales call transcript). |
| 115. | | On a **January 23, 2015** call, a "Senior Life Support" telemarketer identified Senior Life Support as a branch of LW, but that the "main company is Lifewatch." PX 9 FTC Doc. 20-1 at 70 (sales call transcript). |
| 116. | | On a **September 11, 2015** call, an "Agent Med Alert" telemarketer, when asked whether she sends her calls and sales to anyone else other than Lifewatch stated, "Nope. They're the only company we use." PX 23 FTC Doc. 77-1 at 80 (sales call transcript); *see also id.* at 74 (Consumer – "Your company is really Lifewatch." Telemarketer – "Correct."). |
| 117. | | On a **September 15, 2015** call, a telemarketer for "Medical Alarms" advised that the company was Lifewatch. PX 23 FTC Doc. No. 77-1 at 67 (sales call transcript). |
| 118. | Beginning in 2012 and continuing through the Class Period, robo-calls were made anywhere from 10,000 to two million consumers per day, six | *See* PFC 103-104. |

22

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | days a week. | |
| 119. | The FTC's investigation revealed that robo-calling on LW's behalf happened throughout the Class Period, including in the year 2015 and *currently* through LW's 7 telemarketers. | *Id. See also id.* 91-99. |
| 120. | The products described by the telemarketers during the Class Period are linked to Lifewatch by price, charged by designation, and description. | Telemarketers advised consumers of the precise payment they could expect for the medical alert device. *See, e.g.,* PX 19 FTC Doc. 25-14 at ¶ 3 ($34.95/month); PX 6 FTC Doc. 17-2 at 6, 14 (James (Gilman) told that monitoring fee was $34/month, confirmed at $34.95/month); PX 17 FTC Doc. 24-28 at ¶ 14 ($39.95/month); PX 23 FTC Doc. 77-1 at 15 ($29.95/month); PX 73 FTC Doc. 77-1 at 26-27 ($39.90 for first month and shipping, $29.95/month thereafter). *See also* PX 20 FTC Doc. 25-27 at ¶ 4 (Thill's mother billed at $34.95). |
| 121. | | LW's telemarketers have log-in credentials, including passwords, and ***direct access*** to input customer information into the CRM database. PX 1 FTC Tr. 80:21-81:2; 81:19-24. |

23

**Facts Supporting Typicality**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 122. | Mr. Donaca received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of Lifewatch during the Class Period. | Mr. Donaca received robo-calls on his landline telephone. Upon answering the call, a pre-recorded message and/or artificial voice stated that the call was regarding medical alert devices. Plaintiff's Second Amended Complaint (Dkt. 29) ("SAC") at ¶¶ 13-14; *see, e.g.*, PX 3 Donaca Tr. at 62:8-19, 63:22-64:11, 68:25-69:4, 70:9-11; 77:3-9. |
| 123. | | The robo-calls directed Mr. Donaca to press "1" to speak to a representative. SAC at ¶ 14; *see, e.g.*, PX 3 Donaca Tr. at 68:20-69:11; 77:3-16. |
| 124. | | It was during course of these several phone calls that Mr. Donaca learned that Lifewatch was the seller of these devices. SAC at ¶¶ 13-14; PX 3 Donaca Tr. at 56:9-12, 57:4-7, 57:23-58:5, 58:20-59:12, 63:18-64:7; 81:23-83:14. |
| 125. | | Mr. Donaca did not give Lifewatch prior express consent to make calls to his landline phone. SAC at ¶ 16; PX 3 Donaca Tr. at 93:11-24. |
| 126. | | In addition, Mr. Donaca was informed by Lifewatch that an automatic telephone dialing system was used by Lifewatch. PX 3 Donaca Tr. at 102:24-103:25. |
| 127. | Other consumers, in addition to Mr. Donaca, received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of Lifewatch during the Class Period. | *See, e.g.*, PFC 91-93, 95, 97, 99. |
| 128. | FTC investigators also had the same experience. | *See, e.g.*, PFC 94,96, 98. |
| 129. | The purpose of these telemarketing calls was to generate sales of medical alert devices to profit Lifewatch. | LW pays its telemarketers for providing them with customer accounts, PX 4 Duran Tr. 69:13-20, and every transaction goes through a Lifewatch bank account, *id.* at 68:14-23. |

24

**Facts Supporting Adequacy**

| # | STATEMENT | EVIDENCE |
|---|---|---|
| 130. | Donaca does not have any conflicts of interest with other class members. | Donaca received unsolicited telemarketing calls from, on behalf of, or for the benefit of Lifewatch, as did all members of the putative class. PX 3 Donaca Tr. at 94:8-95:7. |
| 131. | | Donaca understands the role and responsibilities of a class representative. PX 3 Donaca Tr. at 32:5-23. These responsibilities include protecting the interests of similarly situated class members, communicating with his attorneys and providing evidence relevant to the case. *Id.* at 32:9-19. The responsibilities also include reviewing and approving any proposed settlement in the matter. *Id.* at 33:11-18. |
| 132. | Donaca has vigorously prosecuted this action on behalf of the class. | Donaca kept detailed and meticulous notes of every phone call he received, conducted his own investigation into Lifewatch, communicated with counsel, participated in discovery and submitted to multiple hours of deposition questioning. PX 3 Donaca Tr. at 31:25- 32:4 (he is aware of duty to "represent cases and claims of many other plaintiffs... against the same entity or offender, such as your client, Lifewatch USA"); *id.* at 32:15-23 (knows his role is communicating with attorneys and providing evidence); *id.* at 34:11-35:1 (discusses time spent on matter, including demand letter, communicating with attorneys, producing records, receiving the calls); *id.* at 102:16-103:11 (knows what an autodialer is); *id.* at 49:7-17 (understands meaning of "multi district litigation"). |
| 133. | Donaca's pre-litigation demand letter demonstrates that he has, and will continue to, defend the rights of consumers, including himself and the members of the putative class. | Donaca has never been convicted of *any* crime, PX 3 Donaca Tr. at 20:1-6, and has not ever tried to extort money from any telemarketer. *Id.* at 43:19-44:3. Donaca also explained at deposition that he sent the demand to Lifewatch because of Lifewatch's repeated wrongdoing—the very subject of this case. *Id.* at 118:17-119:4. |
| 134. | Donaca's counsel are experienced and skilled class action litigators who have committed and will continue to commit the time and resources | *See* Biographies of Katrina Carroll and Peter Lubin, PX 27-28. |

25

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | to vigorously pursue this matter. | |

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

DECLARATION PURSUANT TO L.R. 79-5.2.2(b) EDCV-13-02064 (JGB)-SPx

STEPHEN J. SIMONI (Bar No. 284558)
StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS**
**CLASS ACTION LAW OFFICES**
12131 Turnberry Drive, Suite 100
Rancho Mirage, CA 92270-1500
Telephone:  (917) 621-5795

*Attorney for Plaintiff Matthew Donaca*
*and the Proposed Class*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW DONACA, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>       v.<br><br>LIFEWATCH, INC.<br><br>            Defendant. | No. EDCV-13-02064 (JGB) (SPx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION** |

598257.2

# **TABLE OF CONTENTS**

**Pages(s)**

INTRODUCTION ................................................................................. 1

LEGAL STANDARD ........................................................................... 5

ARGUMENT ....................................................................................... 6

I.   LW Is Vicariously Liable for the Acts of Its Telemarketers ........................... 6

    1.   LW's Telemarketers Sell Medical Devices on Behalf of and for the
        Benefit of LW and LW Controls its Telemarketers ............................. 8

        a.   "On Behalf of and for the Benefit of" ........................................ 8

        b.   LW Controls Its Telemarketers ................................................ 10

    2.   LW's Feigned Ignorance is Unpersuasive ........................................... 12

II.   The Proposed Class is Readily Ascertainable ................................................ 15

III.   The Class Satisfies Rule 23(a) ....................................................................... 18

    A.   Numerosity .............................................................................................. 18

        1.   The Only Plausible Explanation is that the Vast Majority
            of LW's Customers Became Customers Because of
            Robo-Calling ................................................................................ 19

        2.   The Class is Geographically Diverse ........................................ 23

        B.   Commonality ................................................................................ 24

        C.   Typicality ..................................................................................... 25

        D.   Adequacy ...................................................................................... 27

IV.   The Class Satisfies Rule 23(b)(3) ................................................................. 29

i

1

2       A.    Predominance ........................................................................... 29

3       B.    Superiority .............................................................................. 32

4

5   CONCLUSION ...................................................................................... 34

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF AUTHORITIES

**Cases**                                                            **Pages(s)**

*Bee, Denning, Inc. v. Capital All. Group,*
   No. 13-cv-2654-BAS-WVG, 2015 U.S. Dist. LEXIS 129495
   (S.D. Cal. Sept. 24, 2015) ........................................................ 7, 33, 34

*Bishop v. Saab Auto. A.B.,*
   No. CV 95-0721 JGD (JRx), 1996 U.S. Dist. LEXIS 22890 (C.D. Cal. Feb. 16,
   1996) ........................................................................................ 6

*Booth v. Appstack, Inc.,*
   No. C13-1533JLR, 2015 U.S. Dist. LEXIS 40779
   (W.D. Wash. Mar. 29, 2015) ............................................... 7

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ............................................. 6, 7

*FTC v. Lifewatch Inc.,*
   No. 15 C 5781, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016)....*passim*

*Gen. Tel. Co. of the Sw. v. Falcon,*
   457 U.S. 147 (1982) ............................................................ 24

*Grant v. Capital Mgmt. Servs., L.P.,*
   449 F. App'x 598 (9th Cir. 2011) ....................................... 31

*Haley v. Medtronic, Inc.,*
   169 F.R.D. 643 (C.D. Cal. 1996) ....................................... 19

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ............................... 27, 29, 30

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ............................................. 26

*In re: Cathode Ray Tube Antitrust Litig.,*
   No. ALL DIRECT ACTION CASES MDL NO. 1917, JAMS REF. No.
   1100054618, 2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013).......... 19

*In re Conagra Foods, Inc.,*
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................. 6

iii

*In re DISH Network, L.L.C.*,
    28 FCC Rcd. 6574 (2013) .................................................................. 7

*International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson*,
    102 F.R.D. 457 (N.D. Cal. 1983) ...................................................... 16

*Kamar v. Radio Shack Corp.*,
    254 F.R.D. 387 (C.D. Cal. 2008) ...................................................... 30

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ............................................................ 32

*Keegan v. Am. Honda Motor Co.*,
    284 F.R.D. 504 (C.D. Cal. 2012) ...................................................... 16

*Knutson v. Schwan's Home Serv., Inc.*,
    2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) ........................... 17

*Lamumba Corp. v. City of Oakland*,
    No. C. 05-2712 MHP, 2007 U.S. Dist. LEXIS 81688
    (N.D. Cal. Nov. 2, 2007) .................................................................. 16

*Life Alert Emergency Response, Inc. v. Connect America.com LLC*,
    601 Fed. Appx. 469 (9th Cir. Feb. 4, 2015) ...................................... 8

*Lushe v. Verengo Inc.*,
    No. CV 13-07632 AB (RZ), 2015 U.S. Dist. LEXIS 16961
    (C.D. Cal. Feb. 2, 2015) .................................................................. 7

*Maddock v. KB Homes, Inc.*,
    248 F.R.D. 229 (C.D. Cal. 2007) ...................................................... 29

*Makaron v. GE Sec. Mfg.*,
    No. CV-14-1274-GW(AGRx), 2015 U.S. Dist. LEXIS 75240
    (C.D. Cal. May 18, 2015) ................................................................ 7

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................ 24

*McCrary v. Elations Co.*,
    No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443
    (C.D. Cal. Jan. 13, 2014) .......................................................... 16, 18

iv

*McFarland v. Memorex*,
   96 F.R.D. 357 (N.D. Cal. 1982) ............................................................ 30

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007) ........................................................... 26

*Meyer v. Portfolio Recovery Assocs.*,
   707 F.3d 1036 (9th Cir. 2012) ............................................................... 31

*Pecover v. Elec. Arts Inc.*,
   No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632
   (N.D. Cal. Dec. 21, 2010) ..................................................................... 24

*Perez-Olano v. Gonzalez*,
   248 F.R.D. 248 (C.D. Cal. 2008) ............................................................ 6

*Rannis v. Recchia*,
   380 Fed. Appx. 646 (9th Cir. 2010) ...................................................... 19

*Rodriquez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2009) ............................................................... 27

*Singer v. Becton Dickinson & Co.*,
   No. 08-CV-821 - IEG (BLM), 2009 U.S. Dist. LEXIS 114547
   (S.D. Cal. Dec. 9, 2009) ........................................................................ 30

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ................................................................. 28

*United States v. Bonds*,
   608 F.3d 495 (9th Cir. 2010) ................................................................... 7

*Vandervort v. Balboa Capital Corp.*,
   287 F.R.D. 554 (C.D. Cal. 2012) ........................................................... 33

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .......................................................................... 24

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ............................................................... 27

*Wolin v. Jaguar Land Rover N. Am., L.L.C.*,
   617 F.3d 1168 (9th Cir. 2010) ............................................................... 33

v

1

**Statutes**

2

47 U.S.C. § 227 ..................................................................... 1, 6, 30, 31, 34

3

105 Stat. 2394 § 2(10) .................................................................................. 6

4

**Other**

5

Fed. R. Civ. P. 23(a) ................................................................... 5, 18, 27

6

Fed. R. Civ. P. 23(b) .........................................................................*passim*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INTRODUCTION**

This case arises from a massive, unsolicited robo-call campaign designed to sell Defendant Lifewatch, Inc.'s ("LW") medical alert systems. The campaign involves millions of automated telephone calls all made without prior express consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

Indeed, LW is no stranger to litigation relating to its robo-calling activities. In addition to other private lawsuits and government enforcement actions brought against LW, in 2014 the Federal Trade Commission and the Attorney General of Florida filed suit against LW and its CEO, Evan Sirlin, in the Northern District of Illinois (the "FTC matter"), alleging that LW was liable for telemarketing improprieties including robo-calling, Do Not Call violations and caller ID "spoofing." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *3-4 (N.D. Ill. Mar. 31, 2016) ("FTC Opinion" or "FTC Op."). Because these violations are ongoing, the plaintiffs sought a preliminary injunction in late 2015.

***That injunction was granted on March 31, 2016***, after a full hearing and based on an extensive record. An injunction was necessary ***this year***, the Hon. Gary Feinerman held, despite LW's assertion that the evidence against it was too old to demonstrate continuing misconduct. FTC Op. at *8-9.

Just like LW argued in connection with Plaintiff's first class certification motion in this case, LW asserted two defenses to liability in the FTC matter, both

1

ultimately rejected: (1) LW argued that it is not legally responsible for its telemarketers' misconduct because they are independent of LW, they sell medical alert devices to companies other than LW, and LW purchases accounts on a "non-exclusive basis"; (2) LW argued that its past misconduct has been remedied and that its new quality control program ensures that current telemarketers are legally compliant. *Id*. at *4-6.

Judge Feinerman found both of these arguments wholly unpersuasive. Based on his review of the voluminous record, the court made the following factual findings:

- Judge Feinerman reviewed evidence in connection with the *Worldwide* litigation, filed on January 6, 2014, where LW's telemarketers were accused of robo-calling and Do Not Call violations. The court determined that LW was the defendants' "sole medical alert client" (*id*. at *9); that LW "paid $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013" (*id*.); that "the weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products" (*id*. at *13), and; "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct" (*id*. at *14).

- Judge Feinerman rejected Mr. Sirlin's attempt to plead ignorance of the Worldwide defendants' robo-calling on LW's behalf, stating "the court does not

2

find that testimony credible." *Id*. at *16.

- Judge Feinerman rejected LW's contention that it was not responsible for the telemarketer's scripts, citing the FTC's evidence of call scripts filed in connection with LW's Florida telemarketing licensing (*id*. at *16-17) and the 2012-2014 Florida filings of LW's telemarketers (*id*. at *20).  The court concluded that Mr. Sirlin "essentially ***conceded*** that Lifewatch was responsible for misrepresentations in the script." *Id*. at *17-18 (emphasis added).

- The court conducted an exhaustive analysis of the evidence adduced by the FTC to demonstrate the ongoing nature of LW's misconduct, including: evidence in 2014 relating to the FTC's "honeypot," a system set up to catch illegal telemarketing; evidence derived from the FTC's Consumer Sentinel database of consumer complaints of robo-calls and Do Not Call violations ***as recent as June 16, 2015*** (655 specific complaints named LW); and complaints to the Better Business Bureau ***as recent as February 17, 2015***.  *Id*. at *22-27.

- The court considered "declarations, telephone transcripts, and live testimony" illustrating over fifty consumer experiences with LW's telemarketers. *Id*. at *27-35.

- The court found LW's evidence of its compliance program and the testimony of LW Director of Operations, Sarai Baker, as "lacking in credibility." *Id*. at *36.

- Judge Feinerman found it "telling" that, despite LW's alleged enforcement

3

measures, "Lifewatch does not currently provide sales scripts to its telemarketers and does not review or approve the scripts they use." *Id*. at *37-38. The court found Mr. Sirlin's testimony on this point "unpersuasive" and "Lifewatch's ostrich-like approach … extremely troubling." *Id*. at *39.

- Further evidence adduced by FTC investigator Menjivar reveals ***16,937 DNC and robo-call complaints involving numbers associated with LW's current telemarketers***. *Id*. Judge Feinerman thus found that LW's current telemarketers were no more likely to follow the law than the ones previously shut down. *Id*. at *39-40.

- Judge Feinerman determined that "the evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers." *Id*. at *48. Citing declarations of LW former employees and emails from LW's ***current*** Call Center Liaison, Lauren Vandewater, the court found that, the telemarketers "are principally acting on Lifewatch's behalf… as Lifewatch's agents." *Id*. at *51.

Judge Feinerman's factual findings were carefully made on largely the same record Plaintiff puts before this Court.[1] Based on that record, Plaintiff Matthew

---

[1] Rather than detailing the overwhelming volume of evidence against LW in numbered paragraph form in the accompanying Simoni Declaration, Plaintiff has attached to that Declaration as Exhibit PX29 a Fact Chart (cited herein as "PFC") summarizing relevant evidence with reference to each exhibit. Plaintiff believes the PFC will be helpful to the Court in analyzing the entire universe of documents and their applicability to each class certification factor.

4

Donaca ("Plaintiff") now asks this Court to certify a class as follows:

> **Proposed Class:** All individuals in the United States whose identity can be ascertained through Lifewatch's records and who received one or more phone calls directed to a telephone number assigned to a residential landline service using an artificial or prerecorded message made by, on behalf of, or for the benefit of Lifewatch from October 16, 2013 through the present.

On February 1, 2016, the Court denied Plaintiff's initial bid for class certification. ECF Doc. 77. In its Order, the Court focused primarily on Plaintiff's failure to: (1) set forth an ascertainable and appropriately numerous class and method for identifying its members; and (2) submit sufficient evidence that telemarketers were placing the calls on behalf of and for the benefit of LW. As explained below, Plaintiff's new Proposed Class is limited to a discrete and identifiable class of people, all of whom can be linked to LW and contacted directly. In doing so, Plaintiff has addressed the Court's concerns and class certification should be granted.

## LEGAL STANDARD

Under Rule 23(a), the party seeking class certification must demonstrate four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Additionally, Rule 23(b)(3)—the prong under which Plaintiff seeks to certify the Class here—requires Plaintiff to show that "questions of law or fact common to the members of the class predominate over

5

any questions affecting individual members, and [that] a class action is superior to

other available methods for the fair and efficient adjudication of the controversy."

*See* Fed. R. Civ. P. 23(b)(3). "The named plaintiffs must also demonstrate that the

class is ascertainable." *Bishop v. Saab Auto. A.B.*, 1996 U.S. Dist. LEXIS 22890

*9-10 (C.D. Cal. Feb. 16, 1996).

In determining class certification, the court does not make findings of fact,

and does not draw any ultimate conclusions on the plaintiff's claims.   *In re

Conaqra Foods, Inc.*, 90 F. Supp. 3d 919, 965 (C.D. Cal. 2015).   And, while the

certification  analysis must be "'rigorous,'" and "may 'entail some overlap with the

merits of the plaintiff's underlying claim' … Rule 23 grants courts no license to

engage in free-ranging merits inquiries at the certification stage." *Ellis v. Costco

Wholesale Corp.*, 657 F.3d 970, 980-81 (9th Cir. 2011) (citations omitted).  Indeed,

"the evidence only needs to enable the court to make a 'reasonable judgment' that

Rule 23 requirements have been met."  *Perez-Olano v. Gonzalez*, 248 F.R.D. 248,

255 (C.D. Cal. 2008).   As fully explained below, the Proposed Class should be

certified.

## **ARGUMENT**

### I.    **LW Is Vicariously Liable for the Acts of Its Telemarketers**

Congress enacted the TCPA after finding that robo-calls are a serious

problem that, pose a nuisance and invade the privacy of telephone subscribers

nationwide. *See* TCPA, 47 U.S.C. § 227 note; *see also* 105 Stat. 2394 § 2(10).

6

Congress granted a private right of action for victims, 47 U.S.C. § 227(b), and courts have routinely certified classes to remedy TCPA violations.[2]

In order to prevent the exact conduct at issue in this case – where businesses hire others to obscure the ultimate source of robo-call marketing– the FCC ruled that companies are vicariously liable for calls made on their behalf. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 6588 (2013).[3]   As this Court has recently recognized, "the standard for classical agency under the TCPA is no different from the federal common law standard applied in any other context…." *Lushe v. Verengo Inc.*, 2015 U.S. Dist. LEXIS 16961, at *3 (C.D. Cal. Feb. 2, 2015). *See also Makaron v. GE Sec. Mfg.*, 2015 U.S. Dist. LEXIS 75240, *15 (C.D. Cal. May 18, 2015) (sellers can be vicariously liable for TCPA violations under agency principles). A key requirement of classic common law agency is that the principal is "in control" of the agent's actions. *See United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010).

---

[2] *See, e.g., Booth v. Appstack, Inc.*, 2015 U.S. Dist. LEXIS 40779, *34-35 (W.D. Wa. Mar. 29, 2015) (certifying a class of plaintiffs who alleged that defendants made or benefitted from robo-calls); *see also Bee, Denning, Inc. v. Capital Alliance Group*, 2015 U.S. Dist. LEXIS 129495, *38 (S.D. Cal. Sept. 24, 2015) (granting class certification in a TCPA case and ruling that "[w]ithout the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.").

[3] *See also id*. at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.").

7

Notably, both the Ninth Circuit and the Northern District of Illinois, in issuing its March 31, 2016 injunction, have specifically rejected LW's contention that it cannot be liable for its "rogue" telemarketers. *Cf. Life Alert Emergency Response, Inc. v. Connect America.com LLC*, 601 Fed. Appx. 469, 474 (9th Cir. 2015) ("The district court did not buy this story of telemarketers-gone-rogue, and neither do we."); FTC Op. at *51 (citing *Life Alert*, and stating that "[t]he same holds true here").

### 1. LW's Telemarketers Sell Medical Devices on Behalf of and for the Benefit of LW and LW Controls its Telemarketers

Here, there is no question that robo-calls made by LW's telemarketers were on behalf of, and for the benefit of, LW and that LW controlled them. The record is replete with evidence showing that this misconduct was continuing throughout the Class Period, and was so pervasive and egregious that a ***2016 injunction*** was necessary. *See generally* FTC Op.; PFC #1-13. As illustrated in the PFC, the robo-calling was done on behalf of and for the benefit of LW, and LW was intimately involved in the entire process:

### a. "On Behalf of and for the Benefit of"

- Telemarketers sold LW's medical alert devices on behalf of and for the benefit of LW during the Class Period. PFC #1-8. By way of example, in October 27, 2014, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that

8

"Lifewatch is over all of us." PFC #1. In a January 15, 2015 call, a "Senior Life Support" telemarketer represented that "all of the products are from Lifewatch," and "we sell for them." PFC #3; *see also* PFC #2, 4-7 (telemarketers linking sales companies and products to LW or confirmatory sales calls from LW).

- The products described by the telemarketers during the Class Period are linked to LW by price, charged-by designation, and description.   PFC #22-24. Telemarketers advised the consumers of the precise payment, that the charge would appear under the name "Lifewatch," and that the products say "Lifewatch, USA."  PFC #22-23.

- The telemarketing calls during the Class Period involve ***live transfers*** directly to LW's verification department or company.   PFC #25-31   (examples of live transfers).    Given the live transfer of sales calls, LW's assertion that telemarketers were not selling exclusively to LW is baseless and not credible.[4]

- LW admits that it ***currently has 7 telemarketers*** and that, during the live transfer process, ***it does nothing to confirm that robo-calling, misrepresentations or DNC violations are not occurring*** because, per LW,  "that would probably be confusing." PFC #34, 79, 119.

---

[4] Mr. Sirlin testified at the December 2015 FTC hearing that, in his opinion,  a telemarketer could simply real-time transfer calls to another medical alert company by pushing a different button.  PFC #32.  But, when asked about the basis for this opinion, Mr. Sirlin confirmed that it was pure speculation on his part because he has "seen phones, not from telemarketers, that .. can transfer and switch calls."  *Id.*

9

- LW- not the telemarketer- takes all customer payments and, in turn, LW pays telemarketers commissions for each customer generated. *See, e.g.,* PFC #65-68 (LW pays telemarketers); PFC #69-70 (every card goes through LW account).

- LW profits and generates substantial revenues derived from robo-calling.  PFC #85.  By way of example, During the Class Period, from ***January through August of 2014***, LW earned almost ***six million dollars*** from monthly fees paid by consumers.  *Id.*  For the same time period, LW earned ***over thirteen million dollars*** from the sale of customer accounts, as reflected on a Profit and Loss statement produced to the FTC by Lifewatch.  *Id.*

### b.      LW Controls Its Telemarketers

- There is ample evidence of knowledge and control by LW based on its communications and interactions with former employees and competitors, and emails by current employees and its telemarketers that show that LW has controlled and continues to control its telemarketers during the Class Period. PFC #9-21.

- LW has at least one dedicated employee—a "Call Center Liaison"—who is ***currently*** responsible for reviewing sales calls and communicating with telemarketers.  PFC #35-38.

- LW communicates with telemarketers regarding the contents of their calls, including reviewing their calls, advising them on what they can and cannot say,

10

and editing telemarketing scripts.  PFC #35 (telemarketer sending sales script to LW liaison for review); PFC #36 (LW liaison attaches edited sales script); PFC #37  (LW liaison instructing telemarketers as to what they should or should not say).  *See also* PFC #39  (Baker testimony indicating LW is in direct contact with its telemarketers regarding the content of sales calls); PFC #41  (Baker communicated with telemarketer TMI regarding "pricing, product info, CRM data entry, commissions, order fulfillment, customer-related issues.").

- LW has an "outside seller compliance" program through which it communicates with and controls its telemarketers.  PFC #43.  LW submitted "**copies of all sales scripts given to those soliciting for LW**" **"copies of all sales information or literature we provide our salespeople or of which we inform our salespeople (including, but not limited to, scripts, outlines, instructions and information regarding how to conduct telephonic sales, sample introduction, sample closings, product information and contest or premium award information"** (emphasis added) in connection with its Florida telemarketing license **in 2012, 2013 and 2015**, each signed by Evan Sirlin.  PFC #16.

- LW also provided its telemarketers a "Call Center Welcome Package" during the Class Period, which was also attached to LW's license applications. Among other things, the package includes an "Up-sell Script," rebuttal scripts, and a product explanation of "how things work." In the "Quality Control" section of

11

the package, it states that "**Scripts and Rebuttals must be approved by Lifewatch-USA.**" PFC #17.

- Some of LW's telemarketers who sought licenses in Florida also included copies of LW's Call Center Welcome Package and proposed scripts as part of their applications in the Class Period. *See, e.g.,* PFC #19. Others attached scripts and other LW documents linking them directly to LW during the Class Period. *Id.*

- LW had its own internal Do Not Call list, which confirms LW's awareness of and complacency in the robo-calling done on its behalf. PFC #73-74.

Indeed, there is no question that the rampant robo-calling was conducted on LW's behalf and that LW directed and controlled the campaign.

### 2.  LW's Feigned Ignorance is Unpersuasive

Any attempt by LW to feign ignorance of its robo-calling scheme is simply not credible (as the Northern District of Illinois just found in March). *See, e.g.*, FTC Op., at *16 (rejecting Mr. Sirlin's attempt to plead ignorance of the Worldwide robo-calling on LW's behalf stating "the court does not find that testimony credible."); *id*. at *39 (finding Mr. Sirlin's testimony "unpersuasive" concerning LW's contention that it does not review or approve scripts and finding "Lifewatch's ostrich-like approach … extremely troubling.").

The record is also riddled with inconsistencies, conflicting testimony, and completely unbelievable explanations by Sarai Baker, LW's Director of Operations. For example:

12

- When asked during a February 2014 deposition as to whether she has an understanding of robo-calling or whether she heard about the rampant robo-calling problem in the medical alert industry, Ms. Baker testified "not really." PFC #46.  This testimony occurred *after* the Indiana Attorney General had initiated an investigation into Lifewatch's telemarketing practices, *after* Lifewatch had received Donaca's 2013 demand letter, *after* Lifewatch had been served with the complaint in the related matter *Salam v. Lifewatch, Inc.*, 1:13-cv-9305 (N.D. Ill 2013) (also alleging rampant TCPA violations), and *after* the *Worldwide* litigation had been initiated in 2014.

- At her deposition, when counsel asked whether Ms. Baker was familiar with the term robo-calling, she said no. She further said that she has never received such a call, that no one she knows has ever received such a call ***and that to her knowledge, robo-calls have never been discussed at LW***.  PFC #47.

- Ms. Baker didn't "have an answer" to counsel's question of whether LW "has done anything to prevent its outside call centers from using robo-calling." Such testimony is remarkable, given that as LW's Director of Operations, Ms. Baker supervises LW's "outside seller compliance program."  PFC #47.

- During the deposition, Ms. Baker was questioned about an email string between LW and Worldwide, which Ms. Baker was copied on. Incredibly, Ms. Baker claimed that she did not know whether Worldwide was a telemarketer. Further,

13

when asked whether at some point she learned or even heard that Worldwide "was using robo-calling," Ms. Baker professed ignorance and said no.  PFC #49.

- Ms. Baker testified at the deposition that she was unaware that the State of Indiana sued Lifewatch for robo-call and Do Not Call violations in 2012. PFC #50.  Ms. Baker was then shown a copy of the complaint and testified that she had never seen it before. ***Remarkably, when asked the same question at the FTC preliminary injunction hearing in December 2015, despite having been shown a copy of the complaint a year earlier, Ms. Baker still claimed no knowledge that the State of Indiana sued LW***.  *Id.*

- When asked whether to her knowledge any of LW's telemarketers had called people on the National Do Not Call list, Ms. Baker testified at her deposition, "I don't know."  PFC #53. Further, when asked whether LW does anything to ensure that call centers do not violate the national Do Not Call registry, Ms. Baker stated "I do not know."  *Id.*  This is in direct contradiction to Ms. Baker's testimony concerning LW's knowledge of Do Not Call Violations at the December 2015 FTC hearing, where she testified that LW has terminated 20-24 telemarketers ***in the past two years*** for telemarketing violations, including Do Not Call violations.  PFC #77.  This is further directly in contradiction of Ms. Baker's testimony at the FTC hearing that LW "circulates an internal Do Not Call List."  PFC #73.

14

- At her 2014 deposition, Ms. Baker testified, incredibly, that LW's Call Center Liaison, Ms. Vandewater does not communicate with the third-party call centers about sales scripts.  PFC #42.  This is directly contradicted by the documentary evidence described herein, including Call Center Liaison Vandewater's 2015 emails communicating with third-party call centers about sales scripts, which Judge Feinerman found persuasive in demonstrating LW's control over its telemarketers. FTC Op. at *51; PFC #9, 37.

Indeed, the evidence of LW's culpability in this case is overwhelming and LW's protestations of ignorance are not believable.

## II.    The Proposed Class is Readily Ascertainable

This Court was previously concerned that Plaintiff's prior-defined class of "all individuals in the United States who received one or more phone calls … made by, on behalf of, or for the benefit of LW" was not ascertainable for two reasons: (1) this Court found that Plaintiff did not submit evidence demonstrating any other individuals received unlawful phone calls; and (2) this Court found that Plaintiff had not proposed any feasible method by which to identify such individuals. *See* ECF Doc. 77 at 10. As explained below, Plaintiff's revised Class Definition addresses these concerns.

Plaintiff adopts this Court's prior recitation of the applicable law governing ascertainability.  *Id*. at 9.  To summarize, a class is ascertainable if it is

"administratively feasible for the court to determine whether a particular individual is a member" using objective criteria. *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012). An ascertainable class may be defined "by the activities of the defendants." *Lamumba Corp. v. City of Oakland*, 2007 U.S. Dist. LEXIS 81688, at *11 (N.D. Cal. Nov. 2, 2007) (citing *International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson*, 102 F.R.D. 457, 464 (N.D. Cal. 1983)).

This Court took such an approach in *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014), which involved the sale of over-the-counter supplements. There, despite the defendant's contention that the class was not ascertainable because it did not have records identifying consumer purchasers, this Court determined that the defendant did have some records of sales to retailers, that class members could self-identify through affidavits and that "proper notice regarding the form of the product and its characteristics may help reduce consumer confusion regarding class membership." *Id*. at *22-28. Here, the Class is even more easily ascertainable than in *McCrary*. It is not just defined by the activities of LW; it is defined by LW's ***own records***.

Practically speaking, this Class consists of the following 2 groups: (1) LW's customers; and (2) non-customers of LW, including Mr. Donaca, whose information is contained in LW's records and demonstrates the receipt of a robo-call. LW knows exactly who is in the Class.

16

As demonstrated in the PFC, LW's 66,000 customers are all identified in the Company's CRM system.  PFC #54-83.  LW's CRM tracks the identity of each telemarketer who signed up each customer (*id.* #62-63), the commissions paid by LW to the telemarketer for each customer (*id.* #65-66), and the CRM system contains enough detail to confirm that such customers were originated through outbound telemarketing (*id.* #64).  Based on all this, customers who received robo-calls can be easily identified and directly contacted.

Indeed, the fact that LW can use its CRM system to contact its own customers is illustrated by the company's 2014 "refund program," which involved contacting 3,000 customers in response to the FTC's shutdown of the Worldwide entities. PFC #71-72.  LW's customers are thus ascertainable. *See Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively.").

Concerning non-customers, LW's Director of Operations testified that LW circulates an internal Do Not Call list containing information on each individual and the relevant telemarketer.  PFC #73-76.  If these people had not received a telemarketing call on LW's behalf, why would LW maintain records of a Do Not Call violation and why would LW be aware of their identities? Apart from its own Do Not Call list, LW also certainly has records of individuals who, like Mr. Donaca, complained of robo-calls.  PFC #74, 78.  LW also has in its possession the

17

records produced by the FTC concerning complaints of ascertainable non-customer individuals of robo-calling on LW's behalf. *See e.g.,* PFC #79 (16,937 Do Not Call and robo-call complaints for LW's current telemarketers); PFC #82 (describing 180 BBB complaints); id. (between January 1, 2012 and June 16, 2015, 433 Do Not Call complaints filed against LW). These non-customer individuals are also ascertainable and can be contacted specifically, just as LW's customers can.

Although Plaintiff believes ***direct notice*** can be given to the discrete and identifiable class and does not need to rely on self-identification, if there is any doubt that any person receiving direct notice received a robo-call, class members can submit affidavits swearing, *e.g.*, (i) that they became customers of LW because of a robo-call or, alternatively; (ii) they can describe the robo-call and swear that the call was made on LW's behalf.  This Court endorsed self-identification by affidavit in *McCrary*, and in that case there were no records to assess the identity of any of the class members. 2014 U.S. Dist. LEXIS 8443, at *22.  Here the case is stronger because Plaintiff knows exactly who is in the class and does not need to rely on affidavits alone.  For these reasons, Plaintiff's class is ascertainable and the Court's previous concerns should no longer pose any issues.

### III.    The Class Satisfies Rule 23(a)

#### A.    Numerosity

Plaintiff adopts the Court's recitation of the law concerning numerosity at page 11 of its prior opinion, ECF Doc. 77.  To supplement that discussion, a class

18

of forty or more is usually sufficiently numerous and "raises a presumption of impracticability of joinder based on numbers alone." 1 William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011); *see also Rannis v. Recchia*, 380 Fed. Appx 646, 651 (9th Cir. 2010). The court may make common sense assumptions to support numerosity. *See, e.g., In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137945, at *91-92 (N.D. Cal. June 20, 2013). In considering numerosity, the Court may also consider geographical diversity of potential class members. *See, e.g., Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996).

This Court, considering Plaintiff's prior Class definition, found that numerosity had not been met because Plaintiff had not established that calls were being made for the benefit of LW during the Class Period. Plaintiff's new Proposed Class addresses this concern because Class members are all tied to LW, as explained in the ascertainability section, *supra*.

### 1. The Only Plausible Explanation is that the Vast Majority of LW's Customers Became Customers Because of Robo-Calling

The Class here consists of many thousands of people. With respect to LW's 66,000 customers, when evaluating the evidence, the only logical conclusion is that the vast majority of these customers came from robo-calling (and indeed, given the level of detail in its CRM system, LW can tie each customer to each telemarketer and thus link each person to robo-calling).

19

Not coincidentally, from 2012 when it began robo-calling through the end of 2015, LW *tripled* its customer base and *tripled* in size.  PFC #83-84. During just eight months within the Class Period (*January through August of 2014)*, LW earned almost *six million dollars* from monthly fees paid by consumers and *over thirteen million dollars* from the sale of customer accounts.  *Id.* #85.  These numbers are unsurprising given Mr. Sirlin's statement in 2013 that attributed a meteoric rise in its customer base – 8,000 customers a month – to telemarketing. *Id.*

There is no evidence in the record whatsoever that establishes a plausible explanation for these numbers than rampant outbound robo-calling.  In fact, any argument to the contrary would be inconsistent with the testimony of LW's own Director of Operations who, when asked about LW's television, radio, print or web advertising, responded that she had no knowledge of any such advertising by LW. PFC #67.

The record also confirms that the robo-calling campaign occurred *continually throughout the Class Period*.  FTC Op., at *8. During this time, LW used over 50 telemarketers, many of whom filed licensing materials in Florida and can be linked to LW.  FTC Op., at *22, 27; PFC #87.  The FTC uncovered declarations, call transcripts and testimony from fifty consumers all showing that robo-calls were being made throughout the relevant time period, including in 2015. PFC #91.

20

Most tellingly however, the FTC investigated phone numbers associated with LW's **current** telemarketers, revealing **16,937 DNC and related robo-call complaints**.  PFC #79; FTC Op., at *39; *see also* PFC #7, 8, 94, 96 (recounting FTC "honeypot" investigation in 2014-2015); PFC #82 (describing 180 BBB complaints, one from **February 17, 2015**); *id.* (between **January 1, 2012 and June 16, 2015**, there were **433 Do Not Call complaints** filed against LW).

Examples of just some of the robo-calls made by telemarketers on behalf of and for the benefit of LW during the Class Period include:

- On **November 25, 2014**, William James, who has been on the National DNC Registry since 2003, received a robo-call.  After pressing "1", he spoke with representatives from both "Medical Alert" and "Senior Life Support, " and ordered the product with a fake name and credit card information. The following day, he received a call back from "Laverne calling from LW," informing him that his credit card information did not process. Mr. James received another call **on January 30, 2015**, set forth below.  PFC #95.

- David Eden, who is on the National DNC registry, **was contacted multiple times in December 2014** by a robo-caller selling medical alert devices.  For example, **on December 22, 2014**, Mr. Eden received a medical alert device robo-call.  Mr. Eden pressed "1" and telemarketer stated that he worked for LW. On **January 12, 2015**, Mr. Eden received a voicemail from "Senior Life Support."  When he called back, the representative stated that LW USA was the

21

company's "'corporate office.'"   Mr. Eden was advised that the credit card
transaction would say "LW USA."  PFC #97.

- Mr. James received another robo-call from a company called "Medical Alarms"
  on **January 30, 2015**.  Mr. James again placed an order for a medical alert
  device.  While on the call, he was given the company's customer service number
  which is the customer service number listed on LW's website.  www.lifewatch-
  usa.com (as of June 1, 2016).  He was then transferred to "Laverne," who again
  gave him the same LW customer service number.  PFC #99.

*See also* PFC #92 (**October 19, 2013 call**); PFC #93 (**January 14, 2014** call).
These calls are consistent with the calls received by Mr. Donaca during (and
preceding) the Class Period.  *See* Typicality analysis, *infra*.

There is also evidence in the record that, beginning in 2012 but continuing
into the Class Period and through at least the first week of January 2014 (when the
*Worldwide* litigation was commenced), LW's telemarketers were blasting millions
of calls on its behalf.  PFC #103.  For example, Unique Information Systems, which
provided its services ***exclusively*** to LW beginning in 2011, "sent out nearly 2
million calls per day, six days per week, to consumers."  *Id.* #104.  The company
was not permanently enjoined from telemarketing operations until **November 13,
2014, *over a year after the beginning of the Class Period***, until it was shut down as
a result of the *Worldwide* litigation.  *FTC v. Worldwide Info Services, Inc. et al.*,
No. 6:14-cv-8-Orl-41DAB, Dkt. 102.  *See also* PFC #103 (call between Diana Mey

22

and "Senior Life Savers" on **October 27, 2014, where manager stated that it cycles through 10,000 calls per day** and the company "used to be" called LW); *id.* (during **October 3, 2014** call, consumer told "it's all the same – that[] what's going to show up on your bank statement is Lifewatch."); *id.* ("Lifewatch is over all of us. We're just a small branch from [sic] them."); *id.* (employee of Senior Life Support from **10/31/2014-11/7/2014** declared that "it was clear that these incoming calls had been generated by a consumer's response to an outgoing recorded message or 'robo-call' from the company").

Finally, LW has been the subject of several government investigations and has been sued in at least a dozen other lawsuits alleging that LW's telemarketers engaged in robo-calling in violation of the TCPA since November 2012. *See* PX30 (Litigation Chart identifying cases. At least five of these cases allege unauthorized robo-calls made by and on behalf of LW during the Class Period, some ***as recently as September 2015***. *Id.; see also Bank v. LW, Inc.*, No. 15-5708 (E.D.N.Y.) at Dkt. 1 (identifying unauthorized robo-calls in July, August and September 2015). Because many of these cases appear to have been settled, these individuals would not be Proposed Class members. However, the complaints buttress numerosity and demonstrate that robo-calling was the norm, not the exception, for LW.

## 2. The Class is Geographically Diverse

Another relevant numerosity factor is the location of class members. Here, the potential class members are spread out and not geographically confined: for

23

example, Mr. Donaca resides in California, Mr. James resides in Mississippi, Mr. Eden resides in Illinois, and Mr. Lifshitz resides in Ohio.  PFC #107-110.

Based on all of the foregoing, common sense dictates that the Class here, which consists of the majority of LW's 66,000 customers, non-customers on LW's Do Not Call List and others who have complained of robo-calls and are identifiable in LW's records (including those produced in the FTC litigation), numbers far in excess of the 40 people necessary for numerosity.

## B.   Commonality

To satisfy commonality, Plaintiff must identify "a common contention" that is "capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  Commonality only requires a ***single*** significant question of law or fact. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). Commonality is "a low hurdle easily surmounted." *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632, at *37 (N.D. Cal. Dec. 21, 2010).

Here, there are multiple common questions.  To start, Plaintiff's and the class's claims rely on a single contention arising out of a common nucleus of operative facts: LW violated the TCPA by causing to be placed and benefitting from robo-calls made to residential landline numbers without the recipient's prior express consent. If LW is found liable, each class member has suffered the same injury and is entitled to statutory damages under the TCPA.

24

This common nucleus of operative facts gives rise to several common and controlling factual and legal questions that will resolve each class member's TCPA claims in one stroke, including:

- Whether LW, or someone acting on its behalf, placed calls using an artificial or prerecorded message as contemplated by the TCPA;

- Whether LW's conduct constitutes a violation of the TCPA;

- Whether LW can establish an affirmative defense of prior express consent;

- Whether Plaintiff and the Class are entitled to actual, statutory, or other forms of damages, and other monetary relief; and;

- Whether Plaintiff and the Class are entitled to treble damages based on the willfulness of LW's conduct.

Notably, Plaintiff has presented voluminous evidence that both he and the members of the putative class received robo-calls on behalf and for the benefit of LW in violation of the TCPA. *See* above discussion regarding vicarious liability. Thus, in addition to the other common questions listed above, the questions of whether LW is ultimately responsible for these TCPA-violative calls under common law agency principles (LW is), and whether the calls themselves violated the TCPA (they did), are common questions, capable of resolution class-wide.

## C. Typicality

A named plaintiff's claim is typical if plaintiff alleges injuries similar to those of the proposed class members, if that claim is made based upon facts which are not unique, and if those injuries spring from the same course of alleged conduct

25

of the defendants. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). Commonality and typicality inquiries frequently overlap. *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 611 n.16 (S.D. Cal. 2007).

Here, Plaintiff's claims are emblematic of the Proposed Class he seeks to represent:

- Mr. Donaca received robo-calls on his landline telephone during the Class Period.  Upon answering the call, a pre-recorded message and/or artificial voice stated that the call was regarding medical alert devices.  PFC #122.

- The robo-calls directed Mr. Donaca to press "1" to speak to a representative.  *Id.* #123.  It was during the course of these several phone calls that Mr. Donaca learned that LW was the seller of these devices.  *Id.* #124.  In addition, Mr. Donaca was informed by LW that an automatic telephone dialing system was used.  *Id.* #126.

- Mr. Donaca did not give LW prior express consent for the calls.  *Id.* #125.

Other consumers, in addition to Mr. Donaca, received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of LW during the Class Period.  These consumers were directed to press "1" to speak to a representative, and it was during the course of these calls, and related confirmatory calls, that the consumers learned that LW was the seller of the devices.  PFC #91-100 and related discussion *supra*.  The FTC Investigators who

26

were being forwarded calls from the honeypot had the identical experience. *Id.*

Plaintiff's and other Class members' claims all result from the exact same conduct, and all of these calls had the same purpose (to generate sales of medical device monitoring systems and services from which LW would profit). As a result, Plaintiff's rights under the TCPA were violated by the same common course of conduct to which LW subjected every other putative Class member, and Plaintiff suffered the exact same injury as all other class members.

**D.   Adequacy**

Finally, Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Further, whether the class representatives satisfy the adequacy requirement depends on "'the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Rodriquez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009) (quoting *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998)).

27

Plaintiff and his Counsel are undoubtedly adequate. Plaintiff has demonstrated that he has the same interests as the other members of the proposed Class: he received unsolicited telemarketing calls from Defendant in violation of the TCPA.  PFC #130.  He shares the same interest in ensuring that LW is found liable for its conduct and has vigorously prosecuted this case in discovery and he will continue to prosecute this matter to the best of his ability. PFC #131-132. Plaintiff is familiar with the class action vehicle, his responsibilities as a class representative, and the service he will provide as a named plaintiff, and he has affirmatively committed himself to acting in the Class's best interests at all times. *Id.*  None of Mr. Donaca's other cases or interests is antagonistic to those of the class.

LW previously attempted to paint Plaintiff as an "extortionist," and will likely do so again, because he sent LW a demand letter after receiving numerous unsolicited calls during which telemarketers pushed LW's medical alert devices. However, as the Court is aware, demand letters are a common precursor to a lawsuit, and can help parties avoid protracted and costly litigation.  Such a letter cannot constitute extortion under California Penal Code § 518 unless there is a showing of the "wrongful" use of fear by threat of a lawsuit that is "objectively baseless." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939-940 (9th Cir. Cal. 2006). Given that the FTC has sued LW for this very same conduct (among other illegal activities) at issue here, and Judge Feinerman issued an injunction against LW, the

28

suggestion that Plaintiff's demand letter was anything other than an appropriate response to continued telemarketer harassment is baseless.   The Court should decline LW's transparent invitation to shift the Court's focus away from its own misconduct.[5]

Plaintiff has also retained experienced and skilled counsel who will continue to adequately represent the interests of the Class.   Counsel Katrina Carroll of Lite DePalma Greenberg, LLC and Peter S. Lubin of DiTommaso Lubin P.C. have repeatedly demonstrated their commitment to and experience with plaintiffs' class litigation, have the financial resources to represent the class and will commit more than sufficient resources and effort to litigate this action to its conclusion.[6]

## IV.   The Class Satisfies Rule 23(b)(3)

### A.   Predominance

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 236 (C.D. Cal. 2007) (quoting *Hanlon*, 150 F.3d at 1022. "The mere presence of potential individual issues does not defeat the

---

[5] To the extent LW argues that Plaintiff's declination to produce the retention agreement he entered into with counsel makes him inadequate, he is under no obligation to produce that agreement and LW cannot demonstrate how such disclosure would be relevant or necessary.   Regardless, should the Court desire, Plaintiff will produce the agreement for inspection *in camera*.

[6] A copy of Lite DePalma Greenberg's firm resume, including Ms. Carroll's background and experience, is attached to the Simoni Declaration as PX 27.   Copies of DiTommaso Lubin, P.C.'s resume and Mr. Lubin's detailed biography are attached to the Simoni Declaration as PX 28.

29

predominance of common questions." *McFarland v. Memorex*, 96 F.R.D. 357, 363-64 (N.D. Cal. 1982). As such, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

Here, the foregoing discussion regarding commonality and typicality demonstrates that the claims of Plaintiff and the Proposed Class arise out of a common course of conduct.  Where, as here, a class challenges a uniform policy or practice, "[c]lass certification is usually appropriate . . . since in that situation predominance is easily established." *Singer v. Becton Dickinson & Co.*, 2009 U.S. Dist. LEXIS 114547 (S.D. Cal. Dec. 9, 2009) (citing *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008)). As such, Plaintiff's and the Class's claims will be subject to common proof, and this litigation is well-suited to the class action process. Furthermore, the relief sought is identical in each Class member's case because the TCPA provides a statutory damages award of $500 for each violation of the Act.  47 U.S.C.§ 227(b)(3)(C).  Each member of the Class is seeking the same statutory damages, which allows damages to be easily calculated.

Plaintiff anticipates an argument from LW that the (sole) question of prior express consent will predominate over the (myriad) other common questions identified above.  First, express consent "is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears

30

the burden of proof." *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (upholding class certification, noting that defendant "did not show a single instance where express consent was given before the call was placed"). But even putting that aside, there is no consent issue here.

LW has asserted that consent is established because it receives affidavits from telemarketers stating that they will comply with state and federal telemarketing laws. Noticeably absent from these affidavits, however, is any specific reference to prior express written consent.[7] *See, e.g.,* PX 25 at 35-37. And even if the agreements did mention consent, there is not one piece of evidence showing that any telemarketer ever obtained any class member's consent (***i.e. the consent of the "called party" under the TCPA***, 47 USCS § 227(b)(1)(B)). Actually, to the contrary, when asked whether LW made any attempt at the time each sales call was transferred to LW to verify that there had been no robo-calling or Do Not Call violations, LW's CEO answered that LW chose not to do so. PFC #34. Further with respect to LW's alleged compliance program, Judge Feinerman found the testimony Ms. Baker and Mr. Sirlin as "lacking in credibility" (FTC Op. at *36) and its "ostrich-like approach …***extremely troubling***" (*id*. at *39).

---

[7] Even according to LW, the affidavits were only adopted in October 2014. PX 1 at 102:11-17. Thus, even if the affidavits *were* sufficient to demonstrate consent, which they are not, LW has not offered a single shred of evidence that its telemarketers were obtaining prior express, written consent from class members between October 2013 and October 2014.

31

On the other hand, Plaintiff's evidence reveals that both he and scores of other class members received these calls without ever once providing express written consent or while listed on the Do Not Call registry (where consent obviously was not given), and that LW was intimately aware of this. *See generally supra*. Indeed, a **lack of consent** is the common sense conclusion: how would telemarketers obtain prior express **written** consent from consumers they were **cold robo-calling** to generate **new** customers for LW? The **lack of consent** is a **common** issue rather than an individual one.

Accordingly, *all* relevant factual and legal inquiries in this matter are capable of class-wide proof, and predominate over any other minor, individualized question(s) LW may manufacture.

## B.     Superiority

Finally, to proceed as a class action under Rule 23(b)(3), the district court must find that a class action is superior to other available methods for fair and efficient adjudication. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975). The rule identifies a non-exclusive list of pertinent superiority factors:

- the interest of members of the class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and

- the difficulties likely to be encountered in the management of a class action.

32

Fed. R. Civ. P. 23(b)(3).[8]   Courts also look to whether alternative methods of dispute resolution are reasonably available and compare them to the class action device.   *See, e.g., Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 562 (C.D. Cal. 2012).  Here, a class action is the superior method for this controversy.

First, the interest of class members in individually controlling the prosecution of this litigation is small.  "'Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.'"  *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, (C.D. Cal. 2012) (quoting *Wolin v. Jaguar Land Rover N. Am.,* LLC, 617 F.3d 1168, 1175 (9th Cir. 2010)).  The TCPA provides for statutory damages in the amount of $500 per violation; it costs a plaintiff $400 (including a $50 administrative fee) to merely file a claim in federal court, much less litigate it.  Thus, the TCPA's damages provision "is generally insufficient to incentivize individual litigation."  *See Bee, Denning, Inc. v. Capital Alliance Group*, No. 13-cv-2654, 2015 U.S. Dist. LEXIS 129495, at *34-35 (Sept. 24, 2015 S.D. Cal.) (agreeing with plaintiffs' argument).

Second, although some potential class members have commenced litigation against LW, for the most part these claims appear to have been settled or voluntarily dismissed (based on a recent review of the dockets).   The only remaining federal cases brought by consumers against LW for violations of the

---

[8] The other pertinent factor, "the desirability or undesirability of commencing the litigation of the claims in the particular forum," is neutral in this litigation.

33

TCPA are **class actions**, not individual cases, and show that the class action device is necessary for plaintiffs to come forward to purse their claims.[9]

Third, manageability of this case as a class action does not pose any difficulties.  The experience of Plaintiff's counsel in suits of this kind speaks to their ability to manage a class of the expected size here.

A class action "is superior to other methods of litigation 'if no realistic alternative exists.'"  *Bee, Denning*, 2015 U.S. Dist. LEXIS 129495, at *34. Admittedly, an individual can bring an individual TCPA claim in small claims court (potentially avoiding significant filing fees and the need for an attorney).  But where, as here, a company has engaged in a pattern and practice of using other telemarketers to do its "dirty work," making proof of liability very complex, the lawsuit is "ill-suited" for small claims court.  *See Bee, Denning*, 2015 U.S. Dist. LEXIS 129495, at *36 (TCPA case not suited for small claims court where defendant concealed its conduct through aliases and difficult to trace toll-free numbers).  Indeed, the only real alternative to a class action is no action at all.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court enter an order (i) certifying the Proposed Class, (ii) appointing Plaintiff as the Class

---

[9]  The cases are *Salam v. LW, Inc.*, Case No. 13-cv-9305 (N.D. Ill.), and *Bank v. LW, Inc.*, Case No. 15-cv-2278 (E.D.N.Y.).  Note that these matters involve different claims and classes and coordination of the actions was rejected by the Judicial Panel on Multidistrict Litigation.

34

Representative, (iii) appointing Katrina Carroll of Lite DePalma Greenberg, LLC

and Peter Lubin as Co-Lead Class Counsel, and (iv) granting any such further relief

as this Court deems reasonable and just.

Date:  June 7, 2016                          Respectfully submitted,

                                             By:  ___/s/[10] Stephen J. Simoni__
                                             STEPHEN J. SIMONI (Bar No. 284558)
                                             StephenSimoniLAW@gmail.com
                                             **SIMONI CONSUMERS
                                             CLASS ACTION LAW OFFICES**
                                             12131 Turnberry Drive, Suite 100
                                             Rancho Mirage, CA 92270-1500
                                             Telephone:  (917) 621-5795


                                             By:  ___/s/ Chad C. Austin____

                                             CHAD C. AUSTIN (Bar No. 235457)
                                             ChadCAustin@gmail.com
                                             **LAW OFFICE OF CHAD C. AUSTIN**
                                             4632 Berwick Drive
                                             San Diego, CA  92117
                                             Telephone:  (619) 992-7100
                                             Facsimile:  (858) 712-0316


                                             By:  ___/s/ Katrina Carroll__

                                             KATRINA CARROLL (*pro hac vice*)
                                             kcarroll@litedepalma.com
                                             **LITE DePALMA GREENBERG, LLC**
                                             211 West Wacker Drive
                                             Suite 500
                                             Chicago, IL 60606

---

[10] In accordance with Local Rule 5-4.3.4(a)(2)(i), the ECF/CM filer, Stephen J. Simoni, attests
that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing's
content and have authorized the filing.

598257.2 PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION EDCV-13-02064 (JGB)-SPx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone:  (312) 750-1265

By:  ___/s/ Peter S. Lubin__
psl@ditommasolaw.com
**DITOMMASO LUBIN**
17W200 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Telephone:  (630) 333-0000

*Counsel for Plaintiff Matthew
Donaca and the Proposed Class*

36

# PX 2

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
--------------------------------------------X
LIFE ALERT EMERGENCY RESPONSE, INC.,
a California corporation,

               Plaintiff,

                             Docket No.
v.                     CV 13/03455 JAK (SSX)

CONNECT AMERICA.COM, LLC, a Delaware limited
liability company, KENNETH GROSS, an
individual, LIFEWATCH, INC., a New York
corporation, EVAN SIRLIN, an individual,
LIVE AGENT RESPONSE 1, LLC, a Florida limited
liability company, GREG SMALL, an individual,
TRILOGY INVESTMENT, LLC, a Florida limited
liability company, MICHAEL HILGAR, an
individual, WORLDWIDE INFO SERVICES, INC.,
a Florida corporation and DOES 1 to 10,
inclusive,

               Defendants.

--------------------------------------------X

               1225 Franklin Avenue
               Garden City, New York
               February 19, 2014
               10:45 a.m.

     VIDEOTAPED DEPOSITION of LIFEWATCH, INC.,
Defendant, by SARAI BAKER, taken by Plaintiff,
pursuant to Federal Rules of Civil Procedure, and
Order, held at the above-noted time and place,
before Donna C. Gilmore, a Stenotype Reporter and
Notary Public within and for the State of New York

1                          Sarai Baker

2    Adrina, I -- she's new, so I just can't remember her

3    last name at this point.

4         Q    And who was her predecessor?

5         A    Pam.

6         Q    And what was her last name?

7         A    Cohen.

8         Q    Pam Cohen still works for LifeWatch,

9    correct?

10        A    Correct.

11        Q    Just give me a little more detail as to

12   what the HR department is responsible for.

13        A    Hiring, firing, new employees, bringing

14   them on board.

15        Q    Who is the head of that department?

16        A    Lisa Benzola.

17        Q    And who's the head of the accounting

18   department?

19        A    Paule Oliveri.

20        Q    Do you know what his title is?

21        A    Comptroller.

22        Q    And could you explain to me in a little

23   more detail what the responsibilities of the CRM

24   department are?

25        A    To maintain data integrity, to catch,

ATTORNEY'S EYES ONLY

1                    Sarai Baker

2    general mistakes of data entry issues.

3        Q     And the data entry of what data, in

4    general?

5        A     All data.

6        Q     Including customer information?

7        A     More so with employees.



23       Q     Does the data entry that the CRM

24   department is responsible for also include

25   commissions what are paid to third-party sellers of

```
 1                       Sarai Baker

 2   LifeWatch medical alert systems?

 3        A    Yes.

 4        Q    And who is the head of that department?

 5        A    Gerardo Duran.

 6        Q    And what's his title?

 7        A    Lead CRM analyst.

 8        Q    Who do you report to now?

 9        A    Mitchell May.

10        Q    And what is his position at LifeWatch?

11        A    Vice president.

12        Q    Do you know approximately how long Mr. May

13   has worked with LifeWatch?

14        A    I do not know.

15        Q    Do you know generally what his

16   responsibilities are?

17        A    I do not.

18        Q    Do you also report to Evan Sirlin in your

19   job now?

20        A    I do not directly report to him.

21        Q    To your understanding, you report to

22   Mitchell May, Mitchell May reports to Evan Sirlin;

23   is that correct?

24             MR. LIPARI:  Objection, calls for

25             speculation.
```

ATTORNEY'S EYES ONLY

41

Sarai Baker

1
2     Q    And approximately how long has
3  Ms. Vanderwater worked for LifeWatch, to your
4  knowledge?
5     A    Two years.
6     Q    And she's been call center liaison the
7  whole time?
8     A    No.
9     Q    What did she start as?
10    A    Order processing supervisor.
11    Q    As call center liaison, does she work in
12  the order processing department of LifeWatch?
13    A    No.
14    Q    Which department does she work in?
15    A    She's, she directly reports to me.
16  There's not a specific department.
17    Q    Describe for me what Ms. Vanderwatter's
18  responsibilities are as call center liaison.
19    A    Communication with the sellers.
20    Q    Anything else?
21    A    Reviewing recording.
22    Q    When you say that Ms. Vanderwater
23  communicates with sellers, do you mean that she is
24  communicating with representatives of third-party
25  call centers that LifeWatch works with?

ER0042

42

Sarai Baker

2    A    Yes.

3    Q    Can you tell me in general what the nature

4 of those communications are?

5    A    Regarding product information, pricing

6 information, CRM, some customer-related questions.

7    Q    Does she also, to your knowledge,

8 communicate with the third-party call center

9 representatives about sales scripts that they're

10 using?

11    A    No.

12    Q    Who at LifeWatch does that?

13        MR. LIPARI:  Objection.  Object to

14        form, assumes facts not in evidence.

15    A    I wouldn't know.  I don't know.

16    Q    Who at LifeWatch do you believe would know

17 about that?

18        MR. LIPARI:  Objection, form.

19    A    I don't know.

20    Q    And to your knowledge, does LifeWatch

21 communicate with third-party call center

22 representatives about sales scripts that the call

23 centers are using?

24    A    I don't know.

25    Q    Have you ever communicated with

ER0043

43

Sarai Baker

1

2    third-party call center representatives about sales

3    scripts that they're using?

4        A    We, any communication would be regarding

5    product and pricing.

6        Q    Have you ever, have you ever communicated

7    with a third-party call center representative about

8    sales scripts that the call center was using?

9            MR. LIPARI:  Asked and answered.  You

10           can answer again.

11       A    Any information that was communicated was

12   about product and pricing.

13       Q    As opposed to what?

14           MR. LIPARI:  Objection, vague.  Don't

15           answer.  As opposed to jelly.

16       Q    Well, did you ever have a conversation

17   with any third-party call center representative

18   about the content of a sales script that they were

19   using?

20       A    Product, product information, pricing

21   information.

22       Q    You never discussed rebuttals that were in

23   the scripts --

24           MR. LIPARI:  Objection.

25       Q    -- that were being used by the call

ER0044

44

                         Sarai Baker

 1
 2   center?
 3              MR. LIPARI:  Object to form, vague,
 4         terminology hasn't been defined, and asked
 5         and answered.
 6          You can answer again, if you
 7         understand the question and the
 8         terminology that's been used.
 9     A    Yeah, I'm not sure specifically.
10     Q    Have you ever seen sales scripts that are
11   being used by third-party call centers for
12   LifeWatch?
13     A    I have seen pieces, again for, to verify
14   the product and pricing information is correct
15   that's being provided to the customer.
16     Q    Who provided you the pieces of those sales
17   scripts?
18              MR. LIPARI:  If you know.
19     A    I was going to say, I don't recall.
20              MR. LIPARI:  We're just looking for
21         your best recollection here.
22     Q    Let me go back to what you mentioned was a
23   responsibility of Lauren Vanderwater, and you
24   mentioned that she reviews recordings.  What
25   recordings are you referring to?

ER0045

48

1                          Sarai Baker

2     recordings that she was reviewing recordings that

3     Lifewatch's bank had requested?

4           A     That is part of it.

5           Q     What else, what other recordings does she

6     review?

7           A     We also randomly request recordings.

8           Q     And by "we," you mean LifeWatch randomly

9     requests sales recordings from outside call centers,

10    correct?

11          A     From outside sellers.

12          Q     Okay.  But the recordings are of sales

13    phone calls, correct?

14          A     Yes.

15          Q     Any other recordings that you request?

16          A     No.

17          Q     And who is the one at LifeWatch that

18    requests the sales recordings from the outside call

19    centers?

20          A     Either Lauren or myself.

21          Q     And how frequently does LifeWatch, say in

22    2013, request recordings from the outside call

23    centers?

24          A     For our, for the random or for the --

25          Q     For Lifewatch's purposes, not for the

ER0049

1                          Sarai Baker

2      A     I'm not sure.

3      Q     Do you know of anyone else that is

4   responsible for deciding where LifeWatch advertises

5   other than Mr. Sirlin?

6      A     I'm not sure.

7      Q     To your knowledge, is Mr. Sirlin the one

8   who is primarily responsible for the content of

9   Lifewatch's advertising?

10                 MR. LIPARI:  Objection, asked and

11                 answered, calls for speculation.

12     A     Yeah, I'm not sure.

13     Q     Other than Mr. Sirlin, do you know of

14  anyone else at LifeWatch that prepares the content

15  of Lifewatch's advertising?

16                 MR. LIPARI:  Objection to form.

17     A     I really don't know.

18     Q     To your knowledge, is LifeWatch currently

19  advertising on television?

20     A     I don't know.

21     Q     To your knowledge, is LifeWatch currently

22  advertising on the radio?

23     A     I do not know.

24     Q     Do you have any knowledge of what

25  Lifewatch's current print advertising is?

**ATTORNEY'S EYES ONLY**

1                     Sarai Baker

2      A    I do not know.

3      Q    Do you have any involvement in the content

4  of Lifewatch's website?

5      A    No.

6      Q    Do you review the content for any purpose

7  as part of your job?

8      A    No.

9           THE VIDEOGRAPHER:  This completes Tape

10           Number One.  The time is 12:28 p.m. and

11           we're going off the record.

12           (Lunch recess was taken from

13           12:28 p.m. to 1:44 p.m.)

14           MR. LOEB:  Would you mark this,

15           please.

16           (Two-page document was marked as

17           Plaintiff's Exhibit 3, for identification,

18           as of this date.)

19           THE VIDEOGRAPHER:  This begins Tape

20           Number Two.  The time is 1:44 p.m. and

21           we're back on the record.

22  CONTINUED EXAMINATION

23  BY MR. LOEB:

24      Q    Ms. Baker, I'd like to refer you to

25  Exhibit 3 in front of you.  Do you recognize that as

ATTORNEY'S EYES ONLY

1                          Sarai Baker

2        Q    Who is your contact over there?

3        A    David Reilly.

4        Q    Do you know what his position is?

5        A    I do not know.

6        Q    Generally, what's the nature of the

7   contact that you have with David Reilly?

8        A    It would be regarding pricing, product

9   info, CRM data entry, commissions, order

10  fulfillment, customer-related issues.

11       Q    How long have you been dealing with TMI?

12             MR. LIPARI:  Objection to form.  You

13             can answer.

14       A    About two years.

15       Q    And is it your understanding that TMI has

16  a Florida telemarketing license?

17       A    I do not know.

18       Q    But as far as you know, TMI doesn't itself

19  sell or provide medical alert systems to customers,

20  does it?

21             MR. LIPARI:  Objection to form.

22       A    I'm not sure I understand.

23       Q    In other words, TMI is not a medical alert

24  system company, right?

25       A    Correct.

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2        Q     It's a telemarketer.

3              MR. LIPARI:  Object to form.

4        A     It's, I don't know, there are many reasons

5    or many ways that a call center could get leads.

6        Q     Right.  But TMI does have a call center

7    with sales agents that sell medical alert systems

8    for LifeWatch, right?

9        A     Medical alert systems to multiple

10   companies, sure.  Yes.

11       Q     Including LifeWatch?

12       A     Yes.

13       Q     And it has done so for at least two years?

14       A     Yes.

15       Q     During that time, have you ever seen a

16   copy of the sales script that TMI sales agents use?

17             MR. LIPARI:  Objection to form,

18             assumes facts not in evidence, lack of

19             foundation.

20             You can answer it.

21       A     Not the script in its entirety.  Again,

22   regarding pricing and product information, yes.

23       Q     Have you ever asked David Reilly at TMI to

24   provide you a copy of his sales agents'

25   telemarketing script?

ATTORNEY'S EYES ONLY

```
 1                     Sarai Baker
 2           MR. LIPARI:  Objection to form,
 3           assumes facts not in evidence.
 4           You can answer it.
 5      A    Not that I can recall.
 6      Q    Is there someone other than you at
 7  LifeWatch that would be responsible for reviewing
 8  sales scripts that are being used by outside
 9  telemarketers?
10           MR. LIPARI:  Object to form, makes an
11           assumption about her role that hasn't been
12           established, so there's no foundation.
13           You can answer it.
14      A    I do not know.
15      Q    Is there someone at LifeWatch whose
16  responsibility it is to review sales scripts that
17  are used by outside telemarketers?
18      A    No.
19      Q    Why not?
20           MR. LIPARI:  Objection, vague.
21           You can answer, if you understand the
22           question.
23      A    We are buying deals.
24      Q    What do you mean by you're "buying deals"?
25      A    We're simply buying customers.
```

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2        Q     Don't you, as the director of operations,

3   want to know how those customers are obtained by

4   telemarketers?

5                  MR. LIPARI:  Objection, argumentative.

6                  You don't have to answer if you don't

7                  understand the question.

8        A     I'm not clear on that.

9        Q     You don't want TMI sales agents to mislead

10  customers when they're selling LifeWatch medical

11  alert systems, do you?

12       A     No.

13       Q     So don't you want to know what they're

14  telling customers when they're selling the LifeWatch

15  medical alert systems?

16       A     Regarding products, pricing, yes, we, and

17  we do discuss that with them.

18       Q     What about other things that the sales

19  agents are telling the customers during the sales

20  calls, other than product and pricing?  Are you

21  concerned about anything other than product and

22  pricing?

23       A     Like what?

24       Q     For instance, if they're using another

25  company's trademark in selling LifeWatch medical

ATTORNEY'S EYES ONLY

1                              Sarai Baker

2    alert systems, would that be a concern?

3         A    Well, we've never had an issue with that

4    and it's up to the seller to, you know, follow

5    regulations and law.

6         Q    But do you monitor what the seller is

7    doing when they're selling LifeWatch medical alert

8    systems?

9         A    Monitor suggests a realtime, and we're

10   simply reviewing the recordings to make sure that it

11   is accurate information regarding product and

12   pricing.

13        Q    And the only ones that performed those

14   responsibilities at LifeWatch, to your knowledge,

15   are yourself and Lauren Vanderwater, right?

16             MR. LIPARI:  Objection,

17             mischaracterizes.  That's a tricky

18             question.  That suggests that her

19             testimony was X when in fact it was Y.

20        A    Can you repeat the question?

21             MR. LOEB:  Could you read the question

22             back, please.

23             (The requested portion of the record

24             was read by the reporter.)

25             MR. LIPARI:  What responsibilities.

ATTORNEY'S EYES ONLY

1                        Sarai Baker

2        Q     Reviewing the recordings from the

3   telemarketers.  Is there anyone else at LifeWatch

4   that reviews the telemarketing sales recordings, to

5   your knowledge?

6              MR. LIPARI:  Object to characterizing

7              them as telemarketing sales recordings.

8              That wasn't her testimony.

9              Over that objection you can answer it.

10       A     No.

11       Q     Motivated Marketing, where is that company

12   located?

13       A     I do not know.

14       Q     Is there any person in Motivated Marketing

15   that you deal with?

16       A     Kristen, I'm not sure her last name.

17       Q     How long have you been working with

18   Motivated Marketing?

19       A     Do not know.

20       Q     Well, did you work with Motivated

21   Marketing in 2013?

22       A     Yes.

23       Q     And does Motivated Marketing have a call

24   center that uses sales agents to sell LifeWatch

25   medical alert systems over the phone?

ATTORNEY'S EYES ONLY

1                         Sarai Baker

2        A     To sell medical alarm systems and

3    LifeWatch purchases them from Motivated, yes.

4        Q     What does LifeWatch purchase from

5    Motivated Marketing?

6        A     Customers.

7        Q     Have you ever reviewed a telemarketing

8    script that's been used by Motivated Marketing?

9                  MR. LIPARI:  Objection to the

10                 characterization, assumes facts not in

11                 evidence.

12                 You can answer.

13       A     No.

14       Q     To your knowledge, has anyone else at

15   LifeWatch reviewed a telemarketing script, sales

16   script that's used by Motivated Marketing?

17                 MR. LIPARI:  Same objection.

18       A     I do not know.

19       Q     Have you requested to see a copy of any

20   telemarketing sales scripts that are being used by

21   Motivated Marketing?

22                 MR. LIPARI:  Objection, assumes facts

23                 not in evidence.

24                 You can answer it.

25       A     Me, personally?

ATTORNEY'S EYES ONLY

1                            Sarai Baker

2        Q     I'd like to refer the witness to what

3   we've marked as Exhibit 4.  Do you recognize this

4   list as a list of outside, companies that provide

5   outside call centers to sell LifeWatch medical alert

6   systems?

7        A     Yes.

8        Q     And do you believe this is a list of

9   outside call centers that are currently selling

10  LifeWatch medical alert systems?

11       A     No.

12       Q     Can you point out to me companies on this

13  list that you believe are no longer selling

14  LifeWatch medical alert systems?

15       A     Worldwide Info Services, Platinum, Trust

16  Lead Network, DBOSS, Contact Center Network and

17  Dominicana.  I'm not sure about Altitude.  I'm not

18  sure about Alarm Pros, not sure about VR Advocates,

19  not sure about Vertical.  Master TMI yes.  The

20  Solution Center I'm not sure, SSMMSC I'm not sure.

21  Security Alert I'm not sure, SafeGuard I'm not sure,

22  Safe Alarm I'm not sure.  Motivated yes.  Maximum

23  Security Pro I'm not sure, Javonni not sure, Jamp

24  not sure.  IPS Leads yes.  Instinctive Edge I'm not

25  sure.  Inservice America yes.  Fresh Fruit and

ATTORNEY'S EYES ONLY

1                          Sarai Baker

2   Marketing I'm not sure, Ellick I'm not sure,

3   DreamReach not sure, Direct Agent Response not sure,

4   Center Partners not sure, Call Center Transnational

5   not sure, Asian not sure.

6       Q    Okay, then there's some on the second page

7   too.

8       A    TCV no.  Senior Care Alert not sure,

9   Altitude Marketing not sure.  Five States no, Fifth

10  Wave no.  Senior Guardian not sure, Invictus not

11  sure, OnCall Superior not sure.  Lead Advantage

12  Network no, Trusted Lead Source no.

13      Q    A lot of these companies are in the "not

14  sure" category.  Do you know who it would be at

15  LifeWatch that would have better knowledge of which

16  of these companies are currently being used to do

17  outside call center sales for LifeWatch medical

18  alert systems?

19      A    Evan, Mitch.

20      Q    I mean, is it fair to say that to the best

21  of your knowledge, it's Evan Sirlin and Mitchell May

22  who are the ones who decide which of these companies

23  LifeWatch will use?

24           MR. LIPARI:  Object to form, assumes

25           facts not in evidence.

ATTORNEY'S EYES ONLY

```
 1                        Sarai Baker

 2        A    I'm not sure.

 3        Q    Is there somebody else that you think

 4   could be making that decision at LifeWatch?

 5        A    I'm really not sure.

 6        Q    You're not privy to how the decision was

 7   made?

 8        A    Correct.

 9        Q    Could you go down the list -- well, let's

10   start with the ones -- let's go down the list on the

11   ones that you said are currently being used.

12             Inservice America, do you deal with that

13   company?

14        A    Do I communicate with them?

15        Q    Yes.

16        A    Yes.

17        Q    Who at that company do you communicate

18   with?

19        A    Joe Vaughn.

20        Q    And where is that company located?

21        A    Virginia.

22        Q    Do you obtain sales recordings from that

23   company?

24        A    They are relatively new, we have not

25   requested anything as of yet.
```

ATTORNEY'S EYES ONLY

1                           Sarai Baker

2        Q     Do you plan to?

3        A     At some point.

4        Q     Have you reviewed any sales scripts from

5   that company?

6              MR. LIPARI:   Object to form, assumes

7              facts not in evidence.

8        A     No.

9        Q     Have you requested sales scripts?

10       A     No.

11       Q     When you say Inservice America is

12   relatively new, did LifeWatch first start using them

13   in 2014?

14       A     Yes.

15       Q     The next one on the list that you

16   indicated that is currently being used is IPS Leads.

17       A     Yes.

18       Q     Have you communicated with that company?

19       A     No.

20       Q     Do you know where that company is located?

21       A     No.

22       Q     Who, to your knowledge, at LifeWatch has

23   communicated with that company?

24       A     Lauren.

25       Q     And has she requested sales recordings

ATTORNEY'S EYES ONLY

```
 1                          Sarai Baker

 2    from that company?

 3        A    Yes.

 4        Q    And have you listened to them?

 5        A    Yes.

 6        Q    Did you have any problems with the tapes

 7    that you listened to?

 8             MR. LIPARI:  Objection, vague.

 9        A    In regards to what?

10        Q    Anything that you heard on the tapes.

11             MR. LIPARI:  Same objection.

12        A    There was one that I heard that was not

13    compliant with the NACHA regulations regarding ACH.

14        Q    And did you notify IPS Leads about that?

15        A    Lauren did.

16        Q    Do you still have those recordings?

17        A    I'm not sure.

18        Q    Have you reviewed any sales scripts that

19    are being used by IPS Leads?

20        A    No.

21        Q    Do you know if anyone else has at

22    LifeWatch?

23        A    I do not know.

24        Q    Did you request copies of any sales

25    scripts?
```

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2       A    No.

3       Q    How long has, to your knowledge, LifeWatch

4   been using IPS Leads?

5       A    I do not know.

6       Q    Sometime in 2013 was LifeWatch using

7   IPS Leads, to your knowledge?

8       A    Yes.

9       Q    2012?

10      A    I do not know.

11      Q    And then the next one you said yes, that's

12  Motivated Marketing, that's the company that you

13  testified about earlier?

14      A    Yes.

15      Q    And then Master TMI, is that what you

16  referred to as TMI earlier?

17      A    Yes.

18      Q    Okay.  Let's now go back on the list to

19  the ones that you said that LifeWatch is no longer

20  using, right?

21           The first one I have is Contact Center

22  Dominicana.

23      A    Yes.

24      Q    Do you know why LifeWatch stopped using

25  that company?

ATTORNEY'S EYES ONLY

1                          Sarai Baker

2        A    I do not know.

3        Q    Do you know who decided, who at LifeWatch

4   decided not to use that company any longer?

5        A    No, I do not know.

6        Q    Contact Center Network, do you know why

7   LifeWatch stopped using that company?

8        A    I do not know.

9        Q    Do you know who decided not to use that

10  company?

11       A    I do not know.

12       Q    And then DBOSS, is that how you refer to

13  that company?

14       A    DBOSS.

15       Q    Do you know why LifeWatch stopped using

16  that company?

17       A    I don't know.

18       Q    Do you know where that company is located?

19       A    I don't.

20       Q    And you don't know who decided not to use

21  it, right?

22       A    Correct.

23       Q    What about Worldwide Info Services, do you

24  know why LifeWatch stopped using that company?

25       A    I do not.

ATTORNEY'S EYES ONLY

```
 1                        Sarai Baker

 2      Q    Do you know who decided not to use the

 3  company?

 4      A    No, I don't know.

 5      Q    Same questions with Platinum, do you know

 6  why LifeWatch stopped using that company?

 7      A    No.

 8      Q    And you don't know who decided not to use

 9  that company anymore?

10      A    I do not know.

11      Q    And Trusted Lead Network, do you know why

12  LifeWatch stopped using that company?

13      A    I do not know.

14      Q    And you don't know who decided not to use

15  the company?

16      A    I do not know.

17      Q    And same question for the company on the

18  second page that's TCV, The Credit Voice, The

19  Consumer Voice?

20      A    I do not know.

21      Q    You don't know why LifeWatch stopped using

22  that company or who decided not to, right?

23      A    Correct, I do not know.

24      Q    Same question with Five States, do you

25  know why LifeWatch stopped using that company?
```

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2          A    I am familiar with the phrase, I have a

3   limited understanding.

4          Q    Tell me what your limited understanding

5   is.

6          A    That, I know that there's a national do

7   not call registry, numbers are on do not call.

8          Q    And to your knowledge, does LifeWatch do

9   anything to make sure that outside call centers that

10  it uses not violate the national do not call

11  registry by calling people that are registered on

12  it?

13               MR. LIPARI:  Object to form.

14         A    I do not know.

15         Q    And is there someone, again, at LifeWatch

16  that you think would be more knowledgeable about

17  that than you?

18         A    I do not know.

██     ■     ██ ████████ ████████ ██ ████████████

██   ████████ █████ █ ██ █ █ ██ █ ████████ ████████

██   ████ ████████

██     ■   ██ ██ ████████ ██ ████████ ████████

██     ■   ██ ██ ████ ██ ████████ ████

██     ■   ██

██     ■   ██ ████████ ██ ██ █████ ████████

**ATTORNEY'S EYES ONLY**

91

1                              Sarai Baker

2          Q      You see item three of that same section

3     where it says, "All inbound calls need to be tied to

4     a specific mailer and noted in the CRM," do you

5     understand that as being a current guideline that

6     LifeWatch has for outside call centers?

7          A      That is not a current guideline.

8          Q      If you look in the next section, where

9     it's titled "Recordings," if you look at items one

10    through four, do you understand any of those items,

11    number one through four, to currently be guidelines

12    that LifeWatch has for outside call centers?

13         A      No.

14         Q      And do you see the next section where it

15    says, "Do not call lists, in item one says, "All

16    call centers need to maintain an internal do not

17    call list that is in addition to the national and

18    state do not call list," do you understand that as

19    being a current guideline that LifeWatch has for

20    outside call centers?

21         A      I do not know.

22         Q      And do you see the last section on that

23    page where it says, "Reasons a call will fail

24    quality control," and it says, item one,

25    "Misleading, misinforming the clients as to the way

**ATTORNEY'S EYES ONLY**

1                         Sarai Baker

2        A     Sure.

3        Q     And it is correct that Worldwide was a

4    telemarketer of LifeWatch, right?

5        A     There were a seller, they sold to us, sold

6    medical alarms.

7        Q     You don't believe they were a

8    telemarketer?

9        A     I don't know.

10       Q     To your knowledge, did LifeWatch enter

11   into a written telemarketing agreement with

12   Worldwide?

13       A     I'm not sure.

14             MR. LOEB:   I have a document I'd like

15             to mark as Exhibit 7.

16             (Telemarketing Services Agreement was

17             marked as Plaintiff's Exhibit 7, for

18             identification, as of this date.)

19       Q     I'm going to show the witness Exhibit 7,

20   which is captioned Telemarketing Services Agreement.

21   Just briefly review it and let me know if you've

22   ever seen that document before.

23       A     It's possible.

24       Q     And do you recognize Exhibit 7 as a

25   telemarketing services agreement between LifeWatch

ATTORNEY'S EYES ONLY

1                          Sarai Baker

2                  MR. LIPARI:  Objection, vague.

3      A      What do you mean by "problems"?

4      Q      Any kind of problem.

5                  MR. LIPARI:  Objection, vague.

6      A      I have heard something where a

7   representative was not as nice as they could have

8   been to a customer.

9      Q      And did you bring that to the attention of

10  Worldwide?

11     A      Yes.

12     Q      Do you ever recall hearing misleading

13  statements in any of the telemarketing sales

14  recordings that Worldwide provided you?

15     A      It's possible.

16     Q      You just don't recall?

17     A      Correct.

18     Q      Do you recall ever hearing the phrase,

19  "I've fallen and I can't get up" used on any of the

20  telemarketing sales recordings that Worldwide

21  provided you?

22     A      No, I do not recall that.

23     Q      At some point did you learn that Worldwide

24  was using robocalling in connection with the

25  telemarketing it was doing?

ATTORNEY'S EYES ONLY

1                    Sarai Baker

2     A     No.

3     Q     You never heard that?

4     A     No.

5     Q     Let's go back one second.  Is there

6     anybody else that you can remember having contact

7     with at Worldwide other than this person Rick?

8     A     Danny.

9     Q     And do you have a last name --

10    A     No.

11    Q     -- for that person?

12    A     No.

13    Q     Do you know what that person's title was?

14    A     No.

15    Q     Do you remember what your dealings with

16    Danny were?

17    A     Again, it was for the same, the same

18    things.  If I couldn't get Rick on the phone I would

19    call Danny.

20    Q     So you may have also requested copies of

21    telemarketing sales recordings from him?

22    A     Correct, recordings of all kinds, yes.

23    Q     What other kinds of recordings would

24    you --

25    A     Well, remember, I don't know whether it's

ATTORNEY'S EYES ONLY

```
 1                          Sarai Baker
 2   telemarketing or, you know, whether they're
 3   advertising on TV or radio.  I mean, they're sales
 4   recordings, is what they are.
 5        Q    Right.  That's what I --
 6        A    Right, but I'm just saying, I can't tell
 7   you whether or not they're telemarketing or what the
 8   case is.
 9        Q    Well, aren't all of them phone calls?
10   They're all phone calls between --
11        A    Yeah, but they --
12        Q    Excuse me.
13             -- a sales agent and a potential customer,
14   right?
15        A    Correct.  Could be inbound or outbound.
16        Q    Correct.  So you can't tell from, you
17   couldn't tell from the sales recordings whether they
18   were initiated by an inbound or an outbound call,
19   right?
20        A    You can tell, but, you know, I mean, if
21   somebody -- yeah, I mean, if somebody was responding
22   to an ad, you know, they were calling in, for the
23   most, yeah, for the most part you could tell.
24        Q    Did you ever, do you recall ever listening
25   to a sales recording that Worldwide provided you in
```

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2    which the customer complained about receiving a

3    robocall?

4         A    No, I do not recall that.

5         Q    Have you ever, do you recall ever

6    listening to sales recordings provided by any of

7    LifeWatch's outside call centers where you heard a

8    customer complaining that he received a robocall?

9         A    No.

10        Q    Or she.

11   

ATTORNEY'S EYES ONLY

1                    Sarai Baker



ATTORNEY'S EYES ONLY

1                          Sarai Baker

15                 MR. LOEB:  Can we take a break?

16                 THE VIDEOGRAPHER:  This completes Tape

17          Number Two.  The time is 3:06 p.m. and

18          we're going off the record.

19                 (A brief recess was taken from

20          3:06 p.m. to 3:21 p.m.)

21                 THE VIDEOGRAPHER:  This begins Tape

22          Number Three.  The time is 3:22 p.m. and

23          we're back on the record.

24    CONTINUED EXAMINATION

25    BY MR. LOEB:

**ATTORNEY'S EYES ONLY**

1                    Sarai Baker



ATTORNEY'S EYES ONLY

1                          Sarai Baker



**ATTORNEY'S EYES ONLY**

1               Sarai Baker

2        Q    Was a company called American Innovative

3   Concepts, Inc. a telemarketer for LifeWatch?

4        A    They were a company that sold deals, sold

5   accounts, customers to LifeWatch, yes.

6        Q    And did you have any dealings with

7   American Innovative Concepts, Inc.?

8        A    I'm not sure.  I can't recall that.

9        Q    Do you recall how you found out about

10  American Innovative Concepts, Inc.?

11       A    They were listed as an agent in our CRM as

12  a seller.

13       Q    Are all of, to your knowledge, what you

14  call sellers listed in LifeWatch's CRM?

15       A    Yes.

16       Q    And what does CRM stand for?

17       A    Customer Relation Management.

18       Q    Do you know of, what you remembered ever

19  heard of a person called Lisa Nieves, N-I-E-V-E-S?

20       A    I do not recall that name.

21       Q    Do you know where American Innovative

22  Concepts, Inc.'s call center was located?

23       A    I do not.

24       Q    Do you know whether it was located in the,

25  at the 474 Northlake Boulevard in Altamonte Springs,

**ATTORNEY'S EYES ONLY**

1                            Sarai Baker

2    Florida that I referred to earlier?

3        A    I do not know where they were located.

4        Q    Do you recall requesting any telemarketing

5    sales recordings from American Innovative Concepts,

6    Inc.?

7        A    I do not recall.

8        Q    Were you involved at all in the payment of

9    commissions to American Innovative Concepts, Inc.?

10       A    No.

11       Q    Do you know who would have been at

12   LifeWatch?

13       A    I'm not sure.

14            MR. LOEB:   I have another document I'd

15            like to mark as Exhibit 9.

16            (Document entitled Inbound Script

17            ($34.95) was marked as Plaintiff's

18            Exhibit 9, for identification, as of this

19            date.)

20       Q    I'd like to refer you to what we've marked

21   as Exhibit 9, and the caption is "Inbound Script

22   34.95."  I'll represent to you that this was a

23   script that was filed with the State of Florida, and

24   my question to you, though, is have you ever seen

25   it?

**ATTORNEY'S EYES ONLY**

1                      Sarai Baker

2       A    No, I do not recall this.

3       Q    And I also want to represent that this was

4    a script that was filed by American Innovative

5    Concepts, Inc. with the state of Florida.  That

6    doesn't change your answer?

7       A    No.

8       Q    Was a company called Archigen, Inc. a

9    telemarketer for LifeWatch?

10      A    Not that I am aware of.

11      Q    Have you ever heard of that name.

12      A    No.

13      Q    Have you ever heard of a person called

14   Gary Martin?

15      A    No.

16           MR. LOEB:  I have a document I'd like

17           you to mark as Exhibit 10.

18           (Document entitled Inbound Script

19           ($34.95) was marked as Plaintiff's

20           Exhibit 10, for identification, as of this

21           date.)

22      Q    I'd like to refer you to Exhibit 10,

23   which, again, the caption says, "Inbound Script

24   34.95," and I'll represent to you that this script

25   was filed by Archigen, Inc. with the state of

ATTORNEY'S EYES ONLY

112

1                        Sarai Baker

2     Florida, and my question to you is have you ever

3     seen this script?

4          A     No.

5          Q     Was a company called Global Interactive

6     Technologies a telemarketer for LifeWatch?

7          A     LifeWatch did buy accounts from them, yes.

8          Q     And did you have contact with someone from

9     Global Interactive Technologies?

10         A     I can't recall.

11         Q     Do you recognize Gary Martin as a person

12    that was associated with Global Interactive

13    Technologies?

14         A     I don't know who that person is.

15         Q     Do you recall Global Interactive

16    Technologies being located, again, at the same

17    address that I referred to before, 474 Northlake

18    Boulevard, Altamonte Springs, Florida?

19         A     No, I don't know that address.

20               MR. LOEB:  I'd like to mark a document

21               as Exhibit 11.

22               (Commercial Telephone Seller Business

23               License Application Packet was marked as

24               Plaintiff's Exhibit 11, for

25               identification, as of this date.)

ATTORNEY'S EYES ONLY

1              Sarai Baker

2      Q     Exhibit 11 is titled, "Commercial

3  Telephone Seller Business License Application

4  Packet."  Have you ever seen Exhibit 11, briefly

5  review it?

6      A     No.

7      Q     Never seen it?

8      A     Nope.

9      Q     And on the front page it appears that the

10  application is being made by Global Interactive

11  Technologies, Inc., and I just want to refer you, if

12  you flip in five pages from the end, see what

13  appears there to be three-page script?

14      A     Okay.

15      Q     Take a look at that.  Does that appear to

16  be a sales script from LifeWatch?

17           MR. LIPARI:  Objection, lacks

18           foundation.  She already testified she's

19           never seen this document, calls for

20           speculation, and the document speaks for

21           itself.

22      Q     Just focusing on the three pages as part

23  of this document.

24           MR. LIPARI:  Lacks foundation.

25           Have you ever seen the document

ATTORNEY'S EYES ONLY

1                    Sarai Baker

2           before?

3                THE WITNESS:  I have not.

4     Q     The three pages.

5     A     I have not, yeah, I have not seen these

6     three pages or anything in this document.

7     ███  ██  ████  ██ ██ ██ ██████ ████ ███ ████ ████ ██

8  ████ ████ ██████ ████ ████ ████ ████ ███ ████ ████ ██

9  ████ ██ █ ██████ ██ ██ ████ ████ ████ ███ █████ ████

10 █████ ████ ███ ███ ████ ████ ████ ████ ████

11 █████ ██ ██ ███

12 █████ ██ ████ ███ ████ ████ ██████ ████

13 █████ ████████ ██████ █████

14 █████ ██ ██ ███

15 █████ ██ ██████ ████ ██████ ████ ████ ██

16 █████ ██████████ ████ ████ ████ ██████

17 █████ ██████ ████ ████ ████ ████ ████ ██████

18 █████ ████████ ██ ██████

19                MR. LIPARI:  Objection, calls for

20           speculation, lacks foundation and asked

21           and answered.

22    A     I do not know.

23    Q     You see the second page from the end of

24    this document?

25    A     Um-hum.

**ATTORNEY'S EYES ONLY**

1                         Sarai Baker



ATTORNEY'S EYES ONLY

1                              Sarai Baker

■        ■      ▬▬▬   ▬▬▬▬▬

3        Q      I know you haven't seen this particular

4    commercial telephone seller business license

5    application packet.  Have you ever seen such an

6    application, to your recollection?

7        A      No.

8        Q      Do you know who at LifeWatch would be

9    responsible for working with outside call centers'

10   applications for telemarketing licenses in Florida?

11       A      No.

12       Q      Not you, it wouldn't be you, right?

13       A      No.

14       Q      Was a company called The Consumer Voice a

15   telemarketer of LifeWatch?

16       A      LifeWatch did buy accounts from them, yes.

17       Q      You don't believe that Consumer Voice was

18   a telemarketer for LifeWatch then?

19       A      Again, I don't know.  I don't know how

20   they obtained sales.

21              MR. LOEB:  A document I'd like to mark

22              as Exhibit 12.

23              (Telemarketing Services Agreement was

24              marked as Plaintiff's Exhibit 12, for

25              identification, as of this date.)

**ATTORNEY'S EYES ONLY**

121

1                          Sarai Baker

2    robocalling is?

3         A    I mean, not really.

4         Q    I'm using it, do you understand that over

5    the last two years that robocalling has been a

6    problem for the medical alert system industry in

7    general?  Have you heard that?

8         A    Not really.

9         Q    To your knowledge, have any of LifeWatch's

10   telemarketers been involved in calling persons that

11   are on the national do not call list?

12        A    I don't know.

13        Q    You haven't heard that?

14        A    No.

15        Q    Over the last couple of years, have you

16   heard that that has been a problem in general for

17   the medical alert system industry?

18        A    I don't recall.

19        Q    And other than what I've shown you today,

20   is it correct that you are not aware that any of

21   LifeWatch's telemarketers were using the phrase

22   "I've fallen and I can't get up" in connection with

23   their sales pitches?

24             MR. LIPARI:  Object to form.

25        A    Correct, I was not aware.

**ATTORNEY'S EYES ONLY**

```
 1                       Sarai Baker

 2        Q     Prior to today.

 3              MR. LIPARI:  Object to form.

 4        A     Correct.

 5        Q     Are you aware that the State of Indiana

 6   filed a lawsuit against various persons and

 7   companies involved in telemarketing medical alert

 8   systems in 2012?

 9        A     No.

10        Q     Are you aware that at some point the State

11   of Indiana added LifeWatch as a defendant in that

12   case?

13        A     No.

14              MR. LOEB:  Let's mark this as

15              Exhibit 13.

16              (Amended Complaint for Injunction was

17              marked as Plaintiff's Exhibit 13, for

18              identification, as of this date.)

19        Q     Referring the witness to Exhibit 13, which

20   is titled "Amended Complaint for Injunction,

21   Restitution, Civil Penalties and Reasonable Costs,"

22   and the plaintiff is the State of Indiana, I just

23   would ask you to just briefly review it and tell me

24   if you've ever seen it before?

25        A     No.
```

ATTORNEY'S EYES ONLY

1                         Sarai Baker

2              MR. LOEB:  A one-page document I'd

3              like to mark as Exhibit 14.

4                   (Article dated 2/21/2013 was marked as

5              Plaintiff's Exhibit 14, for

6              identification, as of this date.)

7         Q    Exhibit 14 is a one-page document dated

8    February 21, 2013.  The caption is "Attorney General

9    issues Cease and Desist Order against Michael

10   Hilgar, Elite Information Solutions and Worldwide

11   Info Services."

12             First question, have you ever seen this

13   document before?

14        A    No.

15        Q    Have you ever heard that the attorney

16   general for north Dakota issued a cease and desist

17   order cyst against any of these people or companies?

18        A    No.

19        Q    You see in the second paragraph there's a

20   quote from the attorney general from North Dakota,

21   it says, "I am concerned about allegations

22   indicating that Hilgar's businesses are

23   misrepresenting the costs of the medical alert

24   devices and monitoring services they are selling,

25   are using illegal telephone solicitations to sell

**ATTORNEY'S EYES ONLY**

1                          Sarai Baker

2      them and that they have failed to properly respond

3      to the civil investigative demand or cooperate with

4      the federal investigation."

5              Had you heard any of those allegations

6      before?

7          A    No.

8          Q    And prior to today, were you aware that

9      Life Alert filed its lawsuit in this case in May of

10     2013?

11             MR. LIPARI:  Objection, asked and

12             answered.

13         A    I do not recall a time frame.

14             MR. LOEB:  A document I'd like to mark

15             as Exhibit 15.

16             (News release was marked as

17             Plaintiff's Exhibit 15, for

18             identification, as of this date.)

19         Q    I just refer the witness to Exhibit 15 and

20     it appears that it's a press release regarding, or

21     an article regarding a lawsuit that the FTC filed

22     regarding giving robocalling and other unfair

23     practices on January 6, 2014.  My question is are

24     you aware of that lawsuit?

25         A    No.

ATTORNEY'S EYES ONLY

1                          Sarai Baker

2        Q      You see in the last paragraph on the first

3   page it lists the defendants that were named in the

4   FTC's lawsuit.   Were you aware that any of them had

5   been sued by the FTC prior to today?

6        A      No.

7        Q      Do you see the number 13 defendant, Joseph

8   Settecase?

9        A      Um-hum.

10       Q      Do you know who that is?

11       A      No.

12       Q      Never heard of him before?

13       A      No.

14       Q      Do you see, let me refer you four

15  paragraphs from the bottom of this document, you see

16  where it says, "Consumers who press one on their

17  phones for more information were transferred to a

18  live representative who allegedly continued the

19  deception by saying that the medical alert systems

20  are recommended by the American Heart Association,

21  the American Diabetes Association and the National

22  Institute on aging."

23              Had you heard that allegation before

24  today?

25              MR. LIPARI:   Objection, asked and

1                       Sarai Baker

2           answered.

3      A      No.

4      Q      Tell me what steps that you're aware of

5  that LifeWatch has taken to prevent abuses by its

6  outside call centers?

7      A      Abuse of what?

8      Q      Any abuses.

9           MR. LIPARI:  Objection, vague.  The

10          witness has asked for clarification about

11          it.  So if you can answer, if you think

12          that's sufficient clarification go ahead.

13          If you need more clarification you're

14          entitled to ask for further clarification.

15     A      Yeah, I'm just not sure of...

16     Q      Tell me any steps that you're aware of

17  that LifeWatch has taken to prevent its outside call

18  centers from using robocalling in connection with

19  the sales of Lifewatch's medical alert systems.

20          MR. LIPARI:  Object to form.  She

21          testified earlier that she wasn't sure

22          what the term robocalling actually meant,

23          so you're asking her to speak to an issue

24          that she's not even sure about.

25          Do you know what robocalling is?

ATTORNEY'S EYES ONLY

```
 1                      Sarai Baker

 2            THE WITNESS:  Not enough to know what

 3            they're doing -- no, just based off what

 4            you said, but I wouldn't know anything

 5            about that with the sellers.

 6      Q     But do you know whether LifeWatch has done

 7   anything to prevent its outside call centers from

 8   using robocalling?

 9            MR. LIPARI:  Again, you're asking her

10            a question that includes a term that she

11            doesn't understand.

12            Only answer questions that you

13            understand.  Otherwise ask for

14            clarification.

15      Q     Can you answer?

16      A     I don't know.  I don't have an answer.

17      Q     Have you had any discussions at LifeWatch

18   with anyone other than attorneys, your attorneys,

19   about outside call centers using robocalling?

20      A     No.

21      Q     It's never come up?

22      A     No, not that I can recall.

23      Q     And what is your belief as to what

24   robocalling is, if any?

25            MR. LIPARI:  Don't guess.  If you have
```

**ATTORNEY'S EYES ONLY**

1                        Sarai Baker

2              a belief, tell him what your belief is.

3              If you don't that's fine.

4       A     I would just -- some type of automated

5    system?

6       Q     Exactly.  An automated calling system that

7    calls your home number and allows you to press one

8    to be put in contact with a live sales

9    representative.  Are you familiar with that?

10      A     No.

11      Q     You've never received one at your home?

12      A     No.

13      Q     And no one you know has ever received that

14   type of call?

15      A     No.

16      Q     And that type of call has never been

17   discussed at LifeWatch, to your knowledge?

18      A     No.

19      Q     You are not aware of any customers of

20   LifeWatch complaining about receiving those type of

21   calls?

22              MR. LIPARI:  Asked and answered that

23              exact same question.

24              You can answer again.

25      A     No.

ATTORNEY'S EYES ONLY

150

Sarah Baker

2      Q      Did you have any deals with US Digest,

3   LLC?

4      A      I don't recall it.

5             MR. LOEB:  This is a good place to

6         break.

7             THE VIDEOGRAPHER:  This completes Tape

8         Number Three.  The time is 4:44 p.m. and

9         we're going off the record.

10            (A brief recess was taken from

11        4:44 p.m. to 5:00 p.m.)

12            THE VIDEOGRAPHER:  This begins Tape

13        Number Four.  The time is 5 p.m. and we're

14        back on the record.

15            MR. LOEB:  I have another document I'd

16        like to mark as Exhibit 20.

17            (E-mail was marked as Plaintiff's

18        Exhibit 20, for identification, as of this

19        date.)

20     Q      I show the witness Exhibit 20, which is an

21   e-mail string, and my question is have you seen all

22   or part of this e-mail string before?

23     A      Yes.

24     Q      What part have you seen?

25     A      I've definitely seen the part from Lauren,

151

Sarai Baker

1

2 the part at the bottom from Lauren and "Good

3 afternoon, Katie."

4  Q Okay.  That's the e-mail that is from

5 Lauren Vanderwater to Katie, Worldwide Info Service

6 -- and Worldwide Info Services?

7  A Yes.

8  Q Are you copied on that e-mail?

9  A No.

10  Q Were you forwarded a copy of this e-mail,

11 do you believe?

12  A I'm -- yes, whenever Lauren sends out an

13 e-mail to the centers I am sent a copy of it.

14  Q And which call center do you believe this

15 e-mail was sent to by Lauren Vanderwater?

16  A Worldwide.

17  Q And in particular to Katie, Katie at

18 Worldwide?

19  A That's what it looks like, yes.

20  Q Do you know who Katie is?

21  A I mean, I'm not sure.  She was with their

22 customer service.

23  Q Did you have dealings with her?

24  A Yes, I believe I did.

25  Q All right.  The e-mail from Lauren

ER0059

152

Sarai Baker

1

2  Vanderwater says, "Good afternoon, Katie.  See below

3  from Sarai regarding all Canadian orders," and then

4  there's three items of instructions?  Is it correct

5  that those three items are instructions that you

6  gave?

7       A    Yes.

8       Q    And why did you give those instructions?

9       A    Evan and Mitch directed me to.

ER0060

153

1                           Sarai Baker

8         Q     But your intent was to have the actual

9    sales agents in the outside call centers change

10   their sales pitches to reflect these changes, right?

11        A     Regarding pricing.

12        Q     Yes.

13        A     Yes, yes, regarding pricing.

14        Q     Right.  To your knowledge, did all the

15   sales agents for the outside call centers modify

16   their sales pitches as you instructed them?

17              MR. LIPARI:  Objection to form and

18        object to the characterization.

19        A     Orders, accounts were then entered in to

20   the CRM at this adjusted price.

21        Q     My question is going to you understood at

22   the time you had Lauren Vanderwater send out this

23   e-mail that the sales agents at the Worldwide call

24   center as part of their sales pitch were quoting

25   certain prices for Canadian orders to Canadian

ER0061

154

1          Sarai Baker

2    customers, correct?

3          A    They would have, for Canadian orders if

4    they knew the person lived in Canada they would have

5    to change the pricing.

6          Q    Right, in their sales pitches to those

7    Canadian customers, right?

8          A    Sure.

9          Q    And to your knowledge, did the sales

10   agents change their sales pitches based on this

11   instruction?

12              MR. LIPARI:  Object to form, asked and

13              answered.

14              You can answer if you understand the

15              question.

16         A    The CRM showed that orders were being

17   entered under this new pricing.

18         Q    As far as you knew the sales agents

19   changed their sales pitches to the customers on

20   their phone calls, right?

21              MR. LIPARI:  Asked and answered.  You

22              can answer any way you'd like.  You don't

23              have to change your answer.

24         A    The CRM reflected that.

25         Q    And how did the CRM reflect that?

ER0062

155

1                          Sarai Baker

2       A     The product that was assigned, the product

3   and price -- the price that was assigned to that

4   client was then 49.95.

5       Q     So the pricing after this instruction in

6   the e-mail from Lauren Vanderwater, Lifewatch's CRM,

7   indicated that the Worldwide sales agents had

8   modified the pricing for the Canadian orders, right?

9               MR. LIPARI:  Object to form, calls for

10              speculation, asked and answered.

11      A     I mean, yes, the CRM reflected it.

12      Q     You didn't have to follow up, to your

13  recollection, you didn't have to follow up and make

14  another request to Worldwide?

15      A     I cannot recall specifically to Worldwide.

16  Could we have followed up with them or other centers

17  to do that?  Sure.  I can't tell you if it was

18  specifically for Worldwide.

19      Q     Do you recall following up to any of

20  LifeWatch's call centers on these instructions to,

21  for the sales of LifeWatch medical alert systems to

22  Canadians?

23      A     I don't recall.

24      Q     Let's refer to the other portion of the

25  e-mail, the top portion that's in the e-mail string

ER0063

1                    Sarai Baker

2    that's from a John at johninfo@gmail dated May 22,

3    2013. Do you believe you've ever seen that portion

4    of the e-mail string?

5          A     Just from what I was shown by the lawyers.

6          Q     So you reviewed this e-mail before your

7    deposition, this e-mail string?

8          A     I did, I have seen this.

9          Q     Prior to being shown by your attorneys,

10   had you seen the entire e-mail string?

11         A     No.

12         Q     And in the middle of the e-mail string

13   there's an e-mail from Katie dated May 21, 2013 to

14   Michael Medalert. Do you see that?

15         A     Yes.

16         Q     Do you know who Michael Medalert is?

17         A     I do not.

18         Q     Do you know who johnwwinfo@gmail.com, who

19   that is?

20         A     I do not, no.

21         Q     In the top e-mail, the one that's from

22   John dated May 22, 2013, do you recognize any of the

23   e-mail addresses that that e-mail was sent to?

24         A     No, I do not.

25         Q     Now, have you searched for any e-mails

ER0064

157

Sarai Baker

1

2    that you have between yourself and any of

3    Lifewatch's outside call centers?

4        A    We are working on, we're in the process of

5    obtaining those.

6        Q    I'm asking have you searched for them

7    personally.

8        A    Not as of yet.

9        Q    You have your own personal computer at

10   LifeWatch, right?

11       A    Yes.

12       Q    Did you look on your own personal computer

13   if you have copies of any e-mails between yourself

14   and Lifewatch's outside call centers?

15       A    Not as of yet.  We're working on it.

16       Q    Why haven't you looked for them on the

17   computer?

18       A    Just, I just hadn't had time to look

19   through it yet.

20       Q    Do you know if anyone else at LifeWatch

21   has looked for e-mails between LifeWatch and outside

22   call centers?

23       A    I don't know specifically, no.

24       Q    Generally.

25       A    Meaning I don't -- no, I don't know if

ER0065

(116 of 568)

Case 5:13-cv-02045-JGB-SP Document 90-100 Filed 06/07/16 Page 200 of 227 Page ID #:2642
Case 2:13 cv 03455 JAK SS   Document 182 4   F ed 04/14/14   Page 39 of 40   Page D #:2226

```
                                                      158
  1                    Sarai Baker
  2    other people have or not.
  3              MR. SULTZER:  And Ralph, just for the
  4         record, we put a litigation hold to
  5         LifeWatch and I made a representation to
  6         you already that you already asked for all
  7         that information and I'm in the process of
  8         assembling whatever is there, so Sarai is
  9         not involved in that.  As we said in
 10         processing, she has no idea in terms of,
 11         you know, I'm not working with her on
 12         that.  But I want you to know that and
 13         we've already given you some documents
 14         today, we're going to give you more
 15         documents next week, and we should be
 16         finalizing our production at that time.
 17     Q    Do you know if Lauren Vanderwater has
 18    searched her computer to see if she has any e-mails
 19    between her and Lifewatch's outside call centers?
 20     A    I do not know.
 21     Q    Did you ask her to search for them?
 22     A    No.
 23              MR. LOEB:  I have a document I'd like
 24         to mark as Exhibit 21.
 25              (Discover statement was marked as
```

# PX 29

## PLAINTIFF'S FACT CHART ("PFC")

*Class Period: October 16, 2013 through the present*

**Facts Supporting Vicarious Liability**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 1. | Telemarketers sold, and continued to sell during the Class Period, medical alert devices on behalf of LW. | On an **October 27, 2014** call, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that "Lifewatch is over all of us." PX 7 FTC Doc. 19-1 at 74 (sales call transcript). |
| 2. | | On a **January 12, 2015** call, a "Senior Alert" telemarketer advised the declarant that "Lifewatch USA is the company's 'corporate office.'" PX 17 FTC Doc. 24-28 at ¶ 14 (declaration). |
| 3. | | On a **January 19, 2015** call, a "Senior Life Support" telemarketer represented to a consumer that "all of the products are from Lifewatch," and "we sell for them." PX 7 FTC Doc. 19-1 at 30-31 (sales call transcript). |
| 4. | | On a **January 23, 2015** call, a "Senior Life Support" telemarketer identified Senior Life Support as a branch of LW, but that the "main company is Lifewatch." PX 9 FTC Doc. 20-1 at 70 (sales call transcript). |
| 5. | | On a **September 11, 2015** call, an "Agent Med Alert" telemarketer, when asked whether she sends her calls and sales to anyone else other than Lifewatch stated, "Nope. They're the only company we use." PX 23 FTC Doc. 77-1 at 80 (sales call transcript); *see also id.* at 74 (Consumer – "Your company is really Lifewatch." Telemarketer – "Correct."). |
| 6. | | On a **September 15, 2015** call, a telemarketer for "Medical Alarms" advised that the company was Lifewatch. PX 23 FTC Doc. No. 77-1 at 67 (sales call transcript). |
| 7. | | *See also* PFC 94, 96, 98 (referencing FTC's "honeypot") |
| 8. | | The *FTC v. Lifewatch* court conducted an exhaustive analysis of the evidence adduced by the FTC demonstrating the ongoing nature of LW's misconduct, including: evidence in 2014 relating to the FTC's "honeypot"; evidence derived from the FTC's Consumer Sentinel database of consumer complaints of robo-calls and Do Not Call violations, as recent as June 16, 2015 (655 specific complaints named LW); |

1

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | complaints to the Better Business Bureau as recent as February 17, 2015. 2016 U.S. Dist. LEXIS 45057, at *22-27. |
| 9. | Lifewatch has controlled and continues to control its telemarketers throughout the Class Period. | Judge Feinerman determined that "the evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers." 2016 U.S. Dist. LEXIS 45057, at *48. On this point, the court found persuasive declarations of LW former employees and also emails from LW's current Call Center Liaison, Lauren Vandewater, showing LW's review and approval of telemarketing scripts. "In light of the evidence," the court found, the telemarketers "are principally acting on Lifewatch's behalf… as Lifewatch's agents." 2016 U.S. Dist. LEXIS 45057, at *51. |
| 10. | | Joseph Settecase, who owned a telemarketing company that made robo-calls on behalf of LW beginning in 2011 (the telemarketer entered into a final settlement with the FTC on November 13, 2014), declared that "Lifewatch was aware of all the telemarketing [his company] engaged in on Lifewatch's behalf." PX 15 FTC Doc. 24-11 at ¶ 8. |
| 11. | | Leslie Steinmetz, who helped Lifewatch develop new business from 9/09-12/12, including through the use of telemarketing, confirmed that Lifewatch "did control and monitor telemarketers that it worked with" and "employees were in regular contact with representatives of its telemarketers." PX 22 FTC Doc. 26-12 at ¶ 4. He further declared that "Lifewatch was aware of all the telemarketing activities [his company] engaged in on Lifewatch's behalf." *Id.* at ¶ 6. *See also FTC v. Lifewatch, Inc.* Mem. Op. and Order at 29 (finding Steinmetz's averment that LW monitored and controlled its telemarketers credible). |
| 12. | | Kenneth Gross, a competitor of LW who also purchased customers from LW from 9/01-3/13, declared that LW monitored and controlled its telemarketers (also providing examples). PX 14 FTC Doc. 24-9 at ¶¶ 9-11. *See also FTC v. Lifewatch, Inc.* Mem. Op. and Order at 29 (finding Gross's averment that LW monitored and controlled its telemarketers credible). |
| 13. | | Judge Feinerman reviewed evidence in connection with the *Worldwide* litigation, filed on January 6, 2014, where LW's telemarketers were accused of robo-calling and Do Not Call violations. The court determined that LW was the Worldwide defendants' "sole medical alert client" (2016 U.S. Dist. LEXIS 45057, at *9); that "Lifewatch paid |

2

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013" (*id.*); that "the weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products" (*id.* at *13), and; "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct" (*id.* at *14). |
| 14. | There is ample evidence of knowledge and control by Lifewatch based on its communications and interactions with its "Sellers," particularly in connection with LW's, and LW's telemarketers, applications for telemarketing licenses. | Lifewatch has the authority to terminate any telemarketer that breaches its agreement and, in fact, has exercised that authority. PX 2 Baker Tr. 80:7-17. |
| 15. | | In September 2012, the Florida Department of Agriculture and Consumer Services ("FDACS") discovered that Florida telemarketers were selling LW products. Because of this, the FDACS determined that *Lifewatch* needed to be registered as a telemarketer. In response, on November 9, 2012, Lifewatch, Inc. ("Lifewatch") filed for a telemarketing license. PX 12 FTC Doc. 22-1 at ¶ 9. |
| 16. | | LW's 2012 application attached **"copies of all sales scripts given to those soliciting for us," attached "copies of all sales information or literature we provide our salespeople or of which we inform our salespeople (including, but not limited to, scripts, outlines, instructions and information regarding how to conduct telephonic sales, sample introduction, sample closings, product information and contest or premium award information."** PX 12 FTC Doc. 22-2 at 6. These same materials were attached to the applications LW filed in 2013 and 2015, all of which were signed by Evan Sirlin. PX 12 FTC Doc. 22-1 at ¶¶ 12-13. |
| 17. | | LW also attached a "Call Center Welcome Package" to its applications which it provided to its telemarketers during the Class Period. *See, e.g.*, PX 12 FTC Doc. 22-1 at ¶¶ 10, 13. Among other things, LW's Call Center Welcome Package includes an "Up-sell Script," rebuttals on how to address certain questions raised by potential customers, and an explanation of "how things work" to be used with the |

3

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | **customer.** PX 12 FTC Doc. 22-1 and 22-2 at 10-20. Under the "Quality Control" portion of the Package, it states that "**Scripts and Rebuttals must be approved by Lifewatch-USA.**" *Id.* at 20. |
| 18. | | The FDACS investigation (1) identified over a dozen telemarketers that applied for telemarketing licenses in Florida and (2) tied the telemarketers directly to LW. The telemarketers included: |
| | | • **US Digest, LLC** (operated from 2012 until it closed after an FDACS compliance inspection on May 28, 2014); |
| | | • **Multi Level Marketing LLC** (appears to have operated from April 29, 2013 to 2014 and used the name "**LifeWatch**" and "**Preferred Reader**"); |
| | | • **Direct Agent Response, Inc.** (operated from October 23, 2013 until it was dissolved on June 2, 2014); |
| | | • **Senior Medical Alert Systems, LLC** (operated from May 22, 2014 until apparently 2015; FDACS conducted an on-site interview and an employee confirmed that calls were being live transferred to Lifewatch; FDACS found violations for 41 telemarketers on site and the company paid a fine and continued to operate; on November 3, 2014, Senior Medical Alert filed a form with FDACS listing Evan Sirlin and Mitchell May **of Lifewatch** as officers); |
| | | • **TMI Marketing** (operated from March 11, 2013 and renewed its license on March 28, 2014; application listed **Lifewatch** as the only company for which it was telemarketing); |
| | | • **Oasis Money Group LLC** (FDACS conducted an inspection on March 28, 2014 and determined that the company was operating illegally under another company's, **Payless Solutions Inc.'s** telemarketing license; Oasis employees were using a "**Senior Life Response**" script and FDACS determined that the company was telemarketing on behalf of **Lifewatch**); |
| | | • **Payless Solutions Inc.** (operated from 2010 until it changed its name on October 30, 2014 to **Global Marketing Enterprises, Inc.**); |
| | | • **Payless Solutions Enterprises LLC** (began operating on August 25, 2014; attached a "**Medical Alert System**" script); |
| | | • **Miranda Money Group LLC** (began operating on September 17, 2004; a/k/a **Oasis Money Group** and the license application listed **Lifewatch Inc** as an |

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | affiliate; the application stated that **Lifewatch** used the fictitious name **Senior Life Support**; Senior Life Support scripts were attached);<br><br>• **Personal Security Shopper Inc.** (telemarketing license since December 2008; on December 21, 2012 license application listed **"Life Watch"** as a fictitious name and included **Lifewatch's** Call Center Welcome Package);<br><br>• **Total Security Vision Inc.** (began operating on August 4, 2014 and on September 12, 2014 filed a script for the sale of medical alert devices);<br><br>• **Alertlink** (began operating September 11, 2013 until the company cancelled its bond on approximately September 13, 2014; affiliated with **I Slingshot Inc. and Peacewatch Enterprises Inc**; included medical alert device sales scripts; FDACS linked **Peacewatch** to **Lifewatch**; FDACS conducted an on-site inspection on February 3, 2014 and found **"Senior Care Line"** scripts at Alertlink's location; during the inspection an employee confirmed that the company was using an autodialer to make robo-calls; FDACS determined that "a majority of Alertlink's telemarketers were unlicensed, and the company was issued a fine");<br><br>• **Live Response Agent Inc.** (operated from June 14, 2013 until FDACS determined that operations ceased in July 2014; its license application listed **Life Watch USA** as its parent company and the company attached medical alert system scripts); and<br><br>• **Javomi Inc.** (operated from May 7, 2013 until its bond was cancelled on July 25, 2014).<br><br>PX 12 FTC Doc. 22-1 at ¶¶ 14- 62. |
| 19. | | Some of these telemarketer's applications included copies of LW's Call Center Welcome Package – along with its requirement that "Scripts and Rebuttals must be approved by Lifewatch-USA" – and proposed scripts. *See, e.g.*, PX12 FTC Doc. 22-1 at ¶¶ 17 and PX 12 FTC Doc. 22-2 at 88-105 (4/18/14 – U S Digest LLC, aka "Senior Care Alert). Others attached scripts and other LW documents, or identified LW as an affiliate, linking them directly to LW during the Class Period. *See, e.g.*, PX 12 FTC Doc. 22-1 at ¶ 22 and PX 12 FTC Doc. 22-3 at 26-33 (10/23/13 – Direct Agent Response, Inc. aka "Senior Life Alarm", attaching LW forms, subscriber welcome |

5

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|   |           | package, and contract ); PX 12 FTC Doc. 22-1 at ¶ 33 and FTC PX 22-3 at 106-123 (3/29/14 – TMI Marketing Group, LLC aka "American Alert Services, LLC", attaching LW script and other LW documents); PX 12 FTC Doc. 22-1 at ¶ 42 and PX 12 FTC Doc. 22-3 at 158-169 (9/17/14 – Miranda Money Group LLC application identifying LW as affiliate using "Senior Life Support" and addendum stating that LW does all fulfillment). |
| 20. |        | The FDACS investigation also provides detail on 6 telemarketing companies shut down by January 6, 2014 as a result of *FTC v. Worldwide Info Services, Inc.* matter in the United States District Court in the Middle District of Florida, all determined by FDACS to have telemarketed for Lifewatch. They are: **Elite Information Solutions, Inc.; Absolute Solutions Group, Inc.; The Credit Voice, Inc.; Live Agent Response 1 LLC; Arcagen Inc.; and American Innovative Concepts, Inc.** *See* PX 12 FTC Doc. 22-1 at ¶¶ 63-83. |
| 21. |        | Based on the evidence cited above concerning Lifewatch's Florida licensing submission and the submissions of Lifewatch's Florida- affiliated telemarketers, Judge Feinerman determined that "the scripts in question originated with Lifewatch" and that during the FTC injunction hearing, Mr. Sirlin "essentially conceded that Lifewatch was responsible for misrepresentations in the script." *FTC v. Lifewatch Inc..,* 2016 U.S. Dist. LEXIS 45057, *16-18 (N.D. Ill. Mar. 31, 2016). |
| 22. | The products described by the telemarketers during the Class Period are linked to Lifewatch by price, charged by designation, and description. | Telemarketers advised consumers of the precise payment they could expect for the medical alert service. *See, e.g.,* PX 19 FTC Doc. 25-14 at ¶ 3 ($34.95/month);  PX 6 FTC Doc. 17-2 at 6, 14 (James (Gilman) told that monitoring fee was $34/month, confirmed at $34.95/month); PX 17 FTC Doc. 24-28 at ¶ 14 ($39.95/month); PX __ FTC Doc. 77-1 at 15 ($29.95/month);  PX 23 FTC Doc. 77-1 at 26-27 ($39.90 for first month and shipping, $29.95/month thereafter). *See also* PX 20 FTC Doc. 25-27 at ¶ 4 (Thill's mother billed at $34.95). |
| 23. |        | Telemarketers advised consumers that the charge would appear under the name "Lifewatch." *See, e.g.,* PX 7 FTC Doc. 19-1 at 74 ("what's going to show up on your bank statement is Lifewatch"). |
| 24. |        | "Our products say Lifewatch, USA."  PX 23 FTC Doc. 77-1 at 69. |
| 25. | The telemarketing calls during the Class Period involve live | As explained by Ms. Baker, after a telemarketer enters a customer's information into LW's CRM database, the telemarketer "switches" the customer over to LW's |

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|  | transfers to Lifewatch's verification department or company. | verification company, MedGuard, who verifies the information, including the customer's name, address, phone number and payment information.  PX 1 FTC Trans. at 82:14-19.  *See also* PX 26 FTC Doc. 96 and FTC Doc. 96-1 -1 at 19 (telemarketer acknowledging it is no longer verifying on their end, but inserting information into CRM and doing a live transfer). |
| 26. |  | In a September 11, 2015 call, an "Agent Med Alert" telemarketer advised that, if the consumer wants the medical alert system, "we transfer you, live transfer you to [LW's] shipping department to make sure we got – [LW] got all the information correct before they send out the medical alert system.  Been doing this for 30 years plus."  PX 23 FTC Doc. 77-1 at 80-81. |
| 27. |  | FTC Investigator Tyndall was live transferred during a **September 2014** call.  PX 11 FTC Doc. 21-2 at 51-52. |
| 28. |  | FTC Investigator France was live transferred during a **January 2015** call.  PX 10 FTC Doc. 21-1 at 37. |
| 29. |  | Mr. James was live transferred during a **November 2014** call.  PX 6 FTC Doc. 17-2 at 11-12. |
| 30. |  | Mr. Eden was live transferred during a **December 2014** call.  PX 17 FTC Doc. 24-28 at ¶¶ 6-7. |
| 31. |  | *See also, e.g.,* PX 23 FTC Doc. 77-1 at 63-64 (live transfer of customer in **September 2015**); PX 7 FTC Doc. 19-1 at 73-74 (live transfer of customer in **February 2015**). |
| 32. |  | Mr. Sirlin testified at the December 2015 FTC hearing that, "from a technological point of view, there's no reason they couldn't just determine where to send that transfer to."  PX 1 FTC Tr. 145:24-146:14.  He further stated his opinion that a telemarketer could simply real-time transfer calls to another medical alert company by pushing a different button.  *Id.* 172:1-182:7.  But, when asked about the basis for this opinion, Mr. Sirlin **confirmed that it was based on pure speculation** on his part because he has "seen phones, not from telemarketers, that .. can transfer and switch calls."  *Id.* 173:2-173:5. |
| 33. | During the live transfer and verification process, LW can confirm that there has been no robo-calling, misrepresentations | From 2012 through present, every customer call is live transferred from the telemarketer to MedGuard, LW's affiliate. PX 1 FTC Tr. 147:1-147:8 |

7

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | or DNC violations, but chooses not to do so. | |
| 34. | | During the verification process, Mr. Sirlin testified that MedGuard, LW's affiliate, does nothing to verify robo-calling, or DNC violations or misrepresentations. PX 1 FTC Tr. 173:6-175:15. When asked whether MedGuard asks each customer, "'Did this sale come through a robo-call?'", Mr. Sirlin replied that MedGuard does not because "'[T]hat would probably be confusing.'" 174:23-174:25. There is no indication that LW ever attempts to get consent for the call from any customer. |
| 35. | Lifewatch has at least one employee—a "Call Center Liaison"—who is *currently* responsible for reviewing sales calls and communicating with telemarketers. | On **December 23, 2014**, a telemarketer notified Lauren Vanderwater, the Call Center Liaison for LW, that they were revising its sales script, and "will send it to you for your approval." PX 26 FTC Doc. 96-1 at 19. |
| 36. | | On **June 5, 2014**, LW's Vanderwater attaches a telemarketing script that LW edited ("I took out one line about the billing but I added a few things where they are saying its free (its free to use) or that avoids confusion with the customers and avoid[s] compliance issues."). PX 26 FTC Doc. 96-1 at 46-50. |
| 37. | | In other e-mails, LW's Vanderwater instructed telemarketers what they should say. *See, e.g.*, PX 26 FTC Doc. 96-1 at 4 (**June 2015** – "sales reps are NEVER allowed to say Lifewatch or that they work for Lifewatch"); at 6 (**May 2015** – instructing telemarketers not to call certain numbers or to state that a friend, family member or anyone referred them); at 8-10 (advising telemarketers on how to handle a myriad of issues, including cancellations and referrals); at 21 (**December 2014** – "You should not have ANYTHING saying you are Lifewatch."); at 27 (do not tell customers that billing doesn't start until after they plug in and activate the unit). |
| 38. | | LW threatened its telemarketers for non-compliance with its directives. *See, e.g.*, PX 26 FTC Doc. 96-1 at 27 (telemarketer "will lose commission on that deal"); at 51 (deducting commissions if recordings non-compliant). |
| 39. | Testimony by Ms. Baker supports a finding of vicarious liability. | Lifewatch is in direct contact with its telemarketers regarding the content of the telephone calls during which Lifewatch products and services are sold. Ms. Baker, admits to seeing "pieces" of sales scripts used by third-party call centers. PX 2 Baker |

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|  |  | Tr. 44:10-44:15. |
| 40. |  | Ms. Baker testified at the December 2015 FTC hearing that, since 2014, LW provides information regarding "what not to say" during calls with customers and also information on LW's products including "product descriptions, pricing… fact sheets, as well as information on phone service compatibility with medical alert devices." PX 2 Baker Tr. 79:19-80:3. |
| 41. |  | Ms. Baker testified at her February 2014 deposition that she communicated with then-current telemarketer TMI regarding "pricing, product info, CRM data entry, commissions, order fulfillment, customer-related issues." PX 2 Baker Tr. 63:8-10. |
| 42. |  | At her February 2014 deposition, Ms. Baker testified that LW's Call Center Liaison, Ms. Vandewater does not communicate with the third-party call centers about sales scripts. PX 2 Baker Tr. 42:7-11. Ms. Baker further did not know whether Lifewatch communicates with the call centers concerning the scripts. *Id.* 42:20-24. She also testified that there is no one at LW whose responsibility it is to review sales scripts. *Id.* 65:15-65:18. |
| 43. | LW currently has an "outside seller compliance" program. | The Northern District of Illinois found LW's evidence of its compliance program and the testimony of LW Director of Operations, Sarai Baker, as "lacking in credibility." 2016 U.S. Dist. LEXIS 45057, at *36. The court similarly found Mr. Sirlin's testimony "unpersuasive" and Lifewatch's ostrich-like approach extremely troubling." *Id.* at *39. |
| 44. | Lifewatch purposefully hid the fact that the telemarketers were calling on its behalf. | *See, e.g.,* PX 21 FTC Doc 26-1 at ¶ 19 ("In approximately mid-December 2013, Katie Boling told us to stop saying that we were calling directly from Lifewatch."); PX 26 FTC Doc. 96-1 at 4 (June 2015 – "sales reps are NEVER allowed to say Lifewatch or that they work for Lifewatch"); and at 21 (December 2014 – "You should not have ANYTHING saying you are Lifewatch."). |
| 45. | LW's feigned ignorance of rampant robo-calling on its behalf is simply not credible. | Judge Feinerman rejected Mr. Sirlin's attempt to plead ignorance of the Worldwide defendants' robo-calling on its behalf stating "the court does not find that testimony credible." *Id.* at *16. |

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 46. | | When asked during her February 2014 deposition, as to whether she has an understanding of what robo-calling is or whether she heard about the rampant robo-calling problem in the medical alert system industry, Ms. Baker testified "not really." PX 2 Baker Tr. 121:3-8. This testimony occurred *after* Lifewatch had received Donaca's 2013 demand letter, *after* the Worldwide litigation had been initiated in 2014, *after* Lifewatch had been served with the complaint in *Salam v. Lifewatch, inc.*, 1:13-cv-9305 (N.D. Ill 2013), also alleging rampant TCPA violations, and *after* the Indiana Attorney General had initiated an investigation into Lifewatch's telemarketing practices. PX 1 FTC Tr. 12:10, 94:19-95:2. |
| 47. | | At her deposition, when counsel asked whether Ms. Baker was familiar with the term robo-calling, defined as "an automated calling system that calls your home number and allows you to press one to be put in contact with a live sales representative," she said no. She further said that she has never received such a call, that no one she knows has ever received such a call *and that to her knowledge, robo-calls have never been discussed at LW.* PX 2 Baker Tr. 128:6-18.

Ms. Baker didn't "have an answer" to counsel's question of whether LW "has done anything to prevent its outside call centers from using robo-calling." Remarkably, she further testified that the subject of robo-calling *never came up* at any discussions at LW. *Id.* 127:6-22. Such testimony is remarkable, given that Ms. Baker identified herself at the December 2015 FTC hearing as LW's Director of Operations and the supervisor of LW's "outside seller compliance program." PX 1 FTC Tr. 77:3-6. |
| 48. | | During a line of questioning concerning particular complaints of robo-calls, there are inexplicable redactions in the Baker transcript, for which Lifewatch has failed to provide a redaction log or an unredacted version of the transcript.[1] PX 2 Baker Tr. 104:5- 109:1. |

---

[1] Lifewatch indicated last week that it was prepared to provide Plaintiff with an unredacted copy of Ms. Baker's transcript on June 8, the day *after* Plaintiff's renewed motion for class certification is due. Clearly, if Lifewatch has a copy of a redacted transcript, it has a copy of an unredacted transcript.

10

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 49. | | During the deposition, Ms. Baker was questioned about an email string between LW and Worldwide, which Ms. Baker was copied on. Although the transcript contains inexplicable redactions, Ms. Baker testified that she was regularly copied on communications with call centers and that she was in the process of searching for emails between herself and Lifewatch's outside call centers in connection with discovery in that matter. No such emails were ever produced in this case or in the related *Salam* matter. PX 2 Baker Tr. 150:17-158:22 |
| 50. | | Ms. Baker testified at a deposition on February 19, 2014 that she was unaware that the State of Indiana sued Lifewatch for robo-call and Do Not Call violations in 2012. PX 2 Baker Tr. LifeAlert 122:5-13.   Ms. Baker was then shown a copy of the complaint and testified that she had never seen it before. *Id.* 122:16-25.  ***Remarkably, when asked the same question at the FTC preliminary injunction hearing in December 2015***, despite having been shown a copy of the complaint almost a year earlier, *Ms. Baker still had no knowledge* that the State of Indiana sued LW. PX 1 FTC Tr. 94:19-95:2. |
| 51. | | When asked about the FTC lawsuit filed on January 6, 2014, Ms. Baker testified at her February 2014 deposition that she was not aware of the matter. PX 2 Baker Tr. 124:19-25. |
| 52. | | At her deposition in February 2014, Ms. Baker claimed that she did not know whether Worldwide was a telemarketer. Further, when asked whether at some point she learned or even heard that Worldwide "was using robo-calling in connection with the telemarketing it was doing," Ms. Baker professed her ignorance and said no. PX 2 Baker Tr. 94:3-94:13; 101:23-102:4 |
| 53. | | When asked whether to her knowledge any of LW's telemarketers had called people on the national do not call list, Ms. Baker testified at her deposition, "I don't know." Baker Tr. 121:9-12. Further, when asked whether LW does anything to ensure that call centers do not violate the national Do Not Call registry, Ms. Baker stated "I do not know." PX 2 Baker Tr. 85:8-85:14. |

11

**Facts Supporting Ascertainability**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 54. | Lifewatch knows who its customers are. | Evan Sirlin testified that LW has 66,000 *current* clients (as of December 2015), all of whom are ascertainable. PX 1 FTC Tr. 143-25:144:3. |
| 55. | LW obtains the identity of every customer at the time of the sales call. | LW relies on its "outside sellers for customer origination." PX 1 FTC Tr. 77:23-25. These outside sellers operate call centers. In the course of a call with a telemarketer, customers who agree to purchase Lifewatch's system are directed, by live transfer, to a verification department to confirm the details of their order. *From 2012 and continuing to present*, every customer call goes through MedGuard, LW's affiliate, and leads directly to Lifewatch. *Id.* 147:1-147:8. |
| 56. | | At the time the call is transferred, Medguard confirms for LW the customer's information, including the customer's name, address, phone number, and payment information. PX 1 FTC Tr. 82:14-19. |
| 57. | After a customer signs up, LW does all of the order fulfillment and tracks shipments of LW equipment. | LW tracks shipments of monitoring equipment to all customers, including those originated through telemarketing. LW's "new member services division" directly contacts customers to confirm receipt. PX 1 FTC Tr. 83:12-83:20. |
| 58. | LW keeps customer contact information in its "CRM" database. | LW uses a third party database, called the CRM, to identify its customers. PX 25 FTC Doc. 92 at ¶ 29 (11/10/2015 Amended Baker Decl.); PX 1 FTC Tr. 81:19-20 |
| 59. | | The CRM permits LW "to keep a database of all clients that we have in the system. It facilitates multiple tools, identif[ies] how many people we have in specific states or any other type of information that we need." PX 4 Duran Tr.[2] 21:18-25. |
| 60. | | "The CRM includes identifying information for each of Lifewatch's active customers. Further, the identifying information of the outside seller that sold the customer account to Lifewatch is contained within the CRM." PX 25 FTC Doc. 92 at ¶ 35. |

---

[2] Notwithstanding its obvious relevance, Mr. Duran's February 21, 2014 transcript was not provided to Plaintiff's counsel by Lifewatch. Lifewatch's counsel was able to pull excerpts of Mr. Duran's transcript from an appeal taken in *Life Alert Emergency Response, Inc.v. ConnectAmerica, Inc., et al.*, a C.D. Cal. case (No. CV 13-3455) that also named Lifewatch as a defendant.

12

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 61. | | The function of the CRM department is "to maintain data integrity, to catch general mistakes of data entry issues." PX 2 Baker Tr. 26:22-27:5. |
| 62. | For each customer, LW tracks the identity of each telemarketer who sold the account to LW in the CRM. | The specific telemarketers used by Lifewatch are identified in its CRM, by customer. PX 2 Baker Tr. 109:13-15. |
| 63. | | LW's telemarketers have log-in credentials, including passwords, and ***direct access*** to input customer information into the CRM database. PX 1 FTC Tr. 80:21-81:2; 81:19-24. |
| 64. | The CRM system tracks inbound vs. outbound calls. | Included in LW's Call Center Welcome Package, filed in Florida, in connection with its telemarketing license is a Quality Control Section, pursuant to which LW represents:<br>**For call centers utilizing advertisements and mailers:**<br>  1) All mailers need to be approved<br>  2) All mailers need to be dated as to their creation and mail out times<br>  3) All inbound calls need to be tied to a specific mailer and noted in the CRM<br><br>PX 12 FTC Doc. 22-2 at 11 (emphasis in original).  The CRM, therefore, contains highly specific information concerning the exact method of call origination.  Since LW's CRM system tracks inbound calls received as a result of advertisements and mailers, LW can identify customers originating from outbound telemarketing by excluding CRM information designating inbound calls. |
| 65. | The CRM system has specific details on payments made to telemarketers, tied to each customer. | LW pays its telemarketers for providing them with customer accounts.  PX 4 Duran Tr. 69:13-20. |
| 66. | | The CRM tracks commissions that are paid to LW's sellers. PX 2 Baker Tr. 27:23-28:3. |
| 67. | | Mr. Sirlin testified concerning different categories of commissions based on how the customer is originated:<br>"Q. And you pay $350 to the outside sellers for each sale?<br>A. Outside companies that we buy sales from, on average, 350. |

13

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | And if we do TV and radio direct, on average, 350. Marketing, average 350." PX 1 FTC Tr. 176:9-176:12. |
| 68. | | However, despite LW's position that it advertises in various media, Ms. Baker testified at her February 2014 deposition that she had no knowledge of any television, radio, print or web advertising by Lifewatch. PX 2 Baker Tr. 58:18-59:8. |
| | | LW tracked the relationships of outside sellers to specific customers and would "charge[] back" telemarketers for "misleading the customers." PX 1 FTC Tr. 114:8-114:13. |
| 69. | LW directly bills and collects payments from its customers monthly for monitoring services. | Mr. Sirlin testified that the majority of LW's 66,000 current clients use recurring billing through credit card processors. PX 1 FTC Tr. 143-25:144:3. |
| 70. | | "[T]he CRM is designed such that *every* credit card goes through a *LifeWatch* bank account." PX 4 Duran Tr. 68:14-23 (emphasis added). |
| 71. | LW directly contacted thousands of its customers in connection with a 2014 "refund program." | In 2014, LW implemented a "refund program" in response to the FTC's shut down of the Worldwide entities responsible for telemarketing on LW's behalf. PX 1 FTC Tr. 78:14-21. |
| 72. | | In connection with the refund program, LW ascertained from its own records that it had 3,000 customers who had not activated their device. PX 1 FTC Tr. 99:23-100:2. Further, LW determined from its customer records whether it contacted customers or customers contacted LW regarding the refund program. PX 1 FTC Tr. 101:5-101:20. |
| 73. | LW maintains an internal Do Not Call List of consumers. | Sarai Baker testified at the December 2015 FTC hearing, that LW "circulates an internal Do Not Call List." PX 1 FTC Tr. 79:11-12. |
| 74. | | LW provides the latest iteration of Lifewatch's internal DNC list to telemarketers when they contract with LW. PX 24 FTC Doc. 87-3 at ¶ 8. |
| 75. | LW can identify telemarketers who have contacted LW customers on the National Do Not Call Registry or its internal Do Not Call list. | LW checks its CRM to see if the customer who called the customer service department is an existing or prospective LW customer. If the person is in the CRM, and has advised that they were called despite being on the National Do Not Call Registry, LW claims that it will warn or terminate the seller. PX 25 FTC Doc. 92 at ¶ 42. |
| 76. | | Lifewatch claims that "If Lifewatch finds that a sale was made to a consumer on Lifewatch's internal Do Not Call list, Lifewatch will raise the issue with the outside seller." PX 25 FTC Doc. 92 at ¶ 43. Therefore, Lifewatch can determine Do Not Call |

14

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | violations specific to each seller based on the CRM system. |
| 77. | LW is well aware of widespread misrepresentations and Do Not Call violations currently occurring and can tie them to its telemarketers. | LW's knowledge of Do Not Call violations is ongoing through the present. Ms. Baker claims that LW has terminated 20-24 outside sellers *in the past two years* (which overlaps substantially with the Class Period) for issues including specific Do Not Call violations. PX 1 FTC Tr. 86:22-87:4. |
| 78. | Mr. Donaca is an ascertainable class member. | Mr. Donaca served a pre-litigation demand letter on LW on or about June 17, 2013, thus making LW specifically aware of his identity and his complaint that LW was robo-calling at that time. *See also* PFC 122-126. |

15

## Facts Supporting Numerosity

### Class Period: October 16, 2013 through the present

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 79. | The FTC and Better Business Bureau databases indicate that there is a significant volume of robo-calling continuing to occur during the Class Period by LW's telemarketers. | In connection with the FTC matter, Lifewatch identified its 7 **current** telemarketers. PX 1 FTC Tr. 80:6 (Baker testimony that "We're currently purchasing from seven outside sellers"). The FTC then conducted a search using their business names or known fictitious names, revealing numerous DNC complaints against 3 of the 7. The FTC then searched for phone numbers associated with these telemarketers, *revealing 16,937 DNC and robo-call complaints. FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *39 (N.D. Ill. Mar. 31, 2016). |
| 80. | | Judge Feinerman found "that evidence shows that Lifewatch's **current** telemarketers are no more likely to follow the law than the ones shut down in past government actions." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *39-40 (N.D. Ill. Mar. 31, 2016) (citing FTC exhibit) (emphasis added). |
| 81. | | In addition, between **January 1, 2012 and June 16, 2015**, there were **433 Do Not Call complaints** filed against Lifewatch according to the FTC's Consumer Sentinel database. PX 5 FTC Doc. 14-1 at ¶ 55 (Menjivar Decl.). |
| 82. | | The FTC also found that the Better Business Bureau received 180 complaints specifically against Lifewatch since 2012, and one complaint from **February 17, 2015** alleges that the consumer had received calls from Lifewatch's telemarketers at least once a week for years despite being on the DNC registry. *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *25-*26 (N.D. Ill. Mar. 31, 2016). |
| 83. | The size of Lifewatch's current customer base supports a finding of numerosity. | Lifewatch **tripled** its customer base from 2012 to the end of 2015 due to aggressive marketing efforts, and currently has over 66,000 customers, many of whom were originated through outbound telemarketing, as ascertainable through Lifewatch's own CRM database. PX 1 FTC Tr. 171:19-171:25. *See also* Ascertainability, supra. |
| 84. | | LW tripled in size during this same time period, employing 90 people to keep up with ballooning customer base. PX 1 FTC Tr. 171:19-171:25. |
| 85. | Revenues generated by LW supports a finding of numerosity. | In 2013, Mr. Sirlin attributed the meteoric rise in its customer base to telemarketing call centers.  He stated to a competitor that, LW was adding **8,000 customers a** |

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | *month* from telemarketing call centers and that it would continue to do so. PX 14 FTC Doc. 24-9 at ¶¶ 3, 13.<br><br>During the Class Period, from *January through August of 2014*, LW earned almost *six million dollars* from monthly fees paid by consumers. PX 1 FTC Tr. 186:17-187:4. For the same time period, LW earned *over thirteen million dollars* from the sale of customer accounts, as reflected on a Profit and Loss statement produced to the FTC by Lifewatch. PX 1 FTC Tr. 187:11-187:15. |
| 86. | Throughout the Class Period, through the present, LW contracted with scores of telemarketers to obtain its customers. | In 2013, LW had telemarketing agreements with at least 22 different entities. Copies of the telemarketing agreements, Bates numbered SAL-LW-00001-00389, are not attached because of their volume. |
| 87. | | During the relevant time period, Lifewatch used "over fifty telemarketers… at least one of which has been sanctioned or shut down by Florida regulators." *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *22 (N.D. Ill. Mar. 31, 2016). |
| 88. | | LW currently (as of the date of the FTC injunction hearing in December 2015) uses 7 companies who still conduct outbound telemarketing. PX 1 FTC Tr. 225:11-225:15. As demonstrated below, the evidence shows that these companies are robo-calling. |
| 89. | LW itself cannot even keep track of its "revolving door" of telemarketers. | At her deposition, Ms. Baker went over a list of telemarketers but was "not sure" about many who were selling for LW.  PX 2 Baker Tr. 73:15-74:19. |
| 90. | | When asked about why LW stopped using Worldwide Info Services, Ms. Baker testified that she did not know. PX 2 Baker Tr. 79:23-79:25. |
| 91. | The FTC's investigation revealed that robo-calling on LW's behalf and for its benefit happened throughout the Class Period, including in the year 2015. | The FTC uncovered voluminous evidence, set forth in declarations, call transcripts and testimony from *fifty consumers*, that all trace back to Lifewatch and show that robo-calls were made by and on behalf of LW by its telemarketers and are continuing to be made. *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *27 (N.D. Ill. Mar. 31, 2016).  Some of the FTC's evidence is summarized below. |
| 92. | | Gail Thill, a declarant in the FTC case, recounted a call made **on October 19, 2013,** |

17

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | | during which her mother purchased a medical alert system. PX 20 FTC Doc. 25-27 at ¶ 3 (Thill Decl.). The bank statements identified several attempts by Lifewatch to obtain monthly payments from the mother's bank account. *Id.* at ¶¶ 4-5. |
| 93. | | Isaac Lifshitz, another FTC declarant, recounted a **January 2014 telemarketing call** during which he purchased a medical alert device and received a package from Lifewatch. PX 19 FTC Doc. 25-14 at ¶¶ 3, 5 (Lifshitz Decl.). |
| 94. | | In connection with its investigation **in 2014**, the FTC set up a "honeypot" – a group of phone lines set up to receive inbound calls to catch illegal telemarketing. PX 11 FTC Doc. 21-2 at ¶ 2 (Tyndall Decl.). In **September 2014**, Investigator Tyndall received a number of robo-calls from "Rapid Response Alert" and "Senior Life Support." *See generally id.* These conversations were recorded (*see* attachments to Tyndall Decl., PX 11 FTC Doc 21-2 at 7-72). Using an undercover credit card, Investigator Tyndall ordered the medical alert system. The system was branded "Lifewatch" and the credit card charge description included, inter alia, "LIFEWATCH USA." *Id.* at ¶¶ 6, 8. |
| 95. | | On **November 25, 2014**, William James, who has been on the National DNC Registry since 2003, received a robo-call selling a "Life Alert System." PX 18 FTC Doc. 25-9 at ¶¶ 3-4 (James Decl.). After pressing "1", Mr. James (using the pseudonym Gary Gilmore), *see id.* ¶ 4, spoke with representatives from both "Medical Alert" and "Senior Life Support." *Id.* at ¶ 4. Mr. James (Gilmore) ordered the product with a fake name and credit card information. PX 6 FTC Doc. 17-2 (11/25/2014 Trans.) at 5-17. The following day, "Laverne calling from Lifewatch, the medical alarm company" contacted Mr. James (Gilmore) to confirm the credit card information because it did not process. *Id.* at 23-24 (11/26/2014 Trans.). Mr. James received an additional call **on January 30, 2015**, set forth below. |
| 96. | | On **December 16, 2014**, FTC Investigator France received a robo-call (forwarded from the honeypot) from "Senior Life Support." PX 10 FTC Doc. 21-1 at ¶7 (France Decl.). After purchasing a medical alert system, she received a call back from "Jacqueline" to confirm the order. A confirming call was made by "Cathy" from corporate, who took Investigator France's name, address and credit card information. *Id.* at 8. Later that same day, Investigator France received a voice |

18

19

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | | message from "Carmelo" with "Lifewatch Medical Alarm Company" regarding the order placed with Jacqueline. *Id.* at ¶ 10 and selected attachments, PX 10 FTC Doc. 21-1 at 10-47.  She never received the product. |
| 97. | | David Eden, who is on the National DNC registry and is a declarant in the FTC litigation against Lifewatch, was contacted multiple times in **December 2014** by a robo-caller selling medical alert devices.  For example, on **December 22, 2014**, Mr. Eden received a medical alert device robo-call.  Mr. Eden pressed "1" to speak to a representative.  The telemarketer stated that he worked for Lifewatch.  PX 17 FTC Doc. 24-28 at ¶¶ 5-7 (Eden Decl.).  Mr. Eden is on the National Do Not Call Registry, and has not given any company prior permission to make prerecorded telemarketing calls.  *Id.* at ¶ 3.  On **January 12, 2015**, Mr. Eden received a voicemail from "Senior Life Support."  When he called back, the representative identified the company aS "Senior Alert," but also stated that Lifewatch USA was the company's "'corporate office.'"  Mr. Eden was advised that the credit card transaction would say "Lifewatch USA."  *Id.* at ¶¶ 12-15. |
| 98. | | On **January 8, 2015**, Investigator France received a second call from Senior Life Support.  Once it was discovered that she had already placed an order but did not receive the product, she was transferred to "Carmelo."  Carmelo provided Investigator France with tracking information.  The package, once located, had a yellow label that identified it as being from "LIFEWatchUSA," and the device itself had a "LIFEWatchUSA" label.  Other Lifewatch-branded documents were also contained in the package.  PX 10 FTC Doc. 21-1 at ¶¶ 13-17 and selected attachments, PX 10 FTC Doc. 21-1 at 10-47. |
| 99. | | Mr. James received another robo-call from a company called "Medical Alarms" on **January 30, 2015**.  PX 6 FTC Doc. 17-2 at 54-76.  Using the pseudonym William Bormann, Mr. James again placed an order for a medical alert device.  While on the call, he was given the company's customer service number (*id.* at 71) – 1-800-716-1433 – which is the customer service number listed on Lifewatch's website.  www.lifewatch-usa.com (as of June 1, 2016).  He was transferred to "Laverne" for confirmation and billing.  *Id.* at 72-73.  Laverne also gave Mr. James (Bormann) the same Lifewatch customer service number.  *Id.* at 74-75. |
| 100. | Mr. Donaca's experience | *See* PFC 122-126. |

| # | STATEMENT | EVIDENCE |
|---|---|---|
| | demonstrates that LW was robo-calling in 2013. | |
| 101. | LW employment of a designated Call Center Liaison to handle communications with its call centers supports a finding of numerosity. | Ms. Vandewater is LW's Call Center Liaison. She reports directly to Ms. Baker, and her sole responsibilities are to communicate with LW's telemarketers and review call recordings. PX 2 Baker Tr. 41:2-42:2. |
| 102. | | Ms. Baker and Ms. Vandewater both review recordings of sales phone calls they request from the call centers. PX 2 Baker Tr. 48:8-48:14. |
| 103. | Beginning in 2012 and continuing through the Class Period, robo-calls were made anywhere from 10,000 to two million consumers per day, days a week. | For example, one telemarketer, identifying itself as "Senior Life Savers" in a *October 27, 2014* call to a consumer (Diana Mey) *stated that it cycles through 10,000 calls per day.* PX 8 FTC Doc. 19-2 at 75. During that call, the manager represented that the company "used to be" called Lifewatch. *Id.* at 67. This is consistent with the consumer was told in a prior call, on October 3, 2014, *i.e.*, that "it's all the same – that[] what's going to show up on your bank statement is Lifewatch." PX 7 FTC Doc. 19-1 at 74. Further, "Lifewatch is over all of us. We're just a small branch from [sic] them." *Id.* at 74-75. *See also* PX 21 at ¶ 6 (employee of Senior Life Support from **10/31/2014-11/7/2014** declared that "[I]t was clear that these incoming calls had been generated by a consumer's response to an outgoing recorded message or 'robo-call' from the company.") |
| 104. | | Another telemarketer, Unique Information Systems, which provided its services exclusively to Lifewatch beginning in 2011, "sent out nearly 2 million calls per day, six days per week, to consumers." PX 15 FTC Doc. 24-11 at ¶¶ 4, 7 (Settecase Decl.). That telemarketer was responsible for the "dialer" that "sent out" the outbound calls to consumers for Lifewatch using pre-recorded messages. *Id.* at ¶¶ 6-7. Of those connections, 10,000-20,000 were then connected to a live telemarketer when the consumer pushed a button on his or her phone. *Id.* at ¶¶ 6, 11. The company continued to telemarket into the Class Period, during which time a permanent injunction was entered against it in the *Worldwide* litigation. |
| 105. | Lifewatch continued to pay its telemarketers large amounts of money for customer accounts – | For example, early in the Class Period, *in May through December 2013*, American Innovative Concepts ("AIC"), an exclusive Lifewatch telemarketer, received over $3.7 million in payments from Lifewatch before stipulating to a permanent |

20

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | including telemarketers that were later prohibited from robo-calling and telemarketing completely – during the Class Period, suggesting that the number of Class members exceeds 40. | injunction preventing AIC from engaging in robo-calling, telemarketing, and marketing medical alert products or services. *See, e.g.,* PX 16 FTC Doc. 24-12 at ¶ 4 and Ex. A (Kane Decl.). |
| 106. | LW has been sued on an individual basis in a number of lawsuits alleging that LW's telemarketers engaged in robo-calling in violation of the TCPA during the Class Period. | PX 30, Litigation Chronology. *See, e.g., Aronson v. Lifewatch, Inc.,* No. GD 13-20109, Court of Common Pleas, Allegheny County, PA (SAL-LW-00458-464) (removed to W.D.Pa. 13-cv-1624); *Stapleton v. Lifewatch, Inc.,* No. V13017127, Prince William District Court, Virginia (SAL-LW-00674-677); *Guiley v. Lifewatch-USA,* No. 2014-CVI-0426, Canton Municipal Court, Small Claims Division, Canton, OH (SAL-LW-00399-419); *Todd v. Lifewatch, Inc.,* No. 14-cv-00509, N.D. Ill. (SAL-LW-00479-494); *Bank v. Lifewatch, Inc.,* No. 15-cv-2278, N.Y.E.D., *Bank v. Lifewatch, Inc.,* No. 15cv5078, N.Y.E.D.; *Hossfeld v. Lifewatch, Inc.,* No. 16-cv-1614, N.Y.S.D. |
| 107. | Potential class members are spread out and not confined in one geographical area. | Mr. Donaca resides in California. |
| 108. | | Mr. James resides in Mississippi. PX 18 FTC Doc. 25-9 at ¶ 1. |
| 109. | | Mr. Eden resides in Illinois.  PX 17 FTC Doc. 24-28 at ¶ 1. |
| 110. | | Mr. Lifshitz resides in Ohio.  PX 19 FTC Doc. 25-14 at ¶ 1. |

21

**Facts Supporting Commonality**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 111. | LW's telemarketers placed solicitation calls to putative class members attempting to sell medical alert devices on behalf of and for the benefit of LW. | *See, e.g.*, PFC 86-88, 91-99, 122-126. |
| 112. | | On an **October 27, 2014** call, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that "Lifewatch is over all of us." PX 7 FTC Doc. 19-1 at 74 (sales call transcript). |
| 113. | | On a **January 12, 2015** call, a "Senior Alert" telemarketer advised the declarant that "Lifewatch USA is the company's 'corporate office.'" PX 17 FTC Doc. 24-28 at ¶ 14 (declaration). |
| 114. | | On a **January 19, 2015** call, a "Senior Life Support" telemarketer represented to a consumer that "all of the products are from Lifewatch," and "we sell for them." FTC PX 7 Doc. 19-1 at 30-31 (sales call transcript). |
| 115. | | On a **January 23, 2015** call, a "Senior Life Support" telemarketer identified Senior Life Support as a branch of LW, but that the "main company is Lifewatch." PX 9 FTC Doc. 20-1 at 70 (sales call transcript). |
| 116. | | On a **September 11, 2015** call, an "Agent Med Alert" telemarketer, when asked whether she sends her calls and sales to anyone else other than Lifewatch stated, "Nope. They're the only company we use." PX 23 FTC Doc. 77-1 at 80 (sales call transcript); *see also id.* at 74 (Consumer – "Your company is really Lifewatch." Telemarketer – "Correct."). |
| 117. | | On a **September 15, 2015** call, a telemarketer for "Medical Alarms" advised that the company was Lifewatch. PX 23 FTC Doc. No. 77-1 at 67 (sales call transcript). |
| 118. | Beginning in 2012 and continuing through the Class Period, robo-calls were made anywhere from 10,000 to two million consumers per day, six | *See* PFC 103-104. |

22

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| | days a week. | |
| 119. | The FTC's investigation revealed that robo-calling on LW's behalf happened throughout the Class Period, including in the year 2015 and *currently* through LW's 7 telemarketers. | *Id. See also id.* 91-99. |
| 120. | The products described by the telemarketers during the Class Period are linked to Lifewatch by price, charged by designation, and description. | Telemarketers advised consumers of the precise payment they could expect for the medical alert device. *See, e.g.,* PX 19 FTC Doc. 25-14 at ¶ 3 ($34.95/month); PX 6 FTC Doc. 17-2 at 6, 14 (James (Gilman) told that monitoring fee was $34/month, confirmed at $34.95/month); PX 17 FTC Doc. 24-28 at ¶ 14 ($39.95/month); PX 23 FTC Doc. 77-1 at 15 ($29.95/month); PX 73 FTC Doc. 77-1 at 26-27 ($39.90 for first month and shipping, $29.95/month thereafter). *See also* PX 20 FTC Doc. 25-27 at ¶ 4 (Thill's mother billed at $34.95). |
| 121. | | LW's telemarketers have log-in credentials, including passwords, and ***direct access*** to input customer information into the CRM database. PX 1 FTC Tr. 80:21-81:2; 81:19-24. |

23

**Facts Supporting Typicality**

| # | STATEMENT | EVIDENCE |
|---|---|---|
| 122. | Mr. Donaca received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of Lifewatch during the Class Period. | Mr. Donaca received robo-calls on his landline telephone. Upon answering the call, a pre-recorded message and/or artificial voice stated that the call was regarding medical alert devices. Plaintiff's Second Amended Complaint (Dkt. 29) ("SAC") at ¶¶ 13-14; *see, e.g.,* PX 3 Donaca Tr. at 62:8-19, 63:22-64:11, 68:25-69:4, 70:9-11; 77:3-9. |
| 123. | | The robo-calls directed Mr. Donaca to press "1" to speak to a representative. SAC at ¶ 14; *see, e.g.,* PX 3 Donaca Tr. at 68:20-69:11; 77:3-16. |
| 124. | | It was during course of these several phone calls that Mr. Donaca learned that Lifewatch was the seller of these devices. SAC at ¶¶ 13-14; PX 3 Donaca Tr. at 56:9-12, 57:4-7, 57:23-58:5, 58:20-59:12, 63:18-64:7; 81:23-83:14. |
| 125. | | Mr. Donaca did not give Lifewatch prior express consent to make calls to his landline phone. SAC at ¶ 16; PX 3 Donaca Tr. at 93:11-24. |
| 126. | | In addition, Mr. Donaca was informed by Lifewatch that an automatic telephone dialing system was used by Lifewatch. PX 3 Donaca Tr. at 102:24-103:25. |
| 127. | Other consumers, in addition to Mr. Donaca, received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of Lifewatch during the Class Period. | *See, e.g.,* PFC 91-93, 95, 97, 99. |
| 128. | FTC investigators also had the same experience. | *See, e.g.,* PFC 94,96, 98. |
| 129. | The purpose of these telemarketing calls was to generate sales of medical alert devices to profit Lifewatch. | LW pays its telemarketers for providing them with customer accounts, PX 4 Duran Tr. 69:13-20, and every transaction goes through a Lifewatch bank account, *id.* at 68:14-23. |

24

**Facts Supporting Adequacy**

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
| 130. | Donaca does not have any conflicts of interest with other class members. | Donaca received unsolicited telemarketing calls from, on behalf of, or for the benefit of Lifewatch, as did all members of the putative class.  PX 3 Donaca Tr. at 94:8-95:7. |
| 131. | | Donaca understands the role and responsibilities of a class representative. PX 3 Donaca Tr. at 32:5-23.  These responsibilities include protecting the interests of similarly situated class members, communicating with his attorneys and providing evidence relevant to the case.  *Id.* at 32:9-19.  The responsibilities also include reviewing and approving any proposed settlement in the matter.  *Id.* at 33:11-18. |
| 132. | Donaca has vigorously prosecuted this action on behalf of the class. | Donaca kept detailed and meticulous notes of every phone call he received, conducted his own investigation into Lifewatch, communicated with counsel, participated in discovery and submitted to multiple hours of deposition questioning.  PX 3 Donaca Tr. at 31:25- 32:4 (he is aware of duty to "represent cases and claims of many other plaintiffs... against the same entity or offender, such as your client, Lifewatch USA"); *id.* at 32:15-23 (knows his role is communicating with attorneys and providing evidence); *id.* at 34:11-35:1 (discusses time spent on matter, including demand letter, communicating with attorneys, producing records, receiving the calls); *id.* at 102:16-103:11 (knows what an autodialer is); *id.* at 49:7-17 (understands meaning of "multi district litigation"). |
| 133. | Donaca's pre-litigation demand letter demonstrates that he has, and will continue to, defend the rights of consumers, including himself and the members of the putative class. | Donaca has never been convicted of *any* crime, PX 3 Donaca Tr. at 20:1-6, and has not ever tried to extort money from any telemarketer. *Id.* at 43:19-44:3. Donaca also explained at deposition that he sent the demand to Lifewatch because of Lifewatch's repeated wrongdoing—the very subject of this case. *Id.* at 118:17-119:4. |
| 134. | Donaca's counsel are experienced and skilled class action litigators who have committed and will continue to commit the time and resources | *See* Biographies of Katrina Carroll and Peter Lubin, PX 27-28. |

25

| # | STATEMENT | EVIDENCE |
|---|-----------|----------|
|   | to vigorously pursue this matter. |   |

26