STEPHEN J. SIMONI (Bar No. 284558)
 StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS**
**CLASS ACTION LAW OFFICES**
12131 Turnberry Drive, Suite 100
Rancho Mirage, CA 92270-1500
Telephone:  (917) 621-5795

*Attorney for Plaintiff Matthew Donaca*
*and the Proposed Class*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW DONACA, individually and on behalf of all others similarly situated, | No. EDCV-13-02064 (JGB) (SPx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION** |
| v. | |
| LIFEWATCH, INC. | |
| Defendant. | |

598257.2

# **TABLE OF CONTENTS**

**Pages(s)**

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ........................................................................................ 5

ARGUMENT ...................................................................................................... 6

I.      LW Is Vicariously Liable for the Acts of Its Telemarketers ........................... 6

     1.      LW's Telemarketers Sell Medical Devices on Behalf of and for the
            Benefit of LW and LW Controls its Telemarketers ............................. 8

          a.      "On Behalf of and for the Benefit of" ........................................ 8

          b.      LW Controls Its Telemarketers .................................................. 10

     2.      LW's Feigned Ignorance is Unpersuasive ........................................... 12

II.     The Proposed Class is Readily Ascertainable ................................................ 15

III.    The Class Satisfies Rule 23(a) ....................................................................... 18

     A.      Numerosity ............................................................................................ 18

          1.      The Only Plausible Explanation is that the Vast Majority
               of LW's Customers Became Customers Because of
               Robo-Calling ............................................................................... 19

          2.      The Class is Geographically Diverse ........................................ 23

          B.      Commonality .............................................................................. 24

          C.      Typicality .................................................................................... 25

          D.      Adequacy ..................................................................................... 27

IV.     The Class Satisfies Rule 23(b)(3) .................................................................. 29

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    A.    Predominance ....................................................................... 29

    B.    Superiority ........................................................................... 32

CONCLUSION ............................................................................... 34

598257.2 PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION EDCV-13-02064 (JGB)-SPx

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Bee, Denning, Inc. v. Capital All. Group*,
 No. 13-cv-2654-BAS-WVG, 2015 U.S. Dist. LEXIS 129495
 (S.D. Cal. Sept. 24, 2015) ....................................................................... 7, 33, 34

*Bishop v. Saab Auto. A.B.*,
 No. CV 95-0721 JGD (JRx), 1996 U.S. Dist. LEXIS 22890 (C.D. Cal. Feb. 16,
 1996) ...................................................................................................................... 6

*Booth v. Appstack, Inc.*,
 No. C13-1533JLR, 2015 U.S. Dist. LEXIS 40779
 (W.D. Wash. Mar. 29, 2015) ............................................................................... 7

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) ........................................................................... 6, 7

*FTC v. Lifewatch Inc.*,
 No. 15 C 5781, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016) .... *passim*

*Gen. Tel. Co. of the Sw. v. Falcon*,
 457 U.S. 147 (1982) ............................................................................................ 24

*Grant v. Capital Mgmt. Servs., L.P.*,
 449 F. App'x 598 (9th Cir. 2011) ...................................................................... 31

*Haley v. Medtronic, Inc.*,
 169 F.R.D. 643 (C.D. Cal. 1996) ...................................................................... 19

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ............................................................... 27, 29, 30

*Hanon v. Dataproducts Corp.*,
 976 F.2d 497 (9th Cir. 1992) .............................................................................. 26

*In re: Cathode Ray Tube Antitrust Litig.*,
 No. ALL DIRECT ACTION CASES MDL NO. 1917, JAMS REF. No.
 1100054618, 2013 U.S. Dist. LEXIS 137945 (N.D. Cal. June 20, 2013) .......... 19

*In re Conagra Foods, Inc.*,
 90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................. 6

*In re DISH Network, L.L.C.,*
   28 FCC Rcd. 6574 (2013) ........................................................................ 7

*International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson,*
   102 F.R.D. 457 (N.D. Cal. 1983) ........................................................ 16

*Kamar v. Radio Shack Corp.,*
   254 F.R.D. 387 (C.D. Cal. 2008) ........................................................ 30

*Kamm v. Cal. City Dev. Co.,*
   509 F.2d 205 (9th Cir. 1975) ............................................................. 32

*Keegan v. Am. Honda Motor Co.,*
   284 F.R.D. 504 (C.D. Cal. 2012) ........................................................ 16

*Knutson v. Schwan's Home Serv., Inc.,*
   2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013)........................... 17

*Lamumba Corp. v. City of Oakland,*
   No. C. 05-2712 MHP, 2007 U.S. Dist. LEXIS 81688
   (N.D. Cal. Nov. 2, 2007)..................................................................... 16

*Life Alert Emergency Response, Inc.  v. Connect America.com LLC,*
   601 Fed. Appx. 469 (9th Cir. Feb. 4, 2015) ........................................ 8

*Lushe v. Verengo Inc.,*
   No. CV 13-07632 AB (RZ), 2015 U.S. Dist. LEXIS 16961
   (C.D. Cal. Feb. 2, 2015) ....................................................................... 7

*Maddock v. KB Homes, Inc.,*
   248 F.R.D. 229 (C.D. Cal. 2007) ........................................................ 29

*Makaron v. GE Sec. Mfg.,*
   No. CV-14-1274-GW(AGRx), 2015 U.S. Dist. LEXIS 75240
   (C.D. Cal. May 18, 2015) ..................................................................... 7

*Mazza v. Am. Honda Motor Co.,*
   666 F.3d 581 (9th Cir. 2012) ............................................................. 24

*McCrary v. Elations Co.,*
   No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443
   (C.D. Cal. Jan. 13, 2014) ............................................................. 16, 18

iv

*McFarland v. Memorex,*
  96 F.R.D. 357 (N.D. Cal. 1982) ............................................................. 30

*McPhail v. First Command Fin. Planning, Inc.,*
  247 F.R.D. 598 (S.D. Cal. 2007) ........................................................... 26

*Meyer v. Portfolio Recovery Assocs.,*
  707 F.3d 1036 (9th Cir. 2012) ............................................................... 31

*Pecover v. Elec. Arts Inc.,*
  No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632
  (N.D. Cal. Dec. 21, 2010) ..................................................................... 24

*Perez-Olano v. Gonzalez,*
  248 F.R.D. 248 (C.D. Cal. 2008) ............................................................. 6

*Rannis v. Recchia,*
  380 Fed. Appx. 646 (9th Cir. 2010) ........................................................ 19

*Rodriquez v. Hayes,*
  591 F.3d 1105 (9th Cir. 2009) ............................................................... 27

*Singer v. Becton Dickinson & Co.,*
  No. 08-CV-821 - IEG (BLM), 2009 U.S. Dist. LEXIS 114547
  (S.D. Cal. Dec. 9, 2009) ....................................................................... 30

*Sosa v. DIRECTV, Inc.,*
  437 F.3d 923 (9th Cir. 2006) ................................................................. 28

*United States v. Bonds,*
  608 F.3d 495 (9th Cir. 2010) ................................................................... 7

*Vandervort v. Balboa Capital Corp.,*
  287 F.R.D. 554 (C.D. Cal. 2012) ........................................................... 33

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ......................................................................... 24

*Walters v. Reno,*
  145 F.3d 1032 (9th Cir. 1998) ............................................................... 27

*Wolin v. Jaguar Land Rover N. Am., L.L.C.,*
  617 F.3d 1168 (9th Cir. 2010) ............................................................... 33

v

**Statutes**

47 U.S.C. § 227 ..................................................................... 1, 6, 30, 31, 34

105 Stat. 2394 § 2(10) ............................................................................. 6

**Other**

Fed. R. Civ. P. 23(a)  ...................................................... 5, 18, 27

Fed. R. Civ. P. 23(b)  ........................................................*passim*

# **INTRODUCTION**

This case arises from a massive, unsolicited robo-call campaign designed to sell Defendant Lifewatch, Inc.'s ("LW") medical alert systems. The campaign involves millions of automated telephone calls all made without prior express consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

Indeed, LW is no stranger to litigation relating to its robo-calling activities. In addition to other private lawsuits and government enforcement actions brought against LW, in 2014 the Federal Trade Commission and the Attorney General of Florida filed suit against LW and its CEO, Evan Sirlin, in the Northern District of Illinois (the "FTC matter"), alleging that LW was liable for telemarketing improprieties including robo-calling, Do Not Call violations and caller ID "spoofing."  *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057, *3-4 (N.D. Ill. Mar. 31, 2016) ("FTC Opinion" or "FTC Op.").  Because these violations are ongoing, the plaintiffs sought a preliminary injunction in late 2015.

***That injunction was granted on March 31, 2016***, after a full hearing and based on an extensive record.  An injunction was necessary ***this year***, the Hon. Gary Feinerman held, despite LW's assertion that the evidence against it was too old to demonstrate continuing misconduct. FTC Op. at *8-9.

Just like LW argued in connection with Plaintiff's first class certification motion in this case, LW asserted two defenses to liability in the FTC matter, both

1

ultimately rejected: (1) LW argued that it is not legally responsible for its telemarketers' misconduct because they are independent of LW, they sell medical alert devices to companies other than LW, and LW purchases accounts on a "non-exclusive basis"; (2) LW argued that its past misconduct has been remedied and that its new quality control program ensures that current telemarketers are legally compliant. *Id*. at *4-6.

Judge Feinerman found both of these arguments wholly unpersuasive. Based on his review of the voluminous record, the court made the following factual findings:

- Judge Feinerman reviewed evidence in connection with the *Worldwide* litigation, filed on January 6, 2014, where LW's telemarketers were accused of robo-calling and Do Not Call violations. The court determined that LW was the defendants' "sole medical alert client" (*id*. at *9); that LW "paid $15,741,518.50 to the Worldwide telemarketers between March 2012 and December 2013" (*id*.); that "the weight of the evidence strongly suggests that the medical alert scripts found at the Worldwide telemarketers' headquarters were used to sell Lifewatch's products" (*id*. at *13), and; "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the Worldwide telemarketers' illegal conduct" (*id*. at *14).

- Judge Feinerman rejected Mr. Sirlin's attempt to plead ignorance of the Worldwide defendants' robo-calling on LW's behalf, stating "the court does not

2

find that testimony credible." *Id*. at *16.

- Judge Feinerman rejected LW's contention that it was not responsible for the telemarketer's scripts, citing the FTC's evidence of call scripts filed in connection with LW's Florida telemarketing licensing (*id*. at *16-17) and the 2012-2014 Florida filings of LW's telemarketers (*id*. at *20). The court concluded that Mr. Sirlin "essentially ***conceded*** that Lifewatch was responsible for misrepresentations in the script." *Id*. at *17-18 (emphasis added).

- The court conducted an exhaustive analysis of the evidence adduced by the FTC to demonstrate the ongoing nature of LW's misconduct, including: evidence in 2014 relating to the FTC's "honeypot," a system set up to catch illegal telemarketing; evidence derived from the FTC's Consumer Sentinel database of consumer complaints of robo-calls and Do Not Call violations ***as recent as June 16, 2015*** (655 specific complaints named LW); and complaints to the Better Business Bureau ***as recent as February 17, 2015***. *Id*. at *22-27.

- The court considered "declarations, telephone transcripts, and live testimony" illustrating over fifty consumer experiences with LW's telemarketers. *Id*. at *27-35.

- The court found LW's evidence of its compliance program and the testimony of LW Director of Operations, Sarai Baker, as "lacking in credibility." *Id*. at *36.

- Judge Feinerman found it "telling" that, despite LW's alleged enforcement

3

measures, "Lifewatch does not currently provide sales scripts to its telemarketers and does not review or approve the scripts they use." *Id*. at \*37-38. The court found Mr. Sirlin's testimony on this point "unpersuasive" and "Lifewatch's ostrich-like approach … extremely troubling." *Id*. at \*39.

- Further evidence adduced by FTC investigator Menjivar reveals ***16,937 DNC and robo-call complaints involving numbers associated with LW's current telemarketers***. *Id*. Judge Feinerman thus found that LW's current telemarketers were no more likely to follow the law than the ones previously shut down. *Id*. at \*39-40.

- Judge Feinerman determined that "the evidence provides a strong basis for concluding that Lifewatch exercises control over its telemarketers." *Id*. at \*48. Citing declarations of LW former employees and emails from LW's ***current*** Call Center Liaison, Lauren Vandewater, the court found that, the telemarketers "are principally acting on Lifewatch's behalf… as Lifewatch's agents." *Id*. at \*51.

Judge Feinerman's factual findings were carefully made on largely the same record Plaintiff puts before this Court.[1] Based on that record, Plaintiff Matthew

---

[1] Rather than detailing the overwhelming volume of evidence against LW in numbered paragraph form in the accompanying Simoni Declaration, Plaintiff has attached to that Declaration as Exhibit PX29 a Fact Chart (cited herein as "PFC") summarizing relevant evidence with reference to each exhibit. Plaintiff believes the PFC will be helpful to the Court in analyzing the entire universe of documents and their applicability to each class certification factor.

4

Donaca ("Plaintiff") now asks this Court to certify a class as follows:

> **Proposed Class:** All individuals in the United States whose identity
> can be ascertained through Lifewatch's records and who received one
> or more phone calls directed to a telephone number assigned to a
> residential landline service using an artificial or prerecorded message
> made by, on behalf of, or for the benefit of Lifewatch from October
> 16, 2013 through the present.

On February 1, 2016, the Court denied Plaintiff's initial bid for class

certification. ECF Doc. 77. In its Order, the Court focused primarily on Plaintiff's

failure to: (1) set forth an ascertainable and appropriately numerous class and

method for identifying its members; and (2) submit sufficient evidence that

telemarketers were placing the calls on behalf of and for the benefit of LW. As

explained below, Plaintiff's new Proposed Class is limited to a discrete and

identifiable class of people, all of whom can be linked to LW and contacted

directly. In doing so, Plaintiff has addressed the Court's concerns and class

certification should be granted.

## LEGAL STANDARD

Under Rule 23(a), the party seeking class certification must demonstrate four

requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of

representation. *See* Fed. R. Civ. P. 23(a). Additionally, Rule 23(b)(3)—the prong

under which Plaintiff seeks to certify the Class here—requires Plaintiff to show that

"questions of law or fact common to the members of the class predominate over

5

any questions affecting individual members, and [that] a class action is superior to

other available methods for the fair and efficient adjudication of the controversy."

*See* Fed. R. Civ. P. 23(b)(3). "The named plaintiffs must also demonstrate that the

class is ascertainable." *Bishop v. Saab Auto. A.B.*, 1996 U.S. Dist. LEXIS 22890

*9-10 (C.D. Cal. Feb. 16, 1996).

In determining class certification, the court does not make findings of fact,

and does not draw any ultimate conclusions on the plaintiff's claims. *In re

Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 965 (C.D. Cal. 2015). And, while the

certification  analysis must be "'rigorous,'" and "may 'entail some overlap with the

merits of the plaintiff's underlying claim' … Rule 23 grants courts no license to

engage in free-ranging merits inquiries at the certification stage." *Ellis v. Costco

Wholesale Corp.*, 657 F.3d 970, 980-81 (9th Cir. 2011) (citations omitted). Indeed,

"the evidence only needs to enable the court to make a 'reasonable judgment' that

Rule 23 requirements have been met." *Perez-Olano v. Gonzalez*, 248 F.R.D. 248,

255 (C.D. Cal. 2008). As fully explained below, the Proposed Class should be

certified.

## **ARGUMENT**

### I.    **LW Is Vicariously Liable for the Acts of Its Telemarketers**

Congress enacted the TCPA after finding that robo-calls are a serious

problem that, pose a nuisance and invade the privacy of telephone subscribers

nationwide. *See* TCPA, 47 U.S.C. § 227 note; *see also* 105 Stat. 2394 § 2(10).

6

Congress granted a private right of action for victims, 47 U.S.C. § 227(b), and courts have routinely certified classes to remedy TCPA violations.[2]

In order to prevent the exact conduct at issue in this case – where businesses hire others to obscure the ultimate source of robo-call marketing– the FCC ruled that companies are vicariously liable for calls made on their behalf. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, et al.*, 28 F.C.C.R. 6574, 6588 (2013).[3]  As this Court has recently recognized, "the standard for classical agency under the TCPA is no different from the federal common law standard applied in any other context…."  *Lushe v. Verengo Inc.*, 2015 U.S. Dist. LEXIS 16961, at *3 (C.D. Cal. Feb. 2, 2015).  *See also Makaron v. GE Sec. Mfg.*, 2015 U.S. Dist. LEXIS 75240, *15 (C.D. Cal. May 18, 2015) (sellers can be vicariously liable for TCPA violations under agency principles).  A key requirement of classic common law agency is that the principal is "in control" of the agent's actions. *See United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010).

---

[2] *See, e.g., Booth v. Appstack, Inc.*, 2015 U.S. Dist. LEXIS 40779, *34-35 (W.D. Wa. Mar. 29, 2015) (certifying a class of plaintiffs who alleged that defendants made or benefitted from robo-calls); *see also Bee, Denning, Inc. v. Capital Alliance Group*, 2015 U.S. Dist. LEXIS 129495, *38 (S.D. Cal. Sept. 24, 2015) (granting class certification in a TCPA case and ruling that "[w]ithout the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.").

[3] *See also id*. at 6593 ("we see no reason that a seller should not be liable under those provisions for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.").

7

Notably, both the Ninth Circuit and the Northern District of Illinois, in issuing its March 31, 2016 injunction, have specifically rejected LW's contention that it cannot be liable for its "rogue" telemarketers. *Cf. Life Alert Emergency Response, Inc. v. Connect America.com LLC*, 601 Fed. Appx. 469, 474 (9th Cir. 2015) ("The district court did not buy this story of telemarketers-gone-rogue, and neither do we."); FTC Op. at *51 (citing *Life Alert*, and stating that "[t]he same holds true here").

### 1.   LW's Telemarketers Sell Medical Devices on Behalf of and for the Benefit of LW and LW Controls its Telemarketers

Here, there is no question that robo-calls made by LW's telemarketers were on behalf of, and for the benefit of, LW and that LW controlled them.  The record is replete with evidence showing that this misconduct was continuing throughout the Class Period, and was so pervasive and egregious that a ***2016 injunction*** was necessary. *See generally* FTC Op.; PFC #1-13.  As illustrated in the PFC, the robo-calling was done on behalf of and for the benefit of LW, and LW was intimately involved in the entire process:

### a.   "On Behalf of and for the Benefit of"

- Telemarketers sold LW's medical alert devices on behalf of and for the benefit of LW during the Class Period. PFC #1-8. By way of example, in October 27, 2014, a telemarketer for "Senior Life Savers" stated that "it's all the same – that what's going to show up on your bank statement is Lifewatch," and that

8

"Lifewatch is over all of us." PFC #1. In a January 15, 2015 call, a "Senior Life Support" telemarketer represented that "all of the products are from Lifewatch," and "we sell for them." PFC #3; *see also* PFC #2, 4-7 (telemarketers linking sales companies and products to LW or confirmatory sales calls from LW).

- The products described by the telemarketers during the Class Period are linked to LW by price, charged-by designation, and description. PFC #22-24. Telemarketers advised the consumers of the precise payment, that the charge would appear under the name "Lifewatch," and that the products say "Lifewatch, USA." PFC #22-23.

- The telemarketing calls during the Class Period involve ***live transfers*** directly to LW's verification department or company. PFC #25-31 (examples of live transfers). Given the live transfer of sales calls, LW's assertion that telemarketers were not selling exclusively to LW is baseless and not credible.[4]

- LW admits that it ***currently has 7 telemarketers*** and that, during the live transfer process, ***it does nothing to confirm that robo-calling, misrepresentations or DNC violations are not occurring*** because, per LW, "that would probably be confusing." PFC #34, 79, 119.

---

[4] Mr. Sirlin testified at the December 2015 FTC hearing that, in his opinion, a telemarketer could simply real-time transfer calls to another medical alert company by pushing a different button. PFC #32. But, when asked about the basis for this opinion, Mr. Sirlin confirmed that it was pure speculation on his part because he has "seen phones, not from telemarketers, that .. can transfer and switch calls." *Id.*

9

- LW- not the telemarketer- takes all customer payments and, in turn, LW pays telemarketers commissions for each customer generated. *See, e.g.,* PFC #65-68 (LW pays telemarketers); PFC #69-70 (every card goes through LW account).

- LW profits and generates substantial revenues derived from robo-calling. PFC #85. By way of example, During the Class Period, from ***January through August of 2014***, LW earned almost ***six million dollars*** from monthly fees paid by consumers. *Id.* For the same time period, LW earned ***over thirteen million dollars*** from the sale of customer accounts, as reflected on a Profit and Loss statement produced to the FTC by Lifewatch. *Id.*

### b.    LW Controls Its Telemarketers

- There is ample evidence of knowledge and control by LW based on its communications and interactions with former employees and competitors, and emails by current employees and its telemarketers that show that LW has controlled and continues to control its telemarketers during the Class Period. PFC #9-21.

- LW has at least one dedicated employee—a "Call Center Liaison"—who is ***currently*** responsible for reviewing sales calls and communicating with telemarketers. PFC #35-38.

- LW communicates with telemarketers regarding the contents of their calls, including reviewing their calls, advising them on what they can and cannot say,

10

and editing telemarketing scripts.  PFC #35 (telemarketer sending sales script to

LW liaison for review); PFC #36 (LW liaison attaches edited sales script); PFC

#37  (LW liaison instructing telemarketers as to what they should or should not

say).  *See also* PFC #39  (Baker testimony indicating LW is in direct contact

with its telemarketers regarding the content of sales calls); PFC #41   (Baker

communicated with telemarketer TMI regarding "pricing, product info, CRM

data entry, commissions, order fulfillment, customer-related issues.").

- LW has an "outside seller compliance" program through which it communicates

  with and controls its telemarketers.  PFC #43.  LW submitted "**copies of all**

  **sales scripts given to those soliciting for LW**" **"copies of all sales**

  **information or literature we provide our salespeople or of which we inform**

  **our salespeople (including, but not limited to, scripts, outlines, instructions**

  **and information regarding how to conduct telephonic sales, sample**

  **introduction, sample closings, product information and contest or premium**

  **award information"** (emphasis added) in connection with its Florida

  telemarketing license **in 2012, 2013 and 2015**, each signed by Evan Sirlin.  PFC

  #16.

- LW also provided its telemarketers a "Call Center Welcome Package" during

  the Class Period, which was also attached to LW's license applications. Among

  other things, the package includes an "Up-sell Script," rebuttal scripts, and a

  product explanation of "how things work." In the "Quality Control" section of

11

the package, it states that "**Scripts and Rebuttals must be approved by Lifewatch-USA.**" PFC #17.

- Some of LW's telemarketers who sought licenses in Florida also included copies of LW's Call Center Welcome Package and proposed scripts as part of their applications in the Class Period. *See, e.g.,* PFC #19.  Others attached scripts and other LW documents linking them directly to LW during the Class Period. *Id.*

- LW had its own internal Do Not Call list, which confirms LW's awareness of and complacency in the robo-calling done on its behalf.  PFC #73-74.

Indeed, there is no question that the rampant robo-calling was conducted on LW's behalf and that LW directed and controlled the campaign.

## 2.    LW's Feigned Ignorance is Unpersuasive

Any attempt by LW to feign ignorance of its robo-calling scheme is simply not credible (as the Northern District of Illinois just found in March). *See, e.g.*, FTC Op., at *16 (rejecting Mr. Sirlin's attempt to plead ignorance of the Worldwide robo-calling on LW's behalf stating "the court does not find that testimony credible."); *id*. at *39 (finding Mr. Sirlin's testimony "unpersuasive" concerning LW's contention that it does not review or approve scripts and finding "Lifewatch's ostrich-like approach … extremely troubling.").

The record is also riddled with inconsistencies, conflicting testimony, and completely unbelievable explanations by Sarai Baker, LW's Director of Operations. For example:

12



[redacted]

[redacted]

[redacted]

[redacted]



[redacted]

Indeed, the evidence of LW's culpability in this case is overwhelming and LW's protestations of ignorance are not believable.

## II.    The Proposed Class is Readily Ascertainable

This Court was previously concerned that Plaintiff's prior-defined class of "all individuals in the United States who received one or more phone calls … made by, on behalf of, or for the benefit of LW" was not ascertainable for two reasons: (1) this Court found that Plaintiff did not submit evidence demonstrating any other individuals received unlawful phone calls; and (2) this Court found that Plaintiff had not proposed any feasible method by which to identify such individuals. *See* ECF Doc. 77 at 10. As explained below, Plaintiff's revised Class Definition addresses these concerns.

Plaintiff adopts this Court's prior recitation of the applicable law governing ascertainability. *Id*. at 9. To summarize, a class is ascertainable if it is

15

"administratively feasible for the court to determine whether a particular individual is a member" using objective criteria. *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 521 (C.D. Cal. 2012). An ascertainable class may be defined "by the activities of the defendants." *Lamumba Corp. v. City of Oakland*, 2007 U.S. Dist. LEXIS 81688, at \*11 (N.D. Cal. Nov. 2, 2007) (citing *International Molders' and Allied Workers' Local Union No. 164, et al. v. Nelson*, 102 F.R.D. 457, 464 (N.D. Cal. 1983)).

This Court took such an approach in *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014), which involved the sale of over-the-counter supplements.  There, despite the defendant's contention that the class was not ascertainable because it did not have records identifying consumer purchasers, this Court determined that the defendant did have some records of sales to retailers, that class members could self-identify through affidavits and that "proper notice regarding the form of the product and its characteristics may help reduce consumer confusion regarding class membership." *Id*. at \*22-28.  Here, the Class is even more easily ascertainable than in *McCrary*.  It is not just defined by the activities of LW; it is defined by LW's ***own records***.

Practically speaking, this Class consists of the following 2 groups: (1) LW's customers;  and  (2)  non-customers  of  LW,  including  Mr.  Donaca,  whose information is contained in LW's records and demonstrates the receipt of a robo-call.  LW knows exactly who is in the Class.

16

As demonstrated in the PFC, LW's 66,000 customers are all identified in the Company's CRM system.  PFC #54-83.  LW's CRM tracks the identity of each telemarketer who signed up each customer (*id.* #62-63), the commissions paid by LW to the telemarketer for each customer (*id.* #65-66), and the CRM system contains enough detail to confirm that such customers were originated through outbound telemarketing (*id.* #64).  Based on all this, customers who received robo-calls can be easily identified and directly contacted.

Indeed, the fact that LW can use its CRM system to contact its own customers is illustrated by the company's 2014 "refund program," which involved contacting 3,000 customers in response to the FTC's shutdown of the Worldwide entities. PFC #71-72.  LW's customers are thus ascertainable. *See Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 4774763, at *5 (S.D. Cal. Sept. 5, 2013) (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively.").

Concerning non-customers, LW's Director of Operations testified that LW circulates an internal Do Not Call list containing information on each individual and the relevant telemarketer.  PFC #73-76.  If these people had not received a telemarketing call on LW's behalf, why would LW maintain records of a Do Not Call violation and why would LW be aware of their identities? Apart from its own Do Not Call list, LW also certainly has records of individuals who, like Mr. Donaca, complained of robo-calls.  PFC #74, 78.  LW also has in its possession the

17

records produced by the FTC concerning complaints of ascertainable non-customer individuals of robo-calling on LW's behalf. *See e.g.,* PFC #79 (16,937 Do Not Call and robo-call complaints for LW's current telemarketers); PFC #82 (describing 180 BBB complaints); id. (between January 1, 2012 and June 16, 2015, 433 Do Not Call complaints filed against LW). These non-customer individuals are also ascertainable and can be contacted specifically, just as LW's customers can.

Although Plaintiff believes ***direct notice*** can be given to the discrete and identifiable class and does not need to rely on self-identification, if there is any doubt that any person receiving direct notice received a robo-call, class members can submit affidavits swearing, *e.g.*, (i) that they became customers of LW because of a robo-call or, alternatively; (ii) they can describe the robo-call and swear that the call was made on LW's behalf.  This Court endorsed self-identification by affidavit in *McCrary*, and in that case there were no records to assess the identity of any of the class members. 2014 U.S. Dist. LEXIS 8443, at *22.  Here the case is stronger because Plaintiff knows exactly who is in the class and does not need to rely on affidavits alone.  For these reasons, Plaintiff's class is ascertainable and the Court's previous concerns should no longer pose any issues.

## III.    The Class Satisfies Rule 23(a)

### A.    Numerosity

Plaintiff adopts the Court's recitation of the law concerning numerosity at page 11 of its prior opinion, ECF Doc. 77.  To supplement that discussion, a class

18

of forty or more is usually sufficiently numerous and "raises a presumption of impracticability of joinder based on numbers alone." 1 William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011); *see also Rannis v. Recchia*, 380 Fed. Appx 646, 651 (9th Cir. 2010). The court may make common sense assumptions to support numerosity. *See, e.g., In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 137945, at *91-92 (N.D. Cal. June 20, 2013). In considering numerosity, the Court may also consider geographical diversity of potential class members. *See, e.g., Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996).

This Court, considering Plaintiff's prior Class definition, found that numerosity had not been met because Plaintiff had not established that calls were being made for the benefit of LW during the Class Period. Plaintiff's new Proposed Class addresses this concern because Class members are all tied to LW, as explained in the ascertainability section, *supra*.

### 1. The Only Plausible Explanation is that the Vast Majority of LW's Customers Became Customers Because of Robo-Calling

The Class here consists of many thousands of people. With respect to LW's 66,000 customers, when evaluating the evidence, the only logical conclusion is that the vast majority of these customers came from robo-calling (and indeed, given the level of detail in its CRM system, LW can tie each customer to each telemarketer and thus link each person to robo-calling).

19

Not coincidentally, from 2012 when it began robo-calling through the end of 2015, LW *tripled* its customer base and *tripled* in size.  PFC #83-84. During just eight months within the Class Period (*January through August of 2014)*, LW earned almost *six million dollars* from monthly fees paid by consumers and *over thirteen million dollars* from the sale of customer accounts.  *Id.* #85.  These numbers are unsurprising given Mr. Sirlin's statement in 2013 that attributed a meteoric rise in its customer base – 8,000 customers a month – to telemarketing.  *Id.*

There is no evidence in the record whatsoever that establishes a plausible explanation for these numbers than rampant outbound robo-calling.  In fact, any argument to the contrary would be inconsistent with the testimony of LW's own Director of Operations who, when asked about LW's television, radio, print or web advertising, responded that she had no knowledge of any such advertising by LW. PFC #67.

The record also confirms that the robo-calling campaign occurred *continually throughout the Class Period*.  FTC Op., at *8. During this time, LW used over 50 telemarketers, many of whom filed licensing materials in Florida and can be linked to LW.  FTC Op., at *22, 27; PFC #87.  The FTC uncovered declarations, call transcripts and testimony from fifty consumers all showing that robo-calls were being made throughout the relevant time period, including in 2015. PFC #91.

20

Most tellingly however, the FTC investigated phone numbers associated with LW's **current** telemarketers, revealing **16,937 DNC and related robo-call complaints**.  PFC #79; FTC Op., at \*39; *see also* PFC #7, 8, 94, 96 (recounting FTC "honeypot" investigation in 2014-2015); PFC #82 (describing 180 BBB complaints, one from **February 17, 2015**); *id.* (between **January 1, 2012 and June 16, 2015**, there were **433 Do Not Call complaints** filed against LW).

Examples of just some of the robo-calls made by telemarketers on behalf of and for the benefit of LW during the Class Period include:

- On **November 25, 2014**, William James, who has been on the National DNC Registry since 2003, received a robo-call.  After pressing "1", he spoke with representatives from both "Medical Alert" and "Senior Life Support, " and ordered the product with a fake name and credit card information. The following day, he received a call back from "Laverne calling from LW," informing him that his credit card information did not process. Mr. James received another call **on January 30, 2015**, set forth below.  PFC #95.

- David Eden, who is on the National DNC registry, **was contacted multiple times in December 2014** by a robo-caller selling medical alert devices.  For example, **on December 22, 2014**, Mr. Eden received a medical alert device robo-call.  Mr. Eden pressed "1" and telemarketer stated that he worked for LW. On **January 12, 2015**, Mr. Eden received a voicemail from "Senior Life Support."  When he called back, the representative stated that LW USA was the

21

company's "'corporate office.'"   Mr. Eden was advised that the credit card

transaction would say "LW USA."  PFC #97.

- Mr. James received another robo-call from a company called "Medical Alarms"

on **January 30, 2015**.  Mr. James again placed an order for a medical alert

device.  While on the call, he was given the company's customer service number

which is the customer service number listed on LW's website.  www.lifewatch-

usa.com (as of June 1, 2016).  He was then transferred to "Laverne," who again

gave him the same LW customer service number.  PFC #99.

*See also* PFC #92 (**October 19, 2013 call**); PFC #93 (**January 14, 2014** call).

These calls are consistent with the calls received by Mr. Donaca during (and

preceding) the Class Period.  *See* Typicality analysis, *infra*.

There is also evidence in the record that, beginning in 2012 but continuing

into the Class Period and through at least the first week of January 2014 (when the

*Worldwide* litigation was commenced), LW's telemarketers were blasting millions

of calls on its behalf.  PFC #103.  For example, Unique Information Systems, which

provided its services ***exclusively*** to LW beginning in 2011, "sent out nearly 2

million calls per day, six days per week, to consumers."  *Id.* #104.  The company

was not permanently enjoined from telemarketing operations until **November 13,

2014, *over a year after the beginning of the Class Period***, until it was shut down as

a result of the *Worldwide* litigation.  *FTC v. Worldwide Info Services, Inc. et al.*,

No. 6:14-cv-8-Orl-41DAB, Dkt. 102.  *See also* PFC #103 (call between Diana Mey

22

and "Senior Life Savers" on **October 27, 2014, where manager stated that it cycles through 10,000 calls per day** and the company "used to be" called LW); *id.* (during **October 3, 2014** call, consumer told "it's all the same – that[] what's going to show up on your bank statement is Lifewatch."); *id.* ("Lifewatch is over all of us. We're just a small branch from [sic] them."); *id.* (employee of Senior Life Support from **10/31/2014-11/7/2014** declared that "it was clear that these incoming calls had been generated by a consumer's response to an outgoing recorded message or 'robo-call' from the company").

Finally, LW has been the subject of several government investigations and has been sued in at least a dozen other lawsuits alleging that LW's telemarketers engaged in robo-calling in violation of the TCPA since November 2012.  *See* PX30 (Litigation Chart identifying cases.  At least five of these cases allege unauthorized robo-calls made by and on behalf of LW during the Class Period, some ***as recently as September 2015***.  *Id.; see also Bank v. LW, Inc.*, No. 15-5708 (E.D.N.Y.) at Dkt. 1 (identifying unauthorized robo-calls in July, August and September 2015). Because many of these cases appear to have been settled, these individuals would not be Proposed Class members.  However, the complaints buttress numerosity and demonstrate that robo-calling was the norm, not the exception, for LW.

**2.  The Class is Geographically Diverse**

Another relevant numerosity factor is the location of class members.  Here, the potential class members are spread out and not geographically confined:  for

23

example, Mr. Donaca resides in California, Mr. James resides in Mississippi, Mr. Eden resides in Illinois, and Mr. Lifshitz resides in Ohio.  PFC #107-110.

Based on all of the foregoing, common sense dictates that the Class here, which consists of the majority of LW's 66,000 customers, non-customers on LW's Do Not Call List and others who have complained of robo-calls and are identifiable in LW's records (including those produced in the FTC litigation), numbers far in excess of the 40 people necessary for numerosity.

**B.    Commonality**

To satisfy commonality, Plaintiff must identify "a common contention" that is "capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  Commonality only requires a ***single*** significant question of law or fact. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). Commonality is "a low hurdle easily surmounted." *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632, at *37 (N.D. Cal. Dec. 21, 2010).

Here, there are multiple common questions.  To start, Plaintiff's and the class's claims rely on a single contention arising out of a common nucleus of operative facts: LW violated the TCPA by causing to be placed and benefitting from robo-calls made to residential landline numbers without the recipient's prior express consent. If LW is found liable, each class member has suffered the same injury and is entitled to statutory damages under the TCPA.

24

This common nucleus of operative facts gives rise to several common and controlling factual and legal questions that will resolve each class member's TCPA claims in one stroke, including:

- Whether LW, or someone acting on its behalf, placed calls using an artificial or prerecorded message as contemplated by the TCPA;

- Whether LW's conduct constitutes a violation of the TCPA;

- Whether LW can establish an affirmative defense of prior express consent;

- Whether Plaintiff and the Class are entitled to actual, statutory, or other forms of damages, and other monetary relief; and;

- Whether Plaintiff and the Class are entitled to treble damages based on the willfulness of LW's conduct.

Notably, Plaintiff has presented voluminous evidence that both he and the members of the putative class received robo-calls on behalf and for the benefit of LW in violation of the TCPA. *See* above discussion regarding vicarious liability. Thus, in addition to the other common questions listed above, the questions of whether LW is ultimately responsible for these TCPA-violative calls under common law agency principles (LW is), and whether the calls themselves violated the TCPA (they did), are common questions, capable of resolution class-wide.

## C.    Typicality

A named plaintiff's claim is typical if plaintiff alleges injuries similar to those of the proposed class members, if that claim is made based upon facts which are not unique, and if those injuries spring from the same course of alleged conduct

of the defendants. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). Commonality and typicality inquiries frequently overlap. *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 611 n.16 (S.D. Cal. 2007).

Here, Plaintiff's claims are emblematic of the Proposed Class he seeks to represent:

- Mr. Donaca received robo-calls on his landline telephone during the Class Period. Upon answering the call, a pre-recorded message and/or artificial voice stated that the call was regarding medical alert devices. PFC #122.

- The robo-calls directed Mr. Donaca to press "1" to speak to a representative. *Id.* #123. It was during the course of these several phone calls that Mr. Donaca learned that LW was the seller of these devices. *Id.* #124. In addition, Mr. Donaca was informed by LW that an automatic telephone dialing system was used. *Id.* #126.

- Mr. Donaca did not give LW prior express consent for the calls. *Id.* #125.

Other consumers, in addition to Mr. Donaca, received unsolicited, automated telephone calls from telemarketers selling medical alert devices on behalf of and for the benefit of LW during the Class Period. These consumers were directed to press "1" to speak to a representative, and it was during the course of these calls, and related confirmatory calls, that the consumers learned that LW was the seller of the devices. PFC #91-100 and related discussion *supra*. The FTC Investigators who

26

were being forwarded calls from the honeypot had the identical experience. *Id.*

Plaintiff's and other Class members' claims all result from the exact same conduct, and all of these calls had the same purpose (to generate sales of medical device monitoring systems and services from which LW would profit). As a result, Plaintiff's rights under the TCPA were violated by the same common course of conduct to which LW subjected every other putative Class member, and Plaintiff suffered the exact same injury as all other class members.

## D.    Adequacy

Finally, Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).   "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Further, whether the class representatives satisfy the adequacy requirement depends on "'the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.'" *Rodriquez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009) (quoting *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998)).

27

Plaintiff and his Counsel are undoubtedly adequate. Plaintiff has demonstrated that he has the same interests as the other members of the proposed Class: he received unsolicited telemarketing calls from Defendant in violation of the TCPA. PFC #130.  He shares the same interest in ensuring that LW is found liable for its conduct and has vigorously prosecuted this case in discovery and he will continue to prosecute this matter to the best of his ability. PFC #131-132. Plaintiff is familiar with the class action vehicle, his responsibilities as a class representative, and the service he will provide as a named plaintiff, and he has affirmatively committed himself to acting in the Class's best interests at all times. *Id.*  None of Mr. Donaca's other cases or interests is antagonistic to those of the class.

LW previously attempted to paint Plaintiff as an "extortionist," and will likely do so again, because he sent LW a demand letter after receiving numerous unsolicited calls during which telemarketers pushed LW's medical alert devices. However, as the Court is aware, demand letters are a common precursor to a lawsuit, and can help parties avoid protracted and costly litigation.  Such a letter cannot constitute extortion under California Penal Code § 518 unless there is a showing of the "wrongful" use of fear by threat of a lawsuit that is "objectively baseless." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939-940 (9th Cir. Cal. 2006). Given that the FTC has sued LW for this very same conduct (among other illegal activities) at issue here, and Judge Feinerman issued an injunction against LW, the

28

suggestion that Plaintiff's demand letter was anything other than an appropriate response to continued telemarketer harassment is baseless.   The Court should decline LW's transparent invitation to shift the Court's focus away from its own misconduct.[5]

Plaintiff has also retained experienced and skilled counsel who will continue to adequately represent the interests of the Class.   Counsel Katrina Carroll of Lite DePalma Greenberg, LLC and Peter S. Lubin of DiTommaso Lubin P.C. have repeatedly demonstrated their commitment to and experience with plaintiffs' class litigation, have the financial resources to represent the class and will commit more than sufficient resources and effort to litigate this action to its conclusion.[6]

## IV.   The Class Satisfies Rule 23(b)(3)

### A.   Predominance

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 236 (C.D. Cal. 2007) (quoting *Hanlon*, 150 F.3d at 1022. "The mere presence of potential individual issues does not defeat the

---

[5] To the extent LW argues that Plaintiff's declination to produce the retention agreement he entered into with counsel makes him inadequate, he is under no obligation to produce that agreement and LW cannot demonstrate how such disclosure would be relevant or necessary.   Regardless, should the Court desire, Plaintiff will produce the agreement for inspection *in camera*.

[6] A copy of Lite DePalma Greenberg's firm resume, including Ms. Carroll's background and experience, is attached to the Simoni Declaration as PX 27.  Copies of DiTommaso Lubin, P.C.'s resume and Mr. Lubin's detailed biography are attached to the Simoni Declaration as PX 28.

29

predominance of common questions." *McFarland v. Memorex*, 96 F.R.D. 357, 363-64 (N.D. Cal. 1982). As such, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

Here, the foregoing discussion regarding commonality and typicality demonstrates that the claims of Plaintiff and the Proposed Class arise out of a common course of conduct.  Where, as here, a class challenges a uniform policy or practice, "[c]lass certification is usually appropriate . . . since in that situation predominance is easily established." *Singer v. Becton Dickinson & Co.*, 2009 U.S. Dist. LEXIS 114547 (S.D. Cal. Dec. 9, 2009) (citing *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008)). As such, Plaintiff's and the Class's claims will be subject to common proof, and this litigation is well-suited to the class action process. Furthermore, the relief sought is identical in each Class member's case because the TCPA provides a statutory damages award of $500 for each violation of the Act.  47 U.S.C.§ 227(b)(3)(C).  Each member of the Class is seeking the same statutory damages, which allows damages to be easily calculated.

Plaintiff anticipates an argument from LW that the (sole) question of prior express consent will predominate over the (myriad) other common questions identified above.  First, express consent "is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears

30

the burden of proof." *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600

n.1 (9th Cir. 2011); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d

1036, 1042 (9th Cir. 2012) (upholding class certification, noting that defendant "did

not show a single instance where express consent was given before the call was

placed").   But even putting that aside, there is no consent issue here.

LW has asserted that consent is established because it receives affidavits

from telemarketers stating that they will comply with state and federal

telemarketing laws.   Noticeably absent from these affidavits, however, is any

specific reference to prior express written consent.[7]  *See, e.g.,* PX 25 at 35-37.  And

even if the agreements did mention consent, there is not one piece of evidence

showing that any telemarketer ever obtained any class member's consent (***i.e. the

consent of the "called party" under the TCPA***, 47 USCS § 227(b)(1)(B)).

Actually, to the contrary, when asked whether LW made any attempt at the time

each sales call was transferred to LW to verify that there had been no robo-calling

or Do Not Call violations, LW's CEO answered that LW chose not to do so.  PFC

#34.  Further with respect to LW's alleged compliance program, Judge Feinerman

found the testimony Ms. Baker and Mr. Sirlin as "lacking in credibility" (FTC Op.

at *36) and its "ostrich-like approach …***extremely troubling***" (*id*. at *39).

---

[7] Even according to LW, the affidavits were only adopted in October 2014.  PX 1 at
102:11-17.   Thus, even if the affidavits *were* sufficient to demonstrate consent,
which they are not, LW has not offered a single shred of evidence that its
telemarketers were obtaining prior express, written consent from class members
between October 2013 and October 2014.

On the other hand, Plaintiff's evidence reveals that both he and scores of other class members received these calls without ever once providing express written consent or while listed on the Do Not Call registry (where consent obviously was not given), and that LW was intimately aware of this. *See generally supra*. Indeed, a **lack of consent** is the common sense conclusion: how would telemarketers obtain prior express **written** consent from consumers they were **cold robo-calling** to generate **new** customers for LW? The **lack of consent** is a **common** issue rather than an individual one.

Accordingly, *all* relevant factual and legal inquiries in this matter are capable of class-wide proof, and predominate over any other minor, individualized question(s) LW may manufacture.

### B.     Superiority

Finally, to proceed as a class action under Rule 23(b)(3), the district court must find that a class action is superior to other available methods for fair and efficient adjudication. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975). The rule identifies a non-exclusive list of pertinent superiority factors:

- the interest of members of the class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and

- the difficulties likely to be encountered in the management of a class action.

32

Fed. R. Civ. P. 23(b)(3).[8]   Courts also look to whether alternative methods of dispute resolution are reasonably available and compare them to the class action device.  *See, e.g., Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 562 (C.D. Cal. 2012).  Here, a class action is the superior method for this controversy.

First, the interest of class members in individually controlling the prosecution of this litigation is small.  "'Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.'"  *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, (C.D. Cal. 2012) (quoting *Wolin v. Jaguar Land Rover N. Am.,* LLC, 617 F.3d 1168, 1175 (9th Cir. 2010)).  The TCPA provides for statutory damages in the amount of $500 per violation; it costs a plaintiff $400 (including a $50 administrative fee) to merely file a claim in federal court, much less litigate it.  Thus, the TCPA's damages provision "is generally insufficient to incentivize individual litigation."  *See Bee, Denning, Inc. v. Capital Alliance Group*, No. 13-cv-2654, 2015 U.S. Dist. LEXIS 129495, at *34-35 (Sept. 24, 2015 S.D. Cal.) (agreeing with plaintiffs' argument).

Second, although some potential class members have commenced litigation against LW, for the most part these claims appear to have been settled or voluntarily dismissed (based on a recent review of the dockets).  The only remaining federal cases brought by consumers against LW for violations of the

---

[8] The other pertinent factor, "the desirability or undesirability of commencing the litigation of the claims in the particular forum," is neutral in this litigation.

TCPA are **class actions**, not individual cases, and show that the class action device is necessary for plaintiffs to come forward to purse their claims.[9]

Third, manageability of this case as a class action does not pose any difficulties.  The experience of Plaintiff's counsel in suits of this kind speaks to their ability to manage a class of the expected size here.

A class action "is superior to other methods of litigation 'if no realistic alternative exists.'"   *Bee, Denning*, 2015 U.S. Dist. LEXIS 129495, at *34. Admittedly, an individual can bring an individual TCPA claim in small claims court (potentially avoiding significant filing fees and the need for an attorney).  But where, as here, a company has engaged in a pattern and practice of using other telemarketers to do its "dirty work," making proof of liability very complex, the lawsuit is "ill-suited" for small claims court.  *See Bee, Denning*, 2015 U.S. Dist. LEXIS 129495, at *36 (TCPA case not suited for small claims court where defendant concealed its conduct through aliases and difficult to trace toll-free numbers).  Indeed, the only real alternative to a class action is no action at all.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court enter an order (i) certifying the Proposed Class, (ii) appointing Plaintiff as the Class

---

[9]  The cases are *Salam v. LW, Inc.*, Case No. 13-cv-9305 (N.D. Ill.), and *Bank v. LW, Inc.*, Case No. 15-cv-2278 (E.D.N.Y.). Note that these matters involve different claims and classes and coordination of the actions was rejected by the Judicial Panel on Multidistrict Litigation.

1    Representative, (iii) appointing Katrina Carroll of Lite DePalma Greenberg, LLC

2
3    and Peter Lubin as Co-Lead Class Counsel, and (iv) granting any such further relief

4    as this Court deems reasonable and just.

5    Date:  June 7, 2016                    Respectfully submitted,

6
7                                           By: ___/s/[10] Stephen J. Simoni__
                                            STEPHEN J. SIMONI (Bar No. 284558)
8                                           StephenSimoniLAW@gmail.com
9                                           **SIMONI CONSUMERS**
                                            **CLASS ACTION LAW OFFICES**
10                                          12131 Turnberry Drive, Suite 100
                                            Rancho Mirage, CA 92270-1500
11                                          Telephone:  (917) 621-5795

12
13                                          By: ___/s/ Chad C. Austin____
14
15                                          CHAD C. AUSTIN (Bar No. 235457)
                                            ChadCAustin@gmail.com
16                                          **LAW OFFICE OF CHAD C. AUSTIN**
17                                          4632 Berwick Drive
                                            San Diego, CA  92117
18                                          Telephone:  (619) 992-7100
                                            Facsimile:  (858) 712-0316
19
20
21                                          By: ___/s/ Katrina Carroll__

22                                          KATRINA CARROLL (*pro hac vice*)
23                                          kcarroll@litedepalma.com
                                            **LITE DePALMA GREENBERG, LLC**
24                                          211 West Wacker Drive
                                            Suite 500
25                                          Chicago, IL 60606
26
     ───────────────────
27   [10] In accordance with Local Rule 5-4.3.4(a)(2)(i), the ECF/CM filer, Stephen J. Simoni, attests
     that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing's
28   content and have authorized the filing.

                                            35

598257.2  PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION EDCV-13-02064 (JGB)-SPx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone:  (312) 750-1265

By: ____ /s/ Peter S. Lubin __
psl@ditommasolaw.com
**DITOMMASO LUBIN**
17W200 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Telephone:  (630) 333-0000

*Counsel for Plaintiff Matthew Donaca and the Proposed Class*

36