# PX 1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   FEDERAL TRADE COMMISSION and     )
     STATE OF FLORIDA, OFFICE OF      )
     THE ATTORNEY GENERAL,            )
 5   DEPARTMENT OF LEGAL AFFAIRS,     )
                                      )
 6                Plaintiffs,         )
                                      )
 7   -vs-                             )  Case No. 15 C 5781
                                      )
 8   LIFEWATCH, INC., a New York      )
     corporation, doing business      )
 9   as LIFEWATCH USA, doing          )
     business as MEDICAL ALARM        )
10   SYSTEMS, and EVAN SIRLIN,        )
     individually and as an          )
11   officer or manager of           )
     Lifewatch, Inc.,                 )  Chicago, Illinois
12                                    )  December 14, 2015
                  Defendants.         )  10:00 a.m.
13

14     TRANSCRIPT OF PROCEEDINGS - Preliminary Injunction Hearing
                 BEFORE THE HONORABLE GARY FEINERMAN
15

16   APPEARANCES:

17   For Plaintiff FTC:       FEDERAL TRADE COMMISSION
                              BY:  MR. DAVID A. O'TOOLE
18                                 MS. ROZINA C. BHIMANI
                                   MS. MARISSA J. REICH
19                            55 East Monroe Street
                              Suite 1860
20                            Chicago, Illinois  60603
                              (312) 960-5602
21

22   Court Reporter:

23               CHARLES R. ZANDI, CSR, RPR, FCRR
                      Official Court Reporter
                   United States District Court
24          219 South Dearborn Street, Suite 2128
                    Chicago, Illinois  60604
25               Telephone:  (312) 435-5387
            email:  Charles_zandi@ilnd.uscourts.gov
```

1       Started at the end of 2012, the class actions started

2   being filed against Lifewatch because of the Worldwide

3   calling.  In May 2015 -- or 2013, Life Alert sued Lifewatch

4   because of misrepresentations that the Lifewatch telemarketers

5   were using.  Life Alert's claim was based on the fact that

6   they were using a trademark, but that the robo-calling and the

7   telemarketing operations that Lifewatch was funding and

8   operating through Worldwide was killing their brand.  That was

9   the point of the lawsuit in Life Alert.

10      January 2014, we shut Worldwide down.  I've already

11  explained all of the evidence that we found -- and anything to

12  the contrary, defendants haven't provided yet -- shows that

13  Worldwide was working entirely for Lifewatch.  The testimony

14  is that all of the calls that Worldwide was making were

15  outbound, that all began with robo-calls.  There was no Do Not

16  Call scrubbing, and they all had spoofed Caller IDs.

17      Unfortunately, when Worldwide was shut down, things

18  didn't change.  So, we sent a CID to Lifewatch, a Civil

19  Investigative Demand, in April of 2014.  Lifewatch's response

20  again, "It's not our responsibility.  We don't know what's

21  going on."

22      In the CID, we asked them for any evidence to show

23  that they required some -- that they somehow -- the

24  telemarketers were somehow forced to follow the telemarketing

25  rules.  The only documents they provided, just as in the

1  A.  Lifewatch.

2  Q.  Can you just describe for us your role at Lifewatch.

3  A.  Sure.  I'm director of operations.  I oversee and

4  supervise the -- each department that Lifewatch has, customer

5  service, inventory, et cetera, as well as the outside seller

6  compliance program.

7  Q.  How long have you been employed by Lifewatch?

8  A.  I've been employed for eight years now and have been

9  director of operations for four of those years.

10  Q.  Just a moment ago, you referenced the outside seller

11  compliance program, right?

12  A.  Yes.

13  Q.  Can you explain what you mean by outside seller?

14  A.  Sure.  In approximately 2012, Lifewatch began entering

15  into purchase agreements with various sales companies; and

16  pursuant to those agreements, the outside sellers originate

17  customer accounts through radio, television, Internet, print

18  advertising, as well as telemarketing, and then offer to sell

19  those accounts to Lifewatch and others on a non-exclusive

20  basis.

21  Q.  Okay.  Now, why does Lifewatch work with these various

22  outside sellers?

23  A.  Lifewatch doesn't have a marketing department or any

24  marketing staff, so it relies on the outside sellers for

25  customer origination.

1  Q.  Okay.  And earlier, again, you referenced the outside
2  seller compliance program.

3  A.  Yes.

4  Q.  When did that outside seller compliance program first
5  begin?

6  A.  The compliance program has been in place ever since we
7  started working with the outside sellers, but it has continued
8  to evolve and improve.

9  Q.  Can you explain how it's evolved and improved?

10  A.  Well, the contracts themselves require the sellers to be
11  compliant with all applicable laws and regulations.  The
12  contracts require that audio recordings are kept in order to
13  ensure compliance with banking regulations.

14       After the FTC filed suit against the Worldwide
15  defendants, we improved the program to also include a refund
16  program to customers that believed they were induced into
17  purchasing our products and services based on
18  misrepresentations by the Worldwide defendants.

19  Q.  Let me just ask you, when was this refund program
20  implemented?

21  A.  It was implemented in 2014.

22  Q.  Okay.  What other measures does Lifewatch take currently
23  in accordance with its outside seller compliance program?

24  A.  Lifewatch does require that all outside sellers provide a
25  valid business license, that -- Lifewatch provides a copy to

1    the outside sellers of the permanent injunction that was

2    entered in the *Life Alert versus Lifewatch* case.

3           Lifewatch requires the outside sellers to sign

4    affidavits affirming that they will adhere to the regulations

5    and not make certain statements.

6    Q.  Are the certain statements, are they actually itemized and

7    referenced within that affidavit that's sent to the outside

8    seller?

9    A.  Yes, they are.

10   Q.  What -- what other measures does Lifewatch take?

11   A.  Lifewatch also circulates an internal Do Not Call List.

12   Lifewatch requests and receives -- has an employee that

13   requests and receives recordings and then spot-checks those

14   recordings to ensure compliance.

15          And Lifewatch also implemented a verification call

16   that's done by a company called Med Guard.

17   Q.  Okay.  Does Lifewatch provide sales scripts to its outside

18   sellers?

19   A.  No, we do not provide any sales scripts.  We do provide

20   information regarding what not to say, such as the

21   misrepresentations stated in the affidavits.  And we also

22   provide information on product descriptions, pricing sheet --

23   pricing, fact sheets, as well as information on phone service

24   compatibility with medical alert devices.

25   Q.  And approximately how long has Lifewatch been providing

1  these items?  When I say, "these items," I mean the items to

2  the outside sellers that you described for us.

3  A.  Yes, since about 2014.

4  Q.  And how many outside sellers is Lifewatch currently

5  purchasing accounts from?

6  A.  We're currently purchasing from seven outside sellers.

7  Q.  And within the last two years, has Lifewatch ever

8  terminated an outside seller as a result of that outside

9  seller's failure to comply with Lifewatch's policy?

10  A.  Yes.  We have terminated over 20 outside sellers.

11  Q.  Would the number be closer to 24?

12  A.  Yeah.  I do believe that 24 was the exact number.

13  Q.  Okay.  And can you just tell us generally, what are some

14  of the reasons that these 20 or 24 outside sellers had been

15  terminated by Lifewatch?

16  A.  Misstatements, not providing recordings to the employee,

17  Lauren Vandewater, and internal DNC violations.

18  Q.  Okay.  Can you describe for me exactly how the termination

19  process transpired just generally with these 24 outside

20  sellers?

21  A.  Lauren will notify me of a compliance issue.  I then

22  reach out to the CRM department and tell them to deactivate

23  that seller's log-in credentials; and then the seller is

24  notified sometimes via phone, sometimes via e-mail.

25  Q.  Okay.  But to be clear, in order to terminate, the process

1  simply involves deactivating the password, is that correct?

2  A.  Correct.

3  Q.  And does Lifewatch always terminate immediately, or are

4  there instances in which Lifewatch gives a non-compliant

5  outside seller another chance?

6  A.  There are some instances if -- that we might give them

7  another chance.  Especially if the relationship with the

8  seller has been long-term and they have been providing

9  customer accounts that have been valid and good accounts, then

10  that is something that we might give them another chance to

11  try and rectify the situation.

12  Q.  Are you aware of whether Lifewatch has received any

13  complaints about or had any compliance issues with the seven

14  current outside sellers?

15  A.  No, not that I'm aware of.

16  Q.  Okay.  Now, just a moment ago, we talked about

17  deactivating the CRM passwords, right?  Can you just give us a

18  general sense about how that CRM system works?

19  A.  Sure.  Lifewatch uses a third-party CRM database to track

20  customer information.  Outside sellers are provided with

21  log-in credentials and passwords to a third -party portal

22  within that CRM.  They do not have access to Lifewatch's

23  general database.  They only have access to what they enter

24  into -- into that portal.

25         It is my understanding that the outside sellers have

 1  their own customer database that they enter account

 2  information into, and then from there, they decide which

 3  entity to sell that account to or to offer it to.

 4  Q.  In the instances in which an outside seller enters

 5  information into the CRM portal, is Lifewatch obligated at

 6  that point to fulfill the contract?

 7  A.  No, not at all.  Lifewatch can choose to purchase that

 8  account and fulfill it or can deny it.

 9  Q.  Okay.  Does Lifewatch presently have a verification call

10  process as part of its quality control program?

11  A.  Yes, it does.

12  Q.  Okay.  And just generally, what is a verification call

13  process?

14  A.  Basically, a -- the outside seller would switch --

15  basically switches over a customer to a company called Med

16  Guard, and an employee at Med Guard will verify the

17  information, customer's name, address, phone number, verified

18  payment information, as well as that the customer understands

19  they're going to be charged immediately.

20  Q.  Okay.  And does Lifewatch have an understanding that

21  because of this verification call process, the outside sellers

22  are selling exclusively to Lifewatch?

23  A.  No.

24  Q.  How is this verification call process part of a quality

25  control program?  In other words, how does it assure quality?

1  A.  Well, it assures quality because it's -- it's assuring

2  that the customer is not confused about being charged

3  immediately.

4  Q.  Why is the customer charged immediately, as opposed to,

5  for instance, after the product has been shipped, after

6  there's been confirmation that the customer has received and

7  then plugged in and tested the product?

8  A.  We sign the customer up with the monitoring subcontractors

9  immediately, so we want to ensure that when the customer opens

10  the box and plugs in the unit, that they're protected right

11  away.

12  Q.  And does Lifewatch do anything presently to determine and

13  track whether or not the customer has actually received the

14  item?

15  A.  Yes.  We do have tracking information with USPS or

16  whatever carrier we use to fulfill that order.

17  Q.  And does Lifewatch reach out to the customer to see if

18  they've received their device?

19  A.  We do.  We do.  We have a new member services division

20  that does exactly that.

21  Q.  Can you describe the new member services division

22  generally?

23  A.  Um-hum.  We will -- we pull a report of all customers that

24  have been shipped equipment in the last five to seven days.

25  We track that -- we use the tracking number to make sure that

1    the equipment was delivered.  We contact the customer and get

2    them to hook up and test the unit right then and there.

3    Q.  Ms. Baker, the FTC has alleged certain things against

4    Lifewatch in the complaint, and I'm going to reference some of

5    these allegations here.

6            Has Lifewatch made or caused others to make outbound

7    telephone calls delivering prerecorded messages where the

8    telemarketers have failed to disclose truthfully, promptly,

9    and in a clear and conspicuous manner the identity of the

10   seller, the purpose of the call, and the nature of the goods

11   or services?

12           MS. REICH:  Your Honor, I'm going to object to that's

13   asking her to make a legal conclusion.

14           MR. LIPARI:  Your Honor, I would just -- if I might.

15           THE COURT:  Go ahead.

16           MR. LIPARI:  I would just say that it specifically

17   goes to the current quality control process and addresses

18   these factual allegations.  There's nothing -- these are

19   not -- this is not calling for a legal conclusion.  This calls

20   for Miss Baker to address some of the factual averments within

21   the complaint.

22           THE COURT:  I'll overrule the objection.  You can

23   answer.

24   BY THE WITNESS:

25   A.  No.  Lifewatch explicitly prohibits the outside sellers

1  from using prerecorded messages that violate the law.

2  BY MR. LIPARI:

3  Q.  Now, if Lifewatch determines that outside sellers that

4  it's doing business with are using prerecorded messages that

5  violate the law, what does Lifewatch do?

6  A.  They would be immediately terminated.

7  Q.  Ms. Baker, has Lifewatch engaged or caused telemarketers

8  to engage in initiating outbound calls to individuals on the

9  Do Not Call registry?

10        MS. REICH:  Your Honor, again, I'm going to make the

11  same objection.

12        MR. LIPARI:  And, your Honor, my rationale for asking

13  the question is the same.

14        THE COURT:  How does that call for a legal

15  conclusion?  The question is:  Does Lifewatch engage or cause

16  telemarketers to engage outbound calls to individuals on the

17  Do Not Call registry?  What's legal about any of that?

18        MS. REICH:  That's actually language from the

19  Telemarketing Sales Rule clause.

20        THE COURT:  So?  Just because a question has words

21  that also appear in a regulation or a statute doesn't make it

22  a legal question.

23        MS. REICH:  Okay.

24        THE COURT:  Do you agree?

25        MS. REICH:  Oh, I certainly do agree.

1          THE COURT:  So, help me understand.  I don't

2     understand your objection, and I'm always concerned when I

3     don't understand something that a lawyer is saying because it

4     usually means I'm missing something.

5          MS. REICH:  No.  I just want to make clear that it's

6     being used in the typical way that the word "caused" is

7     usually used.

8          THE COURT:  Got it.  Okay.  I'll overrule the

9     objection.

10    BY THE WITNESS:

11    A.  Absolutely not.  Lifewatch prohibits sellers from that,

12    from this type of action.

13    BY MR. LIPARI:

14    Q.  So, let me ask you, my question pertained to Do Not Call.

15    What does Lifewatch do presently, if anything, to ensure that

16    its outside sellers are not making calls to individuals on the

17    Do Not Call List?

18    A.  Lifewatch does circulate the internal Do Not Call List,

19    compiled in part by information from the outside sellers, and

20    will immediately terminate any seller if it is determined that

21    they called someone on the DNC list.

22    Q.  Among those 20 to 24 outside sellers that have been

23    terminated over the last two years, have any been terminated

24    for Do Not Call-related issues?

25    A.  Yes.

1  Q.  And they -- why specifically were they terminated?

2  A.  Because it was determined that they were -- that they had

3  made at least some -- one call or so to someone who's on that

4  internal list.

5  Q.  Okay.  Are there any references to Do Not Call violations

6  within the affidavit that Lifewatch sends to its outside

7  sellers at the outset?

8  A.  Yes.

9  Q.  What happens if the outside seller refuses to sign the

10  affidavit?

11  A.  We do not do business with them.

12  Q.  Has that ever occurred?

13  A.  Yes.

14  Q.  Has Lifewatch represented, directly or indirectly, that

15  its products have already been purchased for the consumer by a

16  friend or family member, that its products are endorsed by the

17  American Heart Association, the American Diabetes Association,

18  and the National Institute on Aging, and that consumers will

19  not be charged the first monitoring fee until they've already

20  received the product?

21  A.  No.  Lifewatch has never authorized outside sellers to

22  make these representations.

23  Q.  Okay.  And does Lifewatch specifically itemize those

24  statements as misrepresentations in the affidavit that it

25  requires outside sellers to sign?

1  be retained and could not be deleted?

2  A.  Yes.

3  Q.  So, ever since March 2014, you have held on to all of your

4  documents?

5  A.  Yes.

6  Q.  Now, you testified earlier that you were aware that in

7  early 2014, Lifewatch learned that some of its outside

8  sellers, which I think you referred to as the Worldwide

9  outside sellers, were sued by the FTC, right?

10 A.  Yes.

11 Q.  And after the FTC sued these Worldwide companies, you

12 state in your declaration that Lifewatch stopped working with

13 them, is that correct?

14 A.  Correct.

15 Q.  But didn't Lifewatch only stop working with them because

16 they were actually shut down by the court-appointed receiver

17 in that case?

18 A.  I do not know.

19 Q.  And are you aware that the Indiana Attorney General had

20 sued Lifewatch in November of 2012?

21 A.  I -- no, I'm not aware.

22 Q.  So, you're not aware that Lifewatch was sued by the

23 Indiana Attorney General's Office for violations of the

24 Indiana Do Not Call List and for sending out illegal

25 prerecorded messages?

1  A.  No, I'm not aware of all of the -- whatever might be

2  happening legally.

3  Q.  So, it's your testimony that as director of operations who

4  oversees the outside sellers, you weren't aware that a lawsuit

5  was brought against Lifewatch regarding actions by those

6  outside sellers?

7  A.  Not at that time, no.

8  Q.  So, in your declaration, in Exhibit F, you provide a list

9  of telemarketer names, and you indicate that Lifewatch is not

10  currently purchasing customer accounts from those companies,

11  correct?  But that doesn't mean that Lifewatch never purchased

12  accounts from those companies, does it?

13  A.  The list is --

14  Q.  It's Exhibit F to your declaration.  It's a list of

15  probably about 30 names of various companies.

16          MR. LIPARI:  Your Honor, I'm just going to object.

17  To the extent that she wants to question Ms. Baker on a list

18  of 30 companies within an exhibit to an affidavit, I think it

19  would be appropriate to put the exhibit in front of the

20  witness.

21          THE COURT:  Is there -- do you have a problem with

22  that?

23          MS. REICH:  I'll just -- I'll move on.

24          THE COURT:  Well, why don't we just give her a copy

25  of the affidavit?

 1  Q.  So, you determined that there were 3,000 of these people,
 2  correct?
 3  A.  Correct.
 4  Q.  And 3,000 of these people were being charged a monthly fee
 5  but were not using the device, is that correct, or did not
 6  have the device plugged in?
 7  A.  Correct.
 8  Q.  And Lifewatch didn't give an automatic refund to those
 9  3,000 people, did it?
10  A.  Correct.  And I want to just back up real quick.  It's not
11  that the device wasn't plugged in.  It's that they hadn't
12  initiated a first test.  I just wanted to be clear about that.
13  Q.  Okay.  So -- thank you.  Lifewatch does encourage
14  customers as soon as they receive the device to plug it in and
15  push the button to be sure it's operating correctly, correct?
16  A.  Yes, that is correct.
17  Q.  So, you determined, though, that 2200 of these 3,000
18  non-activated customers were satisfied with the device and
19  were happy to be paying for it even though they had never
20  tested it to make sure it works, correct?
21  A.  Correct.  But then at that point, we also walked them
22  through the -- the setup process.
23  Q.  I'm talking about the 2200 consumers.  Are you talking
24  about the 800?  So, you actually contacted all 2200 of the --
25  you contacted all 3,000 customers that had never plugged the

1  device in?

2  A.  We spoke with them, absolutely.

3  Q.  Oh, interesting.  Okay.

4      So, Ms. Baker, according to your declaration -- and I

5  can provide you with a copy of it, if you'd like.

6      MS. REICH:  Your Honor, I'm handing Ms. Baker a copy

7  of the declaration that she signed November 10th, 2015, in

8  this case.

9      THE COURT:  Okay.

10 BY MS. REICH:

11 Q.  You indicated in paragraph 13 that you had determined that

12 out of these approximately 3,000 customers, the non-activated,

13 2200 had previously called in to the customer service call

14 center and thus verified with our customer service department

15 that they knew they had the Lifewatch device, were satisfied,

16 and had not indicated any desire to discontinue service.

17 A.  Um-hum.

18 Q.  Are you indicating now that in addition to that, you also

19 called all 2200 of these customers at this point to confirm

20 that they were satisfied?

21 A.  No, I'm sorry, not that we called them, but we made

22 contact with them.  There was some sort of -- either them

23 calling us, us calling them.  There was a contact made with

24 that customer that we were able to verify that they absolutely

25 wanted to continue the service.  They were happy with us.

1          We -- if they -- at that point, if they hadn't

2    already tested the device, we tested it with them.  That

3    was -- it was a complete just making sure that that customer

4    would remain a customer.

5    Q.  And this is just contacts that were made any time between

6    when they became a customer and when you started providing

7    this refund to these customers, correct?

8    A.  Yes, correct.

9    Q.  So, what you're indicating is there was some record that

10   they had contacted Lifewatch or Lifewatch had contacted them

11   at some point, correct?

12   A.  Correct.

13   Q.  So, when you determined that there were these 3,000

14   non-activated customers, did you go through the records of

15   each of those 2200 customers to make sure they said in it,

16   "We love this device and we are happy to be paying for it,

17   even though we're not using it"?

18   A.  Yes.

19   Q.  You actually walked through all 2200?

20   A.  Yes.

21   Q.  And now, you indicate in your declaration that there were

22   800 non-activated customers who hadn't previously contacted

23   Lifewatch, correct?

24   A.  Correct.

25   Q.  And so you followed up with these 800 customers?

1  Q.  So, that telemarketing company was immediately terminated,
2  correct?
3  A.  Not necessarily.  If it was -- if it was one time, one rep
4  happened to do that, that is something that we would give an
5  outside seller another opportunity.
6  Q.  And I'd like to go down further to the heading, "Billed
7  When Activated."
8        Now, there, Ms. Vandewater says, "A rep cannot tell a
9  customer that billing starts once you activate the system or
10  you won't be billed until you test the unit.  You will be
11  considered non-compliant and charged back for that deal for
12  misleading the customers.  This cannot happen, and we will not
13  tolerate misleading the customers," correct?
14  A.  Correct.
15  Q.  So, she's acknowledging that that's a misrepresentation,
16  correct?
17  A.  Correct.
18  Q.  And again, this is the type of thing that would cause a
19  termination of a telemarketer?
20  A.  Correct.
21  Q.  And was the telemarketer terminated for this
22  misrepresentation?
23  A.  For this specific e-mail, I'm not sure.  I don't recall.
24  Q.  And then if you can go to the third page, please, there,
25  there's a heading, "The system is referred for them."  And it

1   says, "You know that a doctor or family member did not refer

2   them to get the system, so you should not be telling customers

3   that," correct?

4   A.  Correct.

5   Q.  So, this is another misrepresentation, correct?

6   A.  Correct.

7   Q.  And this is the type of misrepresentation that would lead

8   to the termination of an outside seller?

9   A.  Correct.

10  Q.  And are you aware if an outside seller was terminated for

11  this misrepresentation?

12  A.  I am not.  Remember, I said that this could be current

13  issues, or it could also include things that might have

14  happened.  It could include the misrepresentations that the

15  FTC alleged that was happening.

16  Q.  If I could move on to the next line please.  Here,

17  Ms. Vandewater writes, "These are all things that have been

18  coming up lately, and the reps need to be reminded they cannot

19  do that," correct?  That's what it says?

20  A.  Correct.  That doesn't mean that that -- she does say

21  things like that also to get them to understand how important

22  it is to adhere to all of these.

23  Q.  Okay.  Now, since May 2015 when this e-mail went out,

24  Lifewatch actually hasn't terminated any outside sellers for

25  making misrepresentations during telemarketing calls, have

Baker - cross

116

1   they?

2   A.  You're saying since May of 2015?

3   Q.  Um-hum, yeah.

4   A.  Lifewatch has -- definitely has terminated outside

5   sellers.

6   Q.  For misrepresentations?

7   A.  For compliance, definitely for compliance issues.

8   Q.  And these sorts of terminations would be documented, is

9   that correct?

10  A.  Not necessarily.  It could have been done via phone.

11  Q.  So, all terminations since May 2015 have solely been done

12  by telephone; is that what you're saying?

13  A.  I'm saying it's possible, yes.

14  Q.  Okay.  You also testified that Lifewatch keeps an internal

15  Do Not Call List, is that correct?

16  A.  Yes.

17  Q.  And is there a written policy about this internal Do Not

18  Call List that Lifewatch maintains, some sort of policy?

19  A.  No.  It's just an ongoing organic list.

20  Q.  And Ms. Vandewater provides this internal Do Not Call List

21  to Lifewatch's outside sellers, correct?

22  A.  Correct.

23  Q.  But you don't say in your declaration that the outside

24  sellers are actually required to upload their own internal

25  Do Not Call lists to Lifewatch, is that correct?

 1          MR. SULTZER:  Right in front?

 2          THE COURT:  No, all you need to do is move the -- so

 3   you're talking towards it.  Thank you.

 4          MR. SULTZER:  How's that?

 5          THE COURT:  Perfect.  Thank you.

 6   BY MR. SULTZER:

 7   Q.  I'm going to come back later and talk about your role in

 8   the company and the company itself, but I just want to dive

 9   into some issues that the FTC has raised and get your response

10   to some of these questions.

11          Let me ask, if the Court enters this preliminary

12   injunction against Lifewatch, what would the impact be on

13   Lifewatch's bottom line financially?

14   A.  Right.  So, can I look at the judge or am I allowed --

15   Q.  Whatever makes you more comfortable.

16   A.  It's okay?

17   Q.  You can look wherever you want.  As long as you talk into

18   the microphone, I don't care.

19   A.  So, a formal injunction or a motion that we're talking

20   about here may actually put us out of business.

21   Q.  Why is that?

22   A.  So, from a financial point of view, what's happened ever

23   since the FTC has started going down the path of, I guess,

24   suing Lifewatch and talking to us, we've lost our ability many

25   times from credit card processors and ACH people.  So, today

1    let's say we have 66,000 clients.  A majority of them are

2    using recurring billing, which is through credit card

3    processors.  So, if they shut us off, the existing clientele

4    will have no way of funding us.

5            And I could go on and on as to why -- my personal

6    banking account has been terminated, and they said, "Because

7    the FTC is going against you, filing something against you."

8            So, I can only imagine if this happens, I really

9    don't know -- we didn't think about a plan of what to do.  We

10   actually have to -- we'd have to think about that.

11   Q.  And just to be clear, have you lost any credit card

12   processors since the FTC has initiated a suit against

13   Lifewatch?

14   A.  Yes, we have.

15   Q.  Which ones?

16   A.  There's been a few of them.  The biggest one that I can

17   recall who specifically said -- actually, I don't know who

18   said it, but somebody told them that the FTC -- something was

19   happening with the FTC, and TD Bank, our main processer, said

20   somebody told them -- and I don't recall if it was Life Alert

21   or who it was -- Lifewatch has been sued by the FTC, and on

22   the day after, they stopped our ability to process.

23   Q.  I want to jump back -- we've been talking a lot today

24   about these outside -- some people call them outside sellers;

25   others call them telemarketers, but we can call them whatever

1   you want.

2          But in terms of these outside sellers who do

3   telemarketing that Lifewatch has these contractual

4   arrangements with, do you have any specific knowledge as to

5   whether or not they're doing business with other competitors

6   in your industry?

7   A.  I have tons of knowledge of that since 2012, and even

8   maybe 2011, but -- and again, I don't know who's listening,

9   but --

10  Q.  Can you explain, give us some specific examples?

11  A.  Yeah.  Just Friday, I get -- I get calls in from

12  outside -- I'll call it outside marketers all the time that

13  want to do business not exclusively with us.

14         And the other day, they were telling me how Connect

15  America, Medical Guardian, Life Alert, Better Alarm, Life One,

16  and there are others, have been giving them existing IOs.

17  "Will you match it?  Will you pay more?  Will you pay less?"

18  It's every day.  But that's been going on for years, and there

19  is clear-cut evidence of that that I gave my lawyers.

20         And I have been listening earlier today, so I'm happy

21  that we're here, because when I heard the opening arguments,

22  this is -- you know, this is my life that we're talking about.

23  So, there's clear-cut evidence of this.

24  Q.  Let me ask you this, Mr. Sirlin.  If these are

25  non-exclusive arrangements -- the FTC has raised the issue

1  that some of these customers are transferred in realtime or

2  live to the Med Guard team, which is an affiliate of

3  Lifewatch, to verify the sale.  So, if they're not exclusive,

4  how are these calls transferring over in realtime?

5  A.  Right.  So, again, I was listening earlier to the opening

6  argument, and it -- I could transfer a call just by pressing a

7  different button.  It was a made a big deal, and I'm not

8  saying there's anything wrong with that; but from a

9  technological point of view, there's no reason they couldn't

10  just determine where to send that transfer to.

11        Plus, I have specific confirmed knowledge and e-mails

12  from people that have done transfers that are simultaneously

13  selling to others.  So, they did transfer, and they still are

14  selling to others.

15  Q.  Does that live -- does the transfer over to Med Guard on

16  some of these calls, does that help Lifewatch in any way in

17  terms of fulfilling the products and consummating the sale?

18  A.  It does.  It does.  It might be hurting us from the law

19  point of view.  I don't know how you interpret it.

20  Q.  Don't worry about that.  I'm just talking about from a

21  business point of view, how does that help you?

22  A.  Yes.  From our point of view, what it does for seniors,

23  they want to know clearly what they're getting, how they're

24  going to be billed, when they're going to be billed, and when

25  is it going to be received.

1        So, during that process, we're able to say, "You

2   clearly understand that the bill is going to start today.

3   Your cycle will not start today."  We give them a 10-day grace

4   period to make sure they get the equipment and receive it, but

5   it helps senior citizens be clear.

6        And a lot of this has started since 2012 because

7   there is no reason to want to get bad business.  None of this

8   makes sense.

9   Q.  Let's talk about that for a minute, the bad business for a

10  moment.  You know, the FTC alleges that Lifewatch is obtaining

11  many -- you've obtained many of your customers because of

12  various fraudulent misrepresentations about the product.

13       Let me ask you, from a business point of view, can

14  you explain to all of us why that simply just would be --

15  would not make sense from a business point of view?

16  A.  Yes, yes.  So, maybe we can throw it out, but I'm going to

17  take you through it.

18  Q.  Well, maybe explain the numbers to us.

19  A.  Okay.  So, this industry works this way, and then it

20  relates directly to us.

21       The piece of equipment that we supply at no cost to

22  the client is -- and I did bring a piece of equipment so

23  everyone sees what it is.  We're mailing a physical piece of

24  equipment.  This is just not just telling them we're billing

25  for something that they're not getting.

1   Q.  Mr. Sultzer asked you some questions about the

2   transferring of telemarketing calls in realtime; and I guess I

3   was having a little trouble understanding, so I want to make

4   sure I do, and that's really why I'm asking.

5          You said that a telemarketer could transfer a call to

6   another medical alert company by pushing a different button.

7   What do you mean?

8   A.  That is just my opinion.

9   Q.  No.  I'm asking you to explain, what is it that you mean?

10  A.  I am not into telephony, but --

11         THE WITNESS:  Do I have to answer this question?  I

12  don't understand.

13         THE COURT:  Well, if you don't understand the

14  question, then -- what don't you understand about the

15  question?

16         THE WITNESS:  He asked the question, and I answered

17  it.  You could transfer a call on your telephone, call

18  forward, call transfer.  That's what I'm saying.

19  BY MR. O'TOOLE:

20  Q.  So, you're saying that you think that telemarketers have

21  different transfer buttons on their phones, and they decide

22  who they're going to transfer a sales call to?

23  A.  I -- that is -- that would be my opinion, that it's

24  possible to do that.

25  Q.  And what's the basis for that opinion?  Have you ever seen

1    a phone like this that has a telemarketer --

2    A.  Yeah, I've seen phones, not from telemarketers, that you

3    can transfer and switch calls.  Just in my office, we take

4    calls in, and you can transfer it to other places.  That's not

5    a technological thing that I don't think exists.

6    Q.  You testified that the purpose of the verification -- and

7    you're using a company now called Med Guard, is that right?

8    A.  Correct.

9    Q.  The purpose is that you don't want to get bad business,

10   and then you explained the costs and how it would be

11   unprofitable for you to get bad business.

12   A.  And more than profit.  It's reputation.

13   Q.  Right.  And so you provide Med Guard with a script,

14   correct?

15   A.  I don't -- I don't know.

16   Q.  There's certain information that you require that Med

17   Guard get from customers.  I think you testified to some of

18   that.

19   A.  In an affidavit?

20   Q.  I think you testified actually today, some of the things

21   you want to make sure of, that they know --

22   A.  Yeah, Lifewatch, not me, but yes, Lifewatch.

23   Q.  So, during that Med Guard portion of the call --

24   A.  Not me personally, because sometimes I take it that way,

25   but yes, Lifewatch would provide that.

Baldwin - cross

1  Q.  So, Lifewatch would say, "This is the information we need
2  to get from customers to make sure that it's a good sale"?
3  A.  Yes.
4  Q.  And one of the questions that you ask is not, "Are you on
5  the National Do Not Call List," right?
6  A.  That is not what we do.  Would you like us to do it?
7  Q.  I'm just asking you if you have.
8  A.  If it would change things, I would do it.
9  Q.  You don't ask, "Were you told that a family or friend
10  referred you"?
11  A.  No.  So, that would get very confusing for a senior to ask
12  them that question.
13  Q.  So, you don't ask that question?
14  A.  We do not ask that question because it would get confusing
15  to a senior.  I would love to ask it because I don't want that
16  business.  Why would we want that?
17  Q.  Do you have Med Guard ask whether or not the consumer was
18  told that the American Hospital Association or the American
19  Diabetes Association recommended your product?
20  A.  We do not ask that.  And again, we probably could do that.
21  Q.  But you don't do that now?
22  A.  No one told us to.
23  Q.  You don't ask, "Did this sale come through a robo-call"?
24  A.  That would probably be confusing.  But again, if that's
25  what we decide -- all decide together to do, I'm open to that.

1  That's why we -- we want -- if there are issues, we want them

2  gone.

3  Q.  You don't ask them if they were told that they wouldn't

4  have to pay anything to return the product if they canceled?

5  A.  Repeat the question.

6  Q.  I'm sorry.  That was a poorly-phrased question.

7        One of the questions that you have Med Guard ask is

8  not, "Were you told that you won't have to pay anything to

9  return the product if you cancel it"?

10  A.  It's not, but we would happily pay to return equipment and

11  again to refund anyone that is not happy.  Why not?

12  Q.  So, your testimony is that if a consumer cancels their

13  contract with you, you always pay return shipping?

14  A.  You put the word "always" in there, so that is not my

15  testimony with always, but a lot of times we do.

16  Q.  And why do you do?

17  A.  Because it depends how long they've been with us.  There's

18  a lot of different variables.  And everything I do -- and by

19  the way, the same thing with the BBB.  We have an A-plus

20  rating with the BBB.  That is because -- and we have very --

21  under 100 complaints over these years.  So, for a business

22  this size, I -- I cried the first time I ever got a BBB

23  complaint.

24        This is -- when you grow a business with senior

25  citizens, you want to make them happy; but you can't always

 1  make them happy, so you do everything possible that you can.

 2  And that is how I preach and train people in my company.  And

 3  as you grow, there might be a weak link.

 4  Q.  When you testified, Mr. Sirlin, about the various costs

 5  that are involved in providing the equipment, it costs, you

 6  said, $100 to purchase the equipment, the medical alert

 7  device.  I think that's right, right?

 8  A.  Average, yes.

 9  Q.  And you pay $350 to the outside sellers for each sale?

10  A.  Outside companies that we buy sales from, on average, 350.

11  And if we do TV and radio direct, on average, 350.  Marketing,

12  average 350.

13  Q.  And then you pay a monitoring fee, you said, I think it

14  averages $3.50?

15  A.  Correct, per month.

16  Q.  And customer service costs 3 to 3.50?

17  A.  Yes.

18  Q.  Is that an internal cost, or is there an outsider you're

19  paying for that?

20  A.  That's an internal cost.  The outside does exist in the

21  industry.

22  Q.  But you don't pay outside?

23  A.  No.

24  Q.  And then you said something about a processing fee, but I

25  didn't actually --

1   A.  Credit card processors on average are 3 percent, 3 percent

2   cost per month, per transaction.  And they charge per

3   processing, too, so refunding and this and that -- and the

4   whole credit card processing thing, it's also self-regulated,

5   in my opinion.  They call us when they have problems with

6   charge-backs, so it's another way that we are able to monitor

7   issues.

8   Q.  When you have a charge-back, do they call you, or do they

9   send you a letter?

10  A.  So -- both.  And not me.  Lifewatch they call.

11  Q.  Do they ever only call for a charge-back?  Is there ever

12  an indication --

13  A.  No.  They follow up with -- in writing.

14  Q.  And those charge-backs that -- letters that come from the

15  processors, are those things that Lifewatch keeps?

16  A.  I don't know.

17  Q.  The letters?

18  A.  I don't know.

19  Q.  When you finished describing the costs of each product,

20  you said it takes you 15 to 18 months to break even on a

21  contract.  That's right?

22  A.  Correct.

23  Q.  What about when you sell the contract?  How long does it

24  take you to break even then?

25  A.  When I sell -- or when I did -- in the agreement with

1  Connect America?

2  Q.  Well, not just -- I'm sorry, not just Connect America,

3  but, yeah, Connect America.

4  A.  In 2012?  I never made any profit.

5  Q.  I'm sorry.  When you sold the contracts to Connect

6  America --

7  A.  It was a pass-through.

8  Q.  So, it didn't take you any time to break even; you broke

9  even right away?

10 A.  So, what happened in that situation was there was -- there

11 was a little situation where for basically every five clients

12 that they purchased, we were able to keep one.  But we did not

13 make any financial gain.

14 Q.  So, you just -- whatever it cost you to pay the

15 telemarketer --

16 A.  Passed right through.

17 Q.  Connect America paid it.

18        What about when you sell to other companies other

19 than Connect America?

20 A.  Now or back then?

21 Q.  Now.

22 A.  I don't.

23 Q.  You don't sell any contracts to anybody now?

24 A.  That I know of, no.

25 Q.  Other than Connect America, were there any companies you

1  sold contracts to in 2014?

2  A.  I don't believe so.

3  Q.  What about 2013?

4  A.  2012-'13 in my head is together, and yes.

5  Q.  And who was that?

6  A.  Philips Life Line and some others.

7  Q.  Do you know a company called SHS?  SHS.  I think it stands

8  for Safe Home Security.

9  A.  Safe Home Security, yes.

10  Q.  Do you sell contracts to them?

11  A.  Do I -- no, no.

12  Q.  Have you ever sold contracts to them?

13  A.  Not that I know of.

14  Q.  Okay.  I'm going to hand you -- this is Attachment V to

15  PX 1, Menjivar declaration.  These are financial statements

16  that Lifewatch provided to us in response to the Civil

17  Investigative Demand.

18          THE COURT:  And this is Plaintiffs' Exhibit 1?

19          MR. O'TOOLE:  Plaintiffs' Exhibit 1, Attachment V.

20          THE COURT:  V like Victor?

21          MR. O'TOOLE:  V like Victor.  It's actually docket

22  number -- actually, this is one of the sealed documents, your

23  Honor, so the way -- the public version of this is docket

24  No. 66.  This is one of the documents that we originally filed

25  and that we put a redacted version in.  I'm showing him the

1    redacted version so we don't have any problem with -- with

2    trade secrets or the like.

3           THE COURT:  Okay.  And this is a Lifewatch P & L

4    statement from January through December of 2011?

5           MR. O'TOOLE:  It's actually 2012 is later in this.

6           THE COURT:  I see.  So, there's four sets of P & L

7    statements, and the last one is January through August

8    of 2014?

9           MR. O'TOOLE:  Correct, your Honor.

10          THE COURT:  Okay.  Defense table, do you know what

11   we're talking about here?

12          MR. LIPARI:  Yes.  Your Honor, it's our understanding

13   that it's the publicly-available version of the financial

14   statement.

15          THE COURT:  Fine.

16          MR. O'TOOLE:  This is the document No. 66, the one

17   that we submitted after the motion to seal.

18          MR. LIPARI:  That's fine, your Honor.

19          THE COURT:  Fine.

20   BY MR. O'TOOLE:

21   Q.  Mr. Sirlin, do you know what these are?

22   A.  It's a profit and loss from December 2011, P & L.

23   Q.  Right.  Have you seen these documents before?

24   A.  Maybe.

25   Q.  Are you familiar with what goes in to these documents?

1  A.  As the CEO in general, but I have financial advisors.  So,
2  again, I don't want to sound like what you think I'm sounding
3  like.  It's --
4  Q.  No, I just want you to explain --
5  A.  We want to make money, and we want to help seniors, so
6  these things are important.
7  Q.  Okay.  So, turn to what's on the bottom of the page
8  marked -- it's 15 of 27.
9           THE COURT:  What's the Bates number?
10           MR. O'TOOLE:  It's page 6 -- the Bates number, that's
11  1980, FTC 1980.  It's also got a page 1 of 7 underneath that
12  on the page.
13           THE COURT:  1 of 7?
14           MR. O'TOOLE:  1 of 7, yeah, sorry.  It's page 15 of
15  27.
16  BY MR. O'TOOLE:
17  Q.  It says Menjivar Attachment V, page 15 of 27.  Do you see
18  where I'm at, Mr. Sirlin?
19  A.  Page -- I thought you were talking to him.  15 of 27.  I'm
20  on that page.
21  Q.  And the top of it is all blacked out?
22  A.  Yes, yes.
23  Q.  And then slightly below that, there's a line that reads,
24  "Total 42213, Monthly Monitoring Revenue," and it shows -- I
25  believe this means it shows a little more than $8 million in

1  monitoring -- I'm sorry, $11 million in monitoring revenue for
2  2012 -- or I'm sorry, 2013, is that correct?
3  A.  It sounds reasonable.
4  Q.  Just below that is a heading called, "43010 Selling," and
5  below that, a heading, "Sale of Customer Accounts."  Do you
6  see that?
7  A.  I do.
8  Q.  And just below that is the account No. 42250, SHS, and
9  that shows $20,655,000 roughly, is that correct?
10 A.  That's what it shows here.
11 Q.  So, does that suggest that Lifewatch sold $20 million
12 worth of accounts to SHS?
13 A.  In what definition from the earlier question?  I -- this
14 could be a total -- we should have financial people look at
15 this.  This -- I don't even know the point.
16 Q.  So, you don't know --
17 A.  Six -- SHS --
18 Q.  What I'm trying to find out is what this number means.
19 A.  I don't know.
20 Q.  But as far as you know, you didn't get $20 million for
21 accounts from SHS in 2013?
22 A.  Not that I know of.
23 Q.  As far as you know, you didn't get any money from SHS --
24 A.  No.  But again, along the way, to grow a business like
25 this, you -- I have gone to outside funding sources.  So, I

1    So, do you want to repeat your question?

2  BY MR. O'TOOLE:

3  Q.  So, my question, Mr. Sirlin, is that on page -- I'm sorry,

4  well 22 of 27, the monthly monitoring revenue of nearly

5  $6 million --

6    THE COURT:  Do you want to just indicate what line

7  you're talking about?

8    MR. O'TOOLE:  So, it's line -- I'm sorry.  I didn't

9  realize there were lines.

10  BY MR. O'TOOLE:

11  Q.  On line 24 -- on the left-hand side of the margin, there's

12  numbers?

13  A.  Yes.

14  Q.  On line 24, it shows monthly monitoring revenue of

15  $5,864,080.63.

16  A.  Yes.

17  Q.  And what I'm asking you is:  Is that what Lifewatch --

18  approximately, at least, what Lifewatch earned from the

19  sale -- from the monthly fees paid by consumers for the period

20  January through August of 2014?

21  A.  I could answer that.  I'd just have to do the math.  I

22  haven't looked at it recently, but January -- how many months

23  are we talking about?

24  Q.  The document says -- and this is -- this is a profit and

25  loss statement, by the way, that Lifewatch provided to us.

1  A.  Yeah.

2  Q.  January through August of 2014, so eight months.

3  A.  Right.

4  Q.  A little under $6 million.

5       THE COURT:  What he's asking is:  Does $6 million in

6  monitoring revenue sound like it's in the ballpark for eight

7  months in 2014?

8       THE WITNESS:  For eight months in 2014, it does.

9       MR. O'TOOLE:  Thank you, Judge.

10  BY MR. O'TOOLE:

11  Q.  A few lines down on line 28, under the heading, "Selling,

12  Sale of Customer Accounts, SHS," it shows $13,331,575.  And

13  what I'm asking is:  Is that the amount that Safe Home

14  Security paid to Lifewatch for accounts in that eight-month

15  period?

16  A.  And that, I do not know that -- I don't know that.

17  Q.  Do you know that -- if Safe Home Security paid any money

18  to Lifewatch for accounts in 2014?

19  A.  I don't know.  But again, can -- Safe Home is no one that

20  I'm affiliated with, but the CEO of Safe Home, I do know.

21  Q.  And who is that?

22  A.  Dave Roman.  And I know who he is.

23  Q.  Does he have a role at Lifewatch?

24  A.  Yes, he does.

25  Q.  What's his role at Lifewatch?

1  could.

2  Q.  Lifewatch --

3  A.  The industry doesn't need any tricks.

4  Q.  Miss Baker testified --

5  A.  There's a huge demand for this.

6  Q.  Miss Baker testified and her declaration said that

7  Lifewatch currently has seven outside sellers, correct?

8  A.  And other marketing things.  We're only talking about

9  that.  But if that's what we want to talk about, yes, there

10 are seven right now.

11 Q.  So, the seven that could be using telemarketing?

12 A.  Yes.

13 Q.  So when Ms. --

14 A.  Outbound telemarketing, because there are others that you

15 guys might use in the definition of telemarketing.

16 Q.  So, if Lifewatch wanted to review the scripts of those

17 seven companies, how big a burden would that be?

18 A.  That wouldn't be a major burden for seven companies.

19 Q.  But Lifewatch doesn't review the scripts?

20 A.  We listen to enough of the recordings to know.

21 Q.  Do the recordings include robo-calls?

22 A.  The ones that I've heard of don't.

23 Q.  And they couldn't, could they?

24 A.  I don't understand.

25 Q.  Would it be possible?  Your understanding of --